PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name VASQUEZ, Adam A.
(Last) (First) (Initial)

Prisoner Number H-10787

Institutional Address P.O. Box 689, Soledad, CA 93960

Correctional Training Facility - Central

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SI (PR)

ADAM ANTHONY VASQUEZ,
(Enter the full name of plaintiff in this action.)

vs.

B. CURRY, Warden, et al.,
(Enter the full name of respondent(s) or jailor in this action)

CV 08 0268

Case No.
(To be provided by the clerk of court)

PETITION FOR A WRIT OF HABEAS CORPUS

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Los Angeles County Superior Ct. Los Angeles, CA 90012
Court Location

(b) Case number, if known VA 008488

(c) Date and terms of sentence 9/12/91, 15-years-to-Life

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes XXX No ____

Where?

Name of Institution: Correctional Training Facility

Address: P.O. Box 686, Soledad, CA 93960-0686

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Homicide of the second degree

§ 187

3. Did you have any of the following?

Arraignment: Yes _XX_ No ____

Preliminary Hearing: Yes _XX_ No ____

Motion to Suppress: Yes ____ No _XX_

4. How did you plead?

Guilty _xx_ Not Guilty ____ Nolo Contendere ____

Any other plea (specify) ________________

5. If you went to trial, what kind of trial did you have?

Jury ____ Judge alone____ Judge alone on a transcript ____

6. Did you testify at your trial? Yes ____ No ____

7. Did you have an attorney at the following proceedings:

(a) Arraignment Yes _XX_ No ____

(b) Preliminary hearing Yes _XX_ No ____

(c) Time of plea Yes _XX_ No ____

(d) Trial Yes ____ No ____

(e) Sentencing Yes _XX_ No ____

(f) Appeal Yes _XX_ No ____

(g) Other post-conviction proceeding Yes ____ No _XX_

8. Did you appeal your conviction? Yes _XX_ No ____

(a) If you did, to what court(s) did you appeal?

Court of Appeal Yes _XX_ No ____

Year: ______ Result:________________

Supreme Court of California Yes _XX_ No ____

Year: ______ Result:________________

Any other court Yes ____ No _XX_

Year: ______ Result:________________

(b) If you appealed, were the grounds the same as those that you are raising in this

petition? Yes ____ No XX

(c) Was there an opinion? Yes XX No ____

(d) Did you seek permission to file a late appeal under Rule 31(a)?

Yes ____ No XX

If you did, give the name of the court and the result:

______________________________

______________________________

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes XX No ____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court: Los Angeles County Superior Court

Type of Proceeding: habeas corpus petition

Grounds raised (Be brief but specific):

a. state/federal denial of due process

b. state/federal denial of equal protection

c. ______________________________

d. ______________________________

Result: petition denied Date of Result: 7/31/07

II. Name of Court: Second Dist. Court of Appeals/Div 8

Type of Proceeding: habeas corpus petition

Grounds raised (Be brief but specific):

a. (See attached)

b.

c.

d.

Result: denied Date of Result: 10/16/07

III. Name of Court: California Supreme Court

Type of Proceeding: Petition for Review

Grounds raised (Be brief but specific):

a. (See attached copy of writ and Exhibits)

b.

c.

d.

Result: denied Date of Result: 12/12/07

IV. Name of Court:

Type of Proceeding:

Grounds raised (Be brief but specific):

a.

b.

c.

d.

Result: Date of Result:

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____ No____

Name and location of court:

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

need more space. Answer the same questions for each claim.

[Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: ______________________________

PLEASE SEE ATTACHED PAPERWORK

Supporting Facts: ______________________________

Claim Two: ______________________________

Supporting Facts: ______________________________

Claim Three: ______________________________

Supporting Facts: ______________________________

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

ALL ISSUES ALLEGED HEREIN ARE FULLY EXHAUSTED

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038

Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063

In re Scott (2005) 133 Cal.App.4th 573

In re: Montgomery (2ndCiv. 2007) DJDAR 16717, 16722

Do you have an attorney for this petition? Yes____ No_X_

If you do, give the name and address of your attorney:

_______________________________________________

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on Jan. 1, 2008 — Adam Vasquez

Date — Signature of Petitioner

(Rev. 6/02)

# ATTACHMENT

Court of Appeal, Second Appellate District, Div. 8 - No. B201740
**S157602**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ADAM ANTHONY VASQUEZ on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

DEC 12 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

**This petition concerns:**

☐ A conviction ☒ Parole

☐ A sentence ☐ Credits

☐ Jail or prison conditions ☐ Prison discipline

☒ Other *(specify)*: State and federal denial of due process and equal protection

1. Your name: Adam A. Vasquez

2. Where are you incarcerated? Correctional Training Facility, Soledad, CA 93960

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Second degree murder on a theory of aiding and abetting

b. Penal or other code sections: P.C. § 187

c. Name and location of sentencing or committing court: L.A. County Superior Court, 210 W. Temple St., L.A., CA 90012

d. Case number: VA 008488

e. Date convicted or committed: 8-28-1991

f. Date sentenced: 9-12-1991

g. Length of sentence: Fifteen (15) years-to-Life

h. When do you expect to be released? Unknown; M.E.P.D. was on 8-19-2001

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

Mr. R. Trejo, L.A. County Public Defenders Office, 111 N. Hill St., L.A., CA 90012

4. What was the LAST plea you entered? *(check one)*

☐ Not guilty ☒ Guilty ☐ Nolo Contendere ☐ Other: ________

5. If you pleaded not guilty, what kind of trial did you have?

☐ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On January 25, 2007, Adam Vasquez (Petitioner) appeared before the Board of Parole Hearings (BPH) for his 3rd subsequent hearing (4th overall), during which Ms. J. Thompson was Presiding Commissioner and Ms. J. Eng was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Mr. R. Rutledge. A staff psychologist, Dr. E. Rueschenberg, Ph.D., testified utilizing a filed Report dated: 1-17-05, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 2000 and 2003 are attached as Exhibit "B". A copy of the

b. Supporting cases, rules, or other authority (optional): (continued on attached pages)

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

(**continued from previous page**):

2006 Counselor's board report is attached as Exhibit "C" and was prepared and filed but not cited to at the Hearing. Copies of the 2005, 2003 and 2001 BPT Decisions denying parole are attached hereto as Exhibit "D" and are clearly anecdotal evidence to further advance the allegation of a "no parole" policy and/or practice that has been held to be unconstitutional as well as illegal by all courts that have ruled on the subject matter and, with the Court's leave, are also incorporated by reference to this pleading as though fully set forth herein.

Also present at the hearing was d.d.a. Ms. J. Glidden, parole division.

Parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1] (2002) 29 Cal.4th 616, 661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him suitable for parole and set his prison term and a parole date because, when his MEPD lapsed, his parole was evaluated to no longer pose an unreasonable risk of danger to society or public safety. (Penal Code (PC) §3041(a); 15 California Code of Regulations (CCR) §§ 2280, 2281(a).)

In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied parole if the commitment offense was especially egregious when compared to other instances of the same offense. Such cases, however, are *exceptions*, and not per the rule. Accordingly, the conduct of an up-to-life sentenced inmate who committed second degree murder **must** be especially violent when compared to that of other second degree murderers for parole to be denied on the basis of the offense in the case of an otherwise qualified inmate. However, the offense cannot serve as a basis for denying parole interminably. In re Ramirez (2001) 94 Cal.App.4th 549, 569-570; Rosenkrantz V, 658. (cf: Biggs v. Terhune (9th Cir. 2003) 34 F.3d 910; Irons v. Warden (E.D. Cal. 2005) 358 F.Supp.2d 936; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 (Martin I); Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1036 [Rosenkrantz VI].)

Here, Petitioner did not actively engage either victim nor intended any violent consequences and he was therefore sentenced as an aider and abettor who cannot have committed any crime in any definitive criteria which would suggest that his crime was committed in "an exceptionally cruel manner" nor with an "especially

---

[1] There have been seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80 Cal.App.4th 409; Davis v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002) 29 Cal.4th 616; In re Rosenkrantz L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1036.

callous disregard for the suffering of another" because he did not intend the logical consequences of the actual perpetrator and had no specific intent to do any harm to anyone such as this wanton murder of an innocent.

Substantive due process requires that the grounds set forth by a BPH panel for its decision must be supported by at least some credible, relevant evidence in the record. The panel was required to base its findings on a weighing of all relevant, reliable evidence. (15 CCR § 2281(b); In re Minnis (1972) 7 Cal.3d 639, 646; In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-427 (Rosenkrantz V); Rosenkrantz V, 655; Ramirez, supra, 566. The "some evidence" standard is satisfied if there is substantial, reliable evidence in the record that could support the conclusion reached. Powell v. Gomez (9th Cir. 1994) 33 F.3d 39, 40; Cato v. Rushen (9th Cir. 1987) 824 F.2d 703, 705. And federal due process requires substantial evidence having indicia of reliability Jancsek v. Oregon Bd. Of Parole (9th Cir. 1987) 833 F.2d 1389, 1390; In re Powell (1988) 45 Cal.3d 894, 904; Rosenkrantz V, 658; McQuillen, supra, 306; Biggs, supra, 915; Caswell v. Calderon (9th Cir.2004) 363 F.3d 832, 839.

> Black's Law Dictionary 5th Ed. 1979 defines **SUBSTANTIAL EVIDENCE** as follows:
> "Such evidence that a reasonable mind might accept as adequate to support a conclusion. ***It is that quality of evidence necessary for a court to affirm a decision*** *of an Administrative board*. (Black's p. 1281, citing State v. Green (1974) 544 p.2d 356, 362. emphasis added.)

The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due process violation must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause, and then show that the procedures that led to the deprivation were constitutionally insufficient. Kentucky Dept. of Corrections v. Thompson (1989) 490 U.S. 454; McQuillen, supra, 900.

In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a protected liberty interest in parole, and the denial of one or more of the procedural protections that must be afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in 1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." McQuillen, supra, 901 (citing Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 7 and Board of Pardons v. Allen (1987) 482 U.S. 369, 373. Because no evidence supported the panel member's finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to "public safety," and the finding was inapposite to the record, parole denial on that basis subverted due process and substantiates those who contend that this state is without an excuse as to why the denial rate is what it is.

The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that his parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p. 84) the sole ground set forth by the panel in support of its Decision to AGAIN, for the second (4th) time, deny suitability and dismiss his warrant of parole which is tremendously long overdue! (His M.E.P.D. was 8-9-2001.)

Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence and abrogated due process because it is supported by **NO** EVIDENCE whatsoever. **All** of the competent, professionally-sanctioned evidence that addresses Petitioner's current **and** future dangerousness, parole risk, etc., found it to be "low to moderate," "less than the average citizen," or "below average," nor has it been for over a decade. "Significantly, ***the evidence underlying THE DECISION must be supported by '"some indicia of reliability."'*** Rosenkrantz VI, supra, at p. 1083, emphasis added. (See again Exhibit "B", Exhibit "A", at pp.48-49.)

Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in Petitioner's records that addresses his dangerousness and parole "risk" all assess these factors to be low. And, because not a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole relevant reason for finding him unsuitable for parole sensibly suggests this was an illegitimate (ongoing) basis for denial. Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1039, (Martin I), Martin v. Marshall 448 F.Supp.2d 1143, (Martin II), et al.

In Martin II, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual consideration and in her July 21, 2006 Memorandum and Order she stated:

"In light of the Board's apparent abandonment of its independent role"—**which occurred AFTER Governor Schwarzenegger took office---**, "*the court finds that a remand would indeed be futile*." There can be no question but that the implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY THE WILSON, DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

In Rosenkrantz V, supra, at p. 655, the Supreme Court explained that parole release decisions "entail the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-case basis and the BPH's discretion in that regard is almost unlimited. Notwithstanding that the BPH's discretion is exceedingly broad, it is circumscribed by the requirements of procedural due process. (Rosenkrantz, id., Calif. Const. article I, § 7(a), and statutory directives mandating a fair and unbiased Hearing.)

Absent substantial evidence of the presence of unsuitability factors, there must be some relevant, reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad discretion in its parole decisions, the Findings must reflect "*an individualized consideration of the specified criteria and cannot be arbitrary or capricious.*" Rosenkrantz V, supra, 677; "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, 914.

The failure to properly consider the post-incarceration factors highlights the inherent misunderstanding and application of the "some evidence" standard and triggers the required scope of judicial review of the federal questions presented here.

There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears that the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given to subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC § 3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its Findings under both sets of criteria and any balanced and reasonable interpretation should compel this approach throughout the entire process due any inmate and to do so would virtually assure a Finding of suitability.

Factors TENDING to show suitability or unsuitability must be weighed and balanced within the parameters of a standard of proof. Without this critical, reliable component, the process is inherently arbitrary, capricious, and defective. This standard-less analysis would vitiate the individualized consideration held appropriate in Rosenkrantz V. The crux of the matter is that of a standard of proof with indicia of reliability as set forth below and reinforced with significant legal precedent.

The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's decisions. It is only one aspect of *judicial* review employed by a habeas court. Edwards v. Balisok (1997) 520 U.S. 640, 647. And, if the Rosenkrantz V decision implies, as it does, that the "some evidence" standard should be applied to the BPH Findings, then this is a clear and unreasonable application of well-established federal Constitutional law set forth by the High Court. Nothing in Superintendent v. Hill (1985) (Hill) 472 U.S. 445, 456, implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive body outside a disciplinary committee within an exigent-circumstances prison setting that has no pressing need for more formal

evidentiary standards or anything warranting standard-less precedents

What IS implied by the Rosenkrantz V court, when it held that a habeas court can't reverse a decision denying parole even if it determines that the evidence overwhelmingly preponderates towards a finding of suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary and capricious decision, and worse, stymies effective judicial review. This court is not obliged nor compelled to defer to a state decision misapplying federal constitutional principles. Hubbart v. Knapp (9th Cir. 2004) 379 F.3d 773, 780; referencing Mullaney v. Wilbur 421 U.S. 684, 691; see also Peltier v. Wright (9th Cir. 1994) 15 F.3d 860, 862.

In Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference to the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's contention that respondents seek to avoid federal review by asserting that the "some evidence" standard 1) is applied by the BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a finding of a defective pre-Decision process.

If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with reliable, articulate proof, it would have logically flowed that he is now MORE suitable than his previous hearing wherein he encouraged that if he continued his positive programming and rehabilitation he would likely be found suitable. (Exhibit "B".) All those laudatory words at his Hearing would have had a consistent ring of truth to them in that he has progressed towards a more-suitable mien, not the reverse. This highly illegal "boilerplate" denial now rises to the level of a federal due process violation. Biggs, supra, pp. 916-917; Martin I, supra, p. 1042.

Please note that the previous Decisions denying parole also gave advice; the present denial is almost a carbon copy of the last panel's decision. This summary denial of suitability leading to parole now rises to the level of a federal due process violation. Biggs, supra, p. 917; Martin I, supra, pp. 1048-49.

The High Court in Greenholtz (at p. 7) Allen (at p. 373) , supra, established that:

> "While there is no constitutional or inherent right of a convicted person to be con- ditionally released before the expiration of a valid sentence, a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." (Citing McQuillen, supra, at 901.)

In the absence of any evidence in the record supporting the BPH's decision, remanding the case back to be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II, supra, p. 1015-15;

Martin II, supra, p. 1145; Rosenkrantz VI, supra, p. 1087.

A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed form. The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041 (b) to "swallow" the due process required under the 14th Amendment, an ingestion violating the equal protection guarantees and abridges Petitioner's civil rights under both state and federal Constitution's proscription against this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268; Ramirez, supra, at 570; Rosenkrantz V, at pp. 658, 683.

> "Judicial oversight must be extensive enough to protect the limited right of parole applicants "'to be free from an arbitrary parole decision ... and to something more than mere pro forma consideration.'" [citation omitted] The courts may properly determine whether the [BPH]'s handling of parole applications is consistent with the parole policies established by the Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ] Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper function of judicial review to ensure that the [BPH] has honored in a '"practical sense"' the applicant's right to '"due consideration."'" [ ] Ramirez supra, at 564.

(Since it is clear that parole should be the rule and not the exception, a moderate or average risk cannot be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception would "operate so as to swallow the rule that parole is 'normally' to be granted. Rosenkrantz V, at pp. 658, 683.)

> "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety ... {However] the [BPH] '"shall normally set a release date."' [citation omitted] The [BPH]'s authority to make an exception ... should not operate to swallow the rule that parole is 'normally' to be granted. ...Therefore, a life term offense must be *particularly egregious* to justify the denial of a parole date. In order to comply with the parole policy established by the Legislature in P.C. § 3041, the [BPH] must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes." (Ramirez, supra, at 570, disapproved on other grounds, emphasis added as usual in published cases.)

The applicability of this standard to the review of decisions applies and Petitioner's right to due consideration does not appear to have been honored in any practical sense by the panel in this case and their Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with the controlling rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell (2001) 94 Cal.App.4th 1017, 1030.)

In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found that there was not some evidence that Smith's crime was more callous than the average second degree murder.

There was nothing to "distinguish th[e] crime from other second degree murders ... the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and counselor[s] concerning [his] dangerousness."

Surely the same must appear to be true here. (See Exhibits "B" and 2004 Correctional Counselor, Level I (CC-I) Board Report as Exhibit "E", p. 4, attached.) The Second District Court of Appeals, in the case of another life-term inmate named Smith similarly found no evidence to support a parole denial based on the commitment offense. In re Smith (2003) (Smith I) 109 Cal.App.4th 489.

Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed the BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence show[ed] no more callous disregard for human suffering than is shown by most second degree murder offenses." (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th 538, Scott II.)

On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton adopted the Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and Wilson (and NOW Governor Schwarzenegger, too. See infra at p. 3), had/have panels with a sub rosa "no parole" policy and were/are carrying it out. Martin I, supra, pp. 1048-49; Martin II, supra, p. 1144; (see Coleman and Final Order, attached as Exhibit "F".)

It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the state can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a statute. Our Court, in the entire history of the statute, has never construed it with any adequacy according to the plain meaning to create guidance and instill compliance by both the BPH panels and those who serve the governors otherwise, although it would seem enough time and toil has passed to have done so.

Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO *NOT* reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the agency's burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of judicial guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of evidence (or lack thereof) although these persons are arguably unqualified by a dearth of professional standing to make these determinations upon which a federal liberty interest depends.

Determining the legality and weight and of evidence requires some specific legal training in evidentiary law; not by lay persons, and which lack of training is visibly evident in the incongruously inapposite findings thus made. (McQuillen I, supra, 907-912; Rosenkrantz V, supra, 680; Rosenkrantz II, supra, 424-426; Smith II, supra, 361; Smith I, supra, 501-506.) These are only a few of the published cases but unpublished absurdities exponentially abound!

The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified factors relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of whether the *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.) This is the first time a published decision on the BPH has even mentioned a burden of proof. This reference infers the BPH must honor this evidentiary standard as faithfully to the letter as legally possible.

Yet there is no settled bright line rule for a court to determine if the BPH has met that standard. Just the opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not meet the standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

The Third District Court of Appeals stated the following as fact:

> "It is without doubt that a blanket no-parole policy would be contrary to the law, which contemplates that persons convicted of murder without special circumstances may eventually become suitable for parole and that, when eligible, they should be considered on an individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In Roberts v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's old indeterminate sentencing law, the Court condemned a blanket parole policy that was contrary to the statutory parole scheme then in place. It appeared that the statutory law *allowed a prisoner to apply for parole after serving ONE YEAR* but that, **contrary to the statute, the parole authority adopted a rule precluding application until one-half the sentence was served.**
>
> The Court held that, '"while the prisoner had no right to apply to release on parole at any time, ***he was entitled to apply*** and have his application duly considered on an individualized basis."' Id. at 640-641.
>
> (Does this sound familiar? Emphasis added to original citation.)

> "With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole and, when suitable for parole, by determination of a release date **in a manner that will provide** UNIFORM TERMS for offenses of similar gravity and magnitude with respect to their threat to the public." (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4th 280, 291-292.)

The arbitrary or capricious misapplication of statutory law violates both state and federal due process. Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165 Cal.App.3d 763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary action of

government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860, 862; ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14th Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined."].)

In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner may derive a due process liberty interest from administrative regulations, as well as state law and the U.S. Constitution.

Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from on p. 484, fn. 5; Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these standards here, the BPH violated Petitioner's right to constitutional due process but he is not challenging the BPH's right to conduct professional psychological assessments as the main focus of the parole evaluation process, but does challenge their "normal" practice of summarily dismissing and patently ignoring their own experts.

Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons v. Warden (E.D. Cal. 2004) 358 F.Supp.2d 936 (9th Cir. Review pending, filed on 5-18-05, No. 05-15275), discussed this conundrum and noted that the propensity analysis thusly:

> "To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after 15 or so years in the cauldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite recognized hardships of prison, [petitioner] does not possess these attributes, the predictive ability of the circumstances of the crime is near zero." [2]

---

[2] "It is worth noting, as has our [Calif.] Supreme Court (*People v. Murtishaw* (1981) 29 Cal.3d 733, 768, disapproved on other grounds in *People v. Boyd* (1985) 38 Cal.3d 762,, that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (See, e.g., Monahan, *Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility*, 57 Wash. & Lee L. Rev. 901 (2000); Otto, *On the Ability of Mental Health Professionals to 'Predict Dangerousness,'* 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., *The Accuracy of Predictions of Violence to Others*, 269, Jour.Am.Med.Assn. 1007 (1993); Diamond, *The Psychiatric Prediction of Dangerousness*, 123 Pa.L.Rev. 439 (1974); Dershowitz, *The Law of Dangerousness: Some Fictions About Predictions* (1970) 23 J. Legal Ed. 24. According to a Task Force of the American Psychiatric Assn., "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Rpt. 8, *Clinical Aspect of the Violent Individual* (1974) at p. 28.) As our [Calif.] Supreme Court has also noted, "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated BEYOND DISPUTE the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take place ('false positives'", thus branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306, 327.) (all emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II, supra, footnote #9.

(Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion of "need for more therapy" used as a ruse to deny suitability at p. 948.)

P.C. § 3041(a) governs parole suitability determination processes and does not define more than one class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an indeterminate term. Through application, however, the agency's discrimination amongst the class serving indeterminate sentences is in violation of the right to equal protection ensconced in the Fourteenth Amendment. Equal protection is "[in essence] a direction that [a person] similarly situated should be treated alike." (City of Cleburne v. Cleburne Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457 U.S. 202, 216, "To state a claim ... for violation of the Equal Protection Clause of the 14th Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194, cert. denied 525 U.S. 1154 (1999).)

Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969) 394 U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being considered when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at 1012; Martin I, supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing Coleman, supra, with approval slip op. at 9] If it is established that a particular judgment was predetermined, then a prisoner's due process rights will have been violated even if there is 'some evidence' to support the decision. [See Bakalis v. Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making "body that has prejudged the outcome cannot render a decision that comports with due process. ... The California Supreme Court has explicitly stated that a blanket no-parole policy as to a certain category of prisoners is illegal. [In re Minnis; In re Morrall] " ... Because petitioner cannot change the past, denying [P]etitioner parole based only on the facts surrounding the crime itself effectively changes his sentence ... into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf: Martin II, supra, at 1144: "In sum, the Board appears to have capitulated to the blanket no-parole policy described by this court in its previous [Martin I] Order, abandoning its role as an independent assessor of petitioner's eligibility. This capitulation is particularly troubling in light of the Board' vigorous assertions of independence during the 2003 hearing." This Honorable Court should grant the writ and Order all appropriate relief including a complete discharge from custody and sanction full redress for Petitioner.

CONCLUSION

WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available remedies leading to his immediate release from custody be Ordered at the earliest possible moment and forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above should there be consideration of the "no parole" policy and/or practice by this or previous administrations.

7 Ground 2 or Ground ______ (if applicable)

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETITONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a. Supporting facts:

Nowhere is there any codification that avers petitioners must prove his or her suitability. Only if an inmate is found unsuitable does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz at 658, 683.) Evidence must be specific, articulable, and have "some indicia of reliability." Respondents have the burden of proof to demonstrate, in the Record, why an inmate is not suitable and a denial of more than one year requires that the BPH panel state for the Record why it isn't likely that petitioners would be found suitable any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041 (a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature intended that some inmates will be suitable at an initial hearing otherwise why would such a gratuitous mandate exist? Govenor's-level review presumes a neutral, well-defined, professional body that will follow all the state and federal laws. Only this practice

(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

Ground 2, continued:

would meet the constitutional burden under the discretionary methods needed to quickly resolve an uncertain matter.

The "some evidence" relied on to deny parole must be relevant and reliable in establishing Petitioner is a <u>current</u>, unreasonable threat to public safety and must not be grounded in an incomplete or unreasonable assessment of the relevant factors.

In explaining what the "some evidence" standard meant, the Court in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 at 677, stated that "[o]nly a modicum of evidence is required." On its face, this standard could thus be seen as remarkably broad--that a scintilla of evidence (or the BPH's assessment of it)--would be enough to completely immunize BPH decisions from judicial review. However, such a reading would effectively serve to nullify the <u>Rosenkrantz</u> court's holding rejecting the Executive's position that factual decisions rejecting parole were immune from examination by the courts and in point of fact were required.

A disection of the "some evidence" standard itself--both conceptually and through a review of the application of the <u>Rosenkrantz</u>' standard (and its progeny)--makes clear that this is the meaningful standard. Properly understood, it strikes an appropriate balance between judicial deference to difficult BPH decisions and the protection of constitutional liberty interests.

The "some evidence" standard of review is laid out here:

> "[W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the [BPH] denying parole in order to ensure that the decison comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPH] supports the decision to deny parole, <u>based upon the factors</u>

specified by statute and regulation. Rosenkrantz, 658. "[a]s long as the [BPH] decision reflects due consideration of the specified factors as applied to the INDIVIDUAL PRISONER in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [BPH] decision." Id. at 677. (emphasis added).

Thus, the inquiry into whether there is "some evidence" is more complex than it might otherwise seem, as the standard MUST be applied within the context of the statutory framework in which it arises. This framework imposes at least 3 requirements on the "some evidence" standard if it is used to deny parole.

First, the BPH must base their decisons only on evidence that serves to establish that the inmate will or will not pose a continuing, "unreasonable risk of danger to society if relesed from prison." CCR, title 15, §2402(a), and PC §3041(b).

Second, the evidentiary basis for parole decisions must be based on the factors specified in the regulations after individualized considerations of all of the factors. Rosenkrantz at 677 ("The precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [executive branch], but the decision must reflect an individualized consideration of the specified criteria and CANNOT BE ARBITRARY AND CAPRICIOUS."); see also In re Stanley (1976) 54 Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the prisoner's record of crime. We abstain from any argument over the relative primacy of various parole factors. It is enough to say that the Adult Authority must apply all the factors.") (citing In re Minnis (1972) 7 Cal.3d 639). These factors naturally all relate to whether the inmate poses **a continuing, unreasonable risk of danger to society if released from prison**. (emphasis added).

Third, the evidence upon which the BPH relies must be relevant and reliable. CCR §2402(b) ("All relevant, reliable information available to the panel shall be considered in determining suitability for parole.") (cf. CCR §§2402(d)(1-9).

In sum, a court examining parole decisions must determine whether, after all consideration of all the factors enumerated in the statute and regulations, the decison was based on: 1) some evidence; 2) a reasonabe consideration of all the factors specified by the statutory guidelines; 3) evidence that is both relevant and reliable; and 4) factual determinations that suggest an inmate poses a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

A review of the post-Rosenkrantz legal panorama reveals that California courts of appeals and federal courts have routinely applied the above boundaries and checkpoints of relevance, reliability and reasonableness to the "some evidence" standard. The California Supreme Court has so far utterly failed to establish a brightline Plimsoll mark to define the full depth of the inquiry.

The courts continue to assess the reasonableness of the BPH's interpretation of the facts and circumstances used to legally sustain a finding of parole suitability denial. The court in In re Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the BPH was reasonably able to conclude that there was some evidence of the inmate's need of continuing therapy and her dangerousnes to the public. Though it found in the affirmative, the court took a close look at whether the BPH "could reasonably conclude that [her] defense, that Manson's influence overwhelmed [her], was exagerated such that she is fully responsible for the LaBianca murders" and whether "[t]he BPH could infer with sufficient

reasonableness to satisfy a minimal 'some evidence' standard that [she] is a danger to the public and in need of continued therapy and programming." Her denial was affirmed with instructions.

Judicial inquiry into the stated reasons for parole denial have their place and numerous state and federal courts--in a wide range of contexts--have similarly held the judicial inquiry into the reasonableness of BPH determinations and conclusions is appropriate, even when such determinations and conclusions are accorded broad deference. (See, e.g., In re Farley (2003) 109 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody determination is limited to determining whether the classification decision is arbitrary, capricious, irrational, or an abuse of the discretion granted those given the responsibility for operating prisons. While we must uphold respondent's classification action if it is supported by "some evidence" and we must afford great deference to an administrative agency's expertise, where the agency's interpretation of the regulation is clearly arbitrary or capricious or has no basis, COURTS SHOULD NOT HESITATE TO REJECT IT."

Federal courts likewise require parole decisions to be reasonable. As an example, in a parole rescission case, a federal court in this state held: "the Court of Appeals conclusory findings that there was 'some evidence' to support the rescinding, the BPH's decision that parole was improvidently granted to petitioner are contrary to clearly established federal law and, to the extent they are fact-based, represent unreasonable determinations of the facts in light of the evidence presented in the state court preceedings." Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at 43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

948 ("Clearly, a conclusion by lay BP[H] commissioners that petitioner has not yet acheived required therapy for insight OR OTHER REASONS is not reasonably sustainable, and a state court's conclusion to the contrary is patently unreasonable.")

The federal liberty interest is made an adjunct to the state requirements of due process by and through the 14th Amendment to the U.S. Constitution and the substantial evidence of the federal standard must be overcome to meet federal guarantees to its citizens who, before they became entitled to state civil rights, were first bestowed by operation of their federal citizenship. A state cannot lawfully deny any federal right to its citizens but that is exactly what respondents are demanding of their agents in the BPH, and will no doubt now ask this Honorable Court to signoff on. That must not be allowed if the judiciary is to be truly separated from the Executive charades disguised is a legitimate exercise in freedom.

The goal of indeterminate sentences and the parole system is not only to punish, but also to provide for reformation and rehabilitation as the CDC's renaming suggests:

> "The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to past life and habits of a particular offender. ... Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence."

People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discussion of this topic, the Supreme Court stated the following:

> "[T]he purpose of the indeterminate sentence law, like other modern laws in relation to the administration of criminal law, is to migitate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender.

> They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing. [...] [The] interests of society require that under prison discipline every effort should be made to produce a reformation of the prisoner. ... The legislative policy [was to provide a system whereby] a hope was to be held out to prisoners that through good conduct in prison and a disposition shown toward reformation, they might be permitted a conditional liberty upon restraint under which they might be restored again to society. ... Although good conduct while incarceratd and potential for reform are not the only relevant factors, this court has acknowledged their significance. Furthermore, the Authority has declared that these factors are among those of 'paramount importance. In re Minnis, 7 Cal.3d 644-45.

The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed these principles: "[E]ven before factors relevant to parole decisions had been set forth expressly by statute and regulations, we concluded that '[a]ny official or board vested with discretion is under an obligation to consider all relevant factors [], and the [BPH] can't, consistently with its obligation, ignore post-conviction factors UNLESS DIRECTED TO by the Legislature." (citing Minnis at 645; emphasis added for illumination).

Petitioner has a Constitutional liberty interest in parole decisions and "[P]arole applicants in this state have an expectation that they will be granted parole unless the BPH finds, in its reviewable discretion, that they are unsuitable for parole in light of the circumstances specified by statute and regulation." Rosenkrantz at 654 and at 659-61 this liberty interest is an expectation protected by due process of law. (holding that the California Constitution Art. V, §8(b) and PC §3041 "give rise to a protected liberety interest" in that "a prisoner granted parole by the BPH has an expectation that the Governor's decision to affirm

modify, or reverse the BPH's decision will be based upon the same factors the BPH is required to consider," and that "this liberty interest underlying a Governor's parole review decision is protected by due process of law.").

Federal courts have also unequivocally held that California's parole system gives rise to a liberty interest constitutionally protected by due process. See: Allen, infra at 376-78; Greenholtz v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12 (holding a state's statutory parole scheme that uses mandatory language may create a presumption that parole release will be granted upon certain circumstances or findings, thus giving rise to a constitutionally protected liberty interest); McQuillen, supra at 902-3 n.1 (holding that because parole scheme uses mandatory language and is largely parallel to the schemes found in Allen and Greenholtz do give rise to a protected libety intrest in RELEASE ON PAROLE, "California's parole scheme gives rise to a cognizable liberty interest in release on parole.") Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate."

Rosenkrantz specifically rejected any position that a court may not properly examine the factual basis of parole decisions at 667, "[W]e conclude that the courts properly can review a Governor's decisions whether to affirm, modify, or reverse a parole decision by the BPH to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the BPH.

Post-Rosenkrantz, courts have reaffirmed the concepts of broad executive deference but vigilent judicial review, by engaging careful analysis, will ensure that the boundaries of due process are respected and upheld. "[t]he exceedingly deferential nature of the "some evidence" standard of judicial review set forth in Rosenkrantz does not convert a court reviewing the denial of parole into a potted plant." In re Scott (119 Cal.App.4th 871, 898, recently affirmed).

The Court, in In re Dannenberg (2005) 34 Cal.4th 1061 at 1095 n.16 reaffirmed that effective judicial review is critical to due process. Rejecting the dissent's suggestion that the opinion "permits untethered pro forma parole denials that are insulated from effective judicial review, thus contravening California life inmates' due process rights to individualized parole consideration," the majority made clear that the [BPH] must apply detailed standards in evaluating individual inmates' suitability for parole on public safety grounds, and that the Executive's broad discretion is subject to meaningful judicial oversight.

There is no question that the discretion afforded to the BPH with respect to parole decisions is great. However, the parole system's very purpose is to provide for the reentry into society of inmates who no longer pose a danger or unreasonable threat to public safety, and those rights afforded thereunder are constitutionally protected.

The BPH must abide by due process considerations, and the courts are entrusted with ensuring that such considerations are adequately respected and thus protected. Neither Rosenkrantz or Dannenberg permits respondents to immunize themselves from re-

view by unreaonable and possibly unlawful assertion that certain facts support a denial of parole. On the contrary, Rosenkrantz and Dannenberg make clear that the courts have a vital and therefore important role to play in ensuring that parole decisions are actually supported by "some evidence" having a basis in fact, and an indicia of reliability supported in the record.

Petitioner submits that there is a real danger that, improperly understood, the guidelines articulated in Rosenkrantz, Dannenberg, and the court of appeals will serve to provide respondents with de facto immunity from judicial review, a result anathema to state and federal due process protections. Properly understood, the "some evidence" standard provides a fair and proper framework for review of parole decisions in any venue, one that provides respondents with an appropriate level of deference in making extremely difficult decisions relating to inmates' liberty interests and public safety concerns, while ensuring that statutory and constitutional liberty interests are being adequately and lawfully safeguarded through judicial review. And, when this standard is properly applied to this case, there should be no doubt but that the BPH's denial of suitability seems unsustainable and must be reversed, a new hearing granted, and an Order with instructions issued.

WHEREFORE, Petitioner prays that the writ be granted in full and all available relief be accorded to Petitioner to comply with and comport to the state and federal Constitutions and the legal adversarial process and resolution of a judicious nature in this most important matter herein. Petitioner hereby incorporates by reference, as though fully set forth, all papers, pleadings, transcripts, exhibits and matters of record in the instant matter.

7 Ground 2 or Ground -3- (if applicable):

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING UNDER STATUTORY CRITERIA AND RESPONDENTS' BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petitioner's fifteen (15) years-to-Life sentence by seeking an Order in this Court granting the writ to discharge petitioner from state prison, or alternatively, compelling the BPH to conduct a new parole consideration hearing and correctly weight their statutory findings to view suitability and consequent release to parole for Petitioner.

The issues raised are of constitutional dimension, comporting to petitioner's federal constitutional rights, and questioning the legality of petitioner's continued confinement in the face of overwhelming evidence of legally-sustainable proof of suitability and unquestioned state-hired professionals and their proffered opinions of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having indicia of reliability that this petitioner poses an unreasonable risk of danger to the public and P.C. §3041(a) and California Code of Regulations (CCR), Title 15, Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria) all make it clear that there IS A MANDATE, based on a legally-sufficient standard, and that standard is subject to judicial review

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

(**continued from previous page**):

for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a review of the "evidence" of unsuitability that is burdened upon respondents.

The California Supreme Court recognizes that prisoners have procedural due process protections in connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in its broad discretion, deny parole suitability.

This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV: "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and regulation**." Rosenkrantz IV, supra, 29 Cal.4th at p. 654. And, [O]ur past decisions make clear that the ***requirement*** of procedural due process embodied in [Art. I, § 7, subd. (a)], places some limitations upon the broad discretionary authority of the BP[H}." Id. at p. 655.

Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either state or federal law, diminish nor extinguish the expectancy of release to parole and in no ways Petitioner's due process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and protected by, the Fourteenth Amendment's Due Process Clause.

Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights to Petitioners. Further, these regulations AS ORIGNIALLY WRITTEN, made it even clearer that parole was to normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there had been an honest attempt to do so.

For respondents to abrogate this federal liberty interest they must provide substantial relevant, reliable evidence having some indicia of credibility that Petitioner poses a CURRENT ***unreasonable*** threat to the public safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3rd 931, where the court cautioned:

> "The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison. In re Scott (2005) 133 Cal.App.4th 573, 595, (however, In re Lowe (2005) 130 Cal.App.4th 1405 suggested "some evidence" applies to the factors, not dangerousness.) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the [inmate's] release unreasonably endangers public safety." Lee, supra, pp. 936-37.
>
> ¶The board and governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real world crime and law and order, has no obvious intersection with incorporeal realm of legal constructs." Id. at p. 940.

This is something they have patently failed to do, as testified by virtually all of their own witnesses as noted in attached Exhibit "B", which has been previously generated BY RESPONDENTS and provided to all concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being accurate and meaningful to ascertain PRESENT DANGEROUSNESS.

"Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz IV at pp. 653-54. "Such information shall include circumstances of the prisoner's social history; past and present mental state; past criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the crime; any conditions of treatment or control ...; and any other information that bears on the prisoner's *suitability for release*." (Emphasis added.)

This extensive list of factors, including other relevant reliable information that must be considered, makes it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that, 'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of the one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances—was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v. E.P.A. (2003) 344 F.3d 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229, 1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless ... unless we carefully review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors ...[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act, they must not rubber-stamp ... administrative decisions that they deem inconsistent with a or that frustrate the congressional policy underlying a statute.")

Second degree murder is not a crime automatically allows one to be deemed unsuitable for release and parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et al., there must be a base set of factors upon which a second degree murderer would have to be paroled or the BPH would risk violating due process. To determine what would qualify as more than the minimum necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of second-degree murder.

The Sixth District Court of Appeals has explained that "[s]econd degree murder requires ... malice—i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life." In re smith (2003) 114 Cal.App.4th 343, 366, citing P.C. §§ 187-189; and CALJIC No. 811. (Noting "all second degree murders by definition involve some callousness, i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others" and that the facts of the instant crime were callous, but not exceptionally callous.) Id. at pp. 366-7.

From this instructive dialog, the limits on the "minimum necessary to sustain a conviction" of second degree murder can be defined. There must be: 1) a killing of another, 2) malice, 3) no premedi-tation or deliberation, planning, lying in wait, torture, etc., as would be present in a first degree murder, a crime that

Petitioner was specifically acquitted by a jury of his peers.

Now that the crime is defined, the question must be what evidence indicates that any particular second degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence indicates the commitment offense was "***especially*** heinous" or "***exceptionally*** grave", given that there typically must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant to have had his second degree murder conviction sustained by the appellate courts in the first place and where Petitioner WAS NOT the killer?

There was no weapon enhancement that could reasonably demonstrate that this crime was "beyond the minimal elements" of a second-degree murder conviction, and is in no way some evidence establishing that he is *currently* an unreasonable threat to public safety. Petitioner was not the shooter and lacked the requisite intent to charge an enhancement. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence in every case, **every** second degree murder would be "beyond the minimal elements" and there would be no way to commit a second degree murder in California that did not qualify as an "especially" heinous crime and thereby justify imprisonment for life, without any chance of parole. This is not what the Legislature wrote the enhancement statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds the bounds of common sense in every conceivable manner.

Having doubts as to these elements, the People accepted a plea to agreement to second degree murder and there has never been any contention that the admission should have been otherwise. The unique elements present here were duly recounted: (by **PRESIDING COMMISSIONER ENG**): "I have another question for you. When you look back, okay, in all honesty, today when you look back, do you, would you say that you had a serious drinking problem or a drug problem? **INMATE VASQUEZ**: I know I had a problem. How serious it was, (sic) I know I had a problem with drinking and using drugs. **PRESIDING COMMISSIONER ENG**: Why do you say you had a problem? How do you define that problem? **INMATE VASQUEZ**: Because I would like, because I had a cycle when, you know, on the weekends I would drink and to me, a normal person doesn't, I could have used that money for something better instead of wasting it on drugs or alcohol. An everyday person doesn't do that. And to me, comparing myself to an everyday person, I knew I had a problem. **PRESIDING COMMISSIONER ENG**: Were you drinking a lot, like on a daily basis or weekly where - -(sic) **INMATE VASQUEZ**: I don't know, for a while there I was drinking on a daily basis. And then I cut back and it was like a

weekly basis. **PRESIDING COMMISSIONER ENG**: Okay would you drink to excess where you would always get drunk or - - **INMATE VASQUEZ**: There was a couple times that I woke up the next morning and I didn't remember nothing. (sic) **PRESIDING COMMISSIONER ENG**: And do you feel that you knew what an alcohol and drug problem looked like? **INMATE VASQUEZ**: At the time I didn't. **PRESIDING COMMISSIONER ENG**: But how did you see your mother and father? **INMATE VASQUEZ**: ...it was sad. When I first discovered they were using drugs, I was going through my dad's closet looking for Christmas presents. And when I went through the closet a bag of stuff falls out. And I go inside the bag. And that's when I found out their drug paraphernalia. And that's when I knew they had a problem. **PRESIDING COMMISSIONER ENG**: Did you notice anything different about their behavior around when you and your sisters were home? **INMATE VASQUEZ**: In the beginning, *my mom would always pass out. **She would OD**.* And he would always have to take my mom to the restroom and bring her back. And then after a while when my dad, when he used to get, when he wasn't using drugs, he had a real nasty attitude. **PRESIDING COMMISSIONER ENG**: So your mother, were they both doing drugs more than drinking? Did they drink to get drunk often, too or no? (sic) **INMATE VASQUEZ**: I remember them just like drinking like, I don't remember them drinking all the time like for parties, you know. Drugs, I could say was a daily basis. **PRESIDING COMMISSIONER ENG**: Right. " (Exhibit "A", pages 63-64, emphasis added.)

Rosenkrantz VI 444 F.Supp.2d 1036 noted such a nexus insofar as age, maturity, situational factors and rage are concerned by stating:

> "The reliability of the facts of his crime as a predictor for his dangerousness is further diminished by petitioner's age at the time of the offense. Petitioner turned 18 [**prior to the crime**], and committed his offense one month later. While *petitioner* was not legally a minor, he was very close to being one. [FN17] As the [U.S.] Supreme Court recently recognized, the evidentiary/predictive value of the conduct of such a young person is diminished. The susceptibility of juveniles to immature and irresponsible behavior means '"**their irresponsible conduct is not as morally reprehensible as that of an adult**."' Thompson v. Oklahoma (1988) 487 u.s. 815, 835 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean ***juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their WHOLE ENVIRONMENT***. (Emphasis added.)

This rendition illustrates further, the importance (given the short tenure of the suggestion that "some evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one

should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT, UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the community.

Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being arbitrary but is almost always counter-instructive. In the parole determination process, the panel is tasked with assuring the Executive branch by determining if the prisoner is a CURRENT threat to the public safety. This determination is, in total, the only decision that the BPH is sanctioned to make by the Penal Code and Regulations codified for that purpose. All interpretations of mitigating and aggravating factors, and the weight given to the special circumstances of the offense, merely go to instruct this final conclusion. "A determination of unsuitability I simply shorthand for a finding that a prisoner CURRENTLY would pose an unreasonable risk of danger if released at this time." Smith, supra, at p. 370, (citing C.C.R. § 2402(d), emphasis added.)

WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete suitability consideration without bias or political, personal, or tenurial considerations, and in accordance with the statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect Petitioner's civil rights.

///

///

///

8. Did you appeal from the conviction, sentence, or commitment? [ ] Yes. [ ] No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
N/A

b. Result: ______ c. Date of decision: ______

d. Case number or citation of opinion, if known: ______

e. Issues raised: (1) ______

(2) ______

(3) ______

f. Were you represented by counsel on appeal? [ ] Yes. [ ] No. If yes, state the attorney's name and address, if known:

______

9. Did you seek review in the California Supreme Court? [ ] Yes. [ ] No. If yes, give the following information:

a. Result: N/A b. Date of decision: ______

c. Case number or citation of opinion, if known: ______

d. Issues raised: (1) ______

(2) ______

(3) ______

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
N/A

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

NO ADMINISTRATIVE REMEDIES ARE AVAILABLE FOR RESOLUTION

b. Did you seek the highest level of administrative review available? [ ] Yes. [ ] No.
*Attach documents that show you have exhausted your administrative remedies.*

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On January 25, 2007, Adam Vasquez (Petitioner) appeared before the Board of Parole Hearings (BPH) for his 3rd subsequent hearing (4th overall), during which Ms. J. Thompson was Presiding Commissioner and Ms. J. Eng was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Mr. R. Rutledge. A staff psychologist, Dr. E. Rueschenberg, Ph.D., testified utilizing a filed Report dated: 1-17-05, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 2000 and 2003 are attached as Exhibit "B". A copy of the

b. Supporting cases, rules, or other authority (optional): (continued on attached pages)

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On January 25, 2007, Adam Vasquez (Petitioner) appeared before the Board of Parole Hearings (BPH) for his 3rd subsequent hearing (4th overall), during which Ms. J. Thompson was Presiding Commissioner and Ms. J. Eng was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Mr. R. Rutledge. A staff psychologist, Dr. E. Rueschenberg, Ph.D., testified utilizing a filed Report dated: 1-17-05, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 2000 and 2003 are attached as Exhibit "B". A copy of the

b. Supporting cases, rules, or other authority (optional): (continued on attached pages)

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

**This petition concerns:**

[ ] A conviction [XX] Parole

[ ] A sentence [ ] Credits

[ ] Jail or prison conditions [ ] Prison discipline

[XX] Other *(specify)*: State and federal denial of due process and equal protection

1. Your name: Adam A. Vasquez

2. Where are you incarcerated? Correctional Training Facility, Soledad, CA 93960

3. Why are you in custody? [XX] Criminal Conviction [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Second degree murder on a theory of aiding and abetting

b. Penal or other code sections: P.C. § 187

c. Name and location of sentencing or committing court: L.A. County Superior Court, 210 W. Temple St., L.A., CA 90012

d. Case number: VA 008488

e. Date convicted or committed: 8-28-1991

f. Date sentenced: 9-12-1991

g. Length of sentence: Fifteen (15) years-to-Life

h. When do you expect to be released? Unknown; M.E.P.D. was on 8-19-2001

i. Were you represented by counsel in the trial court? [xx] Yes. [ ] No. If yes, state the attorney's name and address:

Mr. R. Trejo, L.A. County Public Defenders Office, 111 N. Hill St., L.A., CA 90012

4. What was the LAST plea you entered? *(check one)*

[ ] Not guilty [XX] Guilty [ ] Nolo Contendere [ ] Other: ______

5. If you pleaded not guilty, what kind of trial did you have?

[ ] Jury [ ] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

**This petition concerns:**

[ ] A conviction
[XX] Parole
[ ] A sentence
[ ] Credits
[ ] Jail or prison conditions
[ ] Prison discipline
[XX] Other *(specify)*: State and federal denial of due process and equal protection

1. Your name: Adam A. Vasquez

2. Where are you incarcerated? Correctional Training Facility, Soledad, CA 93960

3. Why are you in custody? [XX] Criminal Conviction [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Second degree murder on a theory of aiding and abetting

b. Penal or other code sections: P.C. § 187

c. Name and location of sentencing or committing court: L.A. County Superior Court, 210 W. Temple St., L.A., CA 90012

d. Case number: VA 008488

e. Date convicted or committed: 8-28-1991

f. Date sentenced: 9-12-1991

g. Length of sentence: Fifteen (15) years-to-Life

h. When do you expect to be released? Unknown; M.E.P.D. was on 8-19-2001

i. Were you represented by counsel in the trial court? [xx] Yes. [ ] No. If yes, state the attorney's name and address:

Mr. R. Trejo, L.A. County Public Defenders Office, 111 N. Hill St., L.A., CA 90012

4. What was the LAST plea you entered? *(check one)*

[ ] Not guilty [XX] Guilty [ ] Nolo Contendere [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

[ ] Jury [ ] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
) SS. In re: Adam Vasquez, on habeas corpus
COUNTY OF MONTEREY )

I, WILLIAM WALKER, am a resident of the State of California, County of Monterey. I am over the age of 18 years and I ~~am~~/am not a party to the within action. My business/residence address is P.O. Box 689, Soledad, California, 93960-0689.

On May 31, 2007, I served the foregoing:

PETITION FOR WRIT OF HABEAS CORPUS WITH POINTS AND AUTHORITIES, EXHIBITS IN SUPPORT THEREOF

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States mail at Soledad, California, addressed as follows:

California Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

There is regular delivery service by the U.S. Postal Service between the place of mailing and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 31st day of May, 2007, at Soledad, California.

/S/ William Walker

MC-275

Name Adam A. Vasquez

Address P.O. Box 689/F-224-Low

Correctional Training Facility-Central

Soledad, CA 93960

CDC or ID Number H-10787

LOS ANGELES COUNTY SUPERIOR COURT

(Court)

ADAM ANTHONY VASQUEZ,
Petitioner

vs.

B. CURRY, Warden, et al.,
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. ______________
*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**
- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.
- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.
- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."
- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.
- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.
- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.
- Notify the Clerk of the Court in writing if you change your address after filing your petition.
- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the Judicial Council of California MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.; Cal. Rules of Court, rule 60(a)

American LegalNet, Inc. www.USCourtForms.com

# EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life Term Parole Consideration Hearing of: ) CDC Number: H-10787

ADAM VASQUEZ )

INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 25, 2007

8:57 A.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
JOAN THOMPSON, Deputy Commissioner

OTHERS PRESENT:

ADAM VASQUEZ, Inmate
RICHARD RUTLEDGE, Attorney for Inmate
JOANN GLIDDEN, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

________ No See Review of Hearing
________ Yes Transcript Memorandum

Sarah M. Collins, Capitol Electronic Reporting

**I N D E X**

| | Page |
|---|---|
| Proceedings | 3 |
| Case Factors | 12 |
| Pre-Commitment Factors | 30 |
| Post-Commitment Factors | 42 |
| Parole Plans | 51 |
| Closing Statements | 70 |
| Recess | 78 |
| Decision | 79 |
| Adjournment | 92 |
| Transcript Certification | 94 |

P R O C E E D I N G S

**DEPUTY COMMISSIONER THOMPSON:** You are on record.

**PRESIDING COMMISSIONER ENG:** All right. Good morning everyone. This is a Subsequent Parole Consideration hearing for Adam Vasquez, V-A-S-Q-U-E-Z, CDC number H-10787. Today's date is January 25th, 2007. And the time is 8:57 in the morning. We are located at CTF, Soledad. The inmate was received on October 2nd, 1991 from Los Angeles County. The life term began on October 2nd, 1991. And the minimum eligible parole date is August 9, 2001. The controlling offense for which the inmate has been committed is murder two, case number of DA008488, count one, Penal Code Section 187. Let's see, the inmate received a total term of 15 years to life.

This hearing is being tape-recorded. So, for the purpose of voice identification, each of us will be required to state our first and last names and spelling out our last names. So, sir, when it comes to your turn, after you spell your last name, please provide us with your CDC number also, okay?

**INMATE VASQUEZ:** Okay.

**PRESIDING COMMISSIONER ENG:** So, I'll begin and we'll move to my left. My name is Janice Eng, E-N-G, Commissioner.

**DEPUTY COMMISSIONER THOMPSON:** And my name is Joan Thompson, T-H-O-M-P-S-O-N. And I'm a Deputy Commissioner.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** JoAnn Glidden, G-L-I-D-D-E-N, Deputy District Attorney of Los Angeles County.

**ATTORNEY RUTLEDGE:** Richard Rutledge, R-U-T-L-E-D-G-E, Counsel for Mr. Vasquez.

**INMATE VASQUEZ:** Adam Vasquez, V-A-S-Q-U-E-Z, H-10787.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. We also have one correctional officer present for security reasons. And he will not be participating in the hearing. Before we begin, sir, I'm going to ask that you read aloud the ADA rights statement that's on the desk in front of you. Begin at anytime.

**INMATE VASQUEZ:**

"ADA: Americans with Disability Act. The Americans with Disability Act is a law to help people with disabilities." Disabilities are problems to, excuse me. "Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work or take care of themselves than it is for others. Nobody can be kept out of public places

or activities because of a disability.

"If you have a disability, you have the right to ask for help to get ready for your BPT hearing, get to the hearing, talk, read forms and papers and understand the hearing process. BPT will look at what you ask for to make sure you have a disability that is covered by the ADA and that you have asked for the right kind of help. If you do not get help or if you don't think you got the kind of help you need, ask for a BPT 1074 grievance form. You can also get help to fill it out."

**PRESIDING COMMISSIONER ENG:** Thank you, sir. The record reflects that you did sign a BPT form 1073 back on June 9th of 2006. And sir, that form is a reasonable accommodation notice and request in accordance with the Americans with Disabilities Act. And on this form, you did check off that you do not have any disabilities as defined under the ADA; is that correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So this information is still current and correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Great. I still have to go through some basic ADA questions with

you. So just bear with me, okay. Do you have any problems walking up and down stairs or for distances of 100 yards or more?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And do you need any glasses in order to read documents or a magnifying device?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** So you should be fine today?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And do you have any hearing impairments?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Have you ever been included in a CCCMS or the EOP programs?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And do you know what those are?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Mental heath?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** You understand that? Okay. Have you ever taken any psychotropic medication in prison or on the streets?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And while you were growing up in school, were you ever enrolled in special education classes that you can recall?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So do you suffer from any disability that could possibly prevent you from participating in today's hearing.

**INMATE VASQUEZ:** None, Ma'am.

**PRESIDING COMMISSIONER ENG:** Counselor, are there any ADA issues that you feel need further discussions?

**ATTORNEY RUTLEDGE:** No, Commissioner.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. Okay. This hearing is being conducted pursuant to the Penal Code and the Rules and Regulations of the Board of Parole Hearings that govern Parole Consideration Hearings for life inmates. The purpose of today's hearing is to once again consider your suitability for parole. And in doing so, we'll consider the number and nature of the crimes for which you were committed, your prior criminal and social history, your behavior and programming since your commitment and your plans if released.

We've had the opportunity to review your central file. And you'll also be given the opportunity to

correct or to clarify the record. Okay. So, we will consider your progress since your commitment, your counselor's reports and your mental health evaluation. However, we will focus on your progress and any new reports since your last hearing. So any changes in parole plans should be brought to our attention.

We will reach a decision today and inform you whether or not we find you suitable for parole and the reasons for our decision. So, if you are found suitable for parole, the length of your confinement will be fully explained to you at that time. Before we recess for deliberations, the District Attorney's representative, who is present, your Attorney and you, yourself, will have an opportunity to give a final statement regarding your parole suitability. So, just remember in your final statement you should focus on why you feel you are suitable for parole.

Okay. We'll then recess, clear the room and deliberate. And once we complete our deliberation, we'll resume the hearing and announce our decision. California Code of Regulations state that regardless of time served, a life inmate shall be found unsuitable for and denied parole if, in the judgment of the Panel, the inmate would pose an unreasonable risk of danger to society if released from prison.

You have certain rights. Those rights include the right to a timely notice of this hearing, the right to review your central file and the right to present relevant documents. Counsel, have your client's rights been met so far?

**ATTORNEY RUTLEDGE:** They have.

**PRESIDING COMMISSIONER ENG:** Thank you. You have the additional right to be heard by an impartial Panel. Do you have any objections to this Panel that you've just been introduced to?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Does Counsel have any objections to the Panel?

**ATTORNEY RUTLEDGE:** No objection.

**PRESIDING COMMISSIONER ENG:** Okay. You'll receive a copy of our written tentative decision today. And that decision becomes final within 120 days. So, a copy of the decision and a copy of the transcript will be sent to you at a later date. On May 1st, 2004, the regulations regarding your right to appeal any decision made at this hearing were repealed. So basically, you have to go to court now in order to appeal a decision. So, if you have any questions about that policy, you can discuss it with your legal counsel or you can review the policy at the prison law library.

You're not required to admit to or discuss your offense. However, this Panel does accept as true the findings of the court. Do you understand what that means?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Commissioner Thompson, is there any confidential material in the file and if there is, will we be using it today?

**DEPUTY COMMISSIONER THOMPSON:** There is a confidential file. We will not be using it today.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. Sir, I've already passed this hearing checklist to your legal counsel. And he's initialed it. And we've already passed it over to Ms. Glidden with the DA's office. And she's initialed it. This is labeled Exhibit One. And we do this to make sure that all of us are operating off of the same set of documents for your hearing. Okay. So this goes into the paperwork. Okay. Are there any additional documents to be submitted to the Panel this morning?

**ATTORNEY RUTLEDGE:** There are, Commissioner.

**PRESIDING COMMISSIONER ENG:** Okay. And what are these? Are these certificates --

**ATTORNEY RUTLEDGE:** Certificates, chronos --

**PRESIDING COMMISSIONER ENG:** -- support letters.

**ATTORNEY RUTLEDGE:** -- support letters (indiscernible).

**PRESIDING COMMISSIONER ENG:** Okay. Okay.

**DEPUTY COMMISSIONER THOMPSON:** We'll have to review --

**PRESIDING COMMISSIONER ENG:** We'll have to sift through these. Okay. And any preliminary objections?

**ATTORNEY RUTLEDGE:** No.

**PRESIDING COMMISSIONER ENG:** Okay. And will your client be speaking with the Panel this morning?

**ATTORNEY RUTLEDGE:** He will.

**PRESIDING COMMISSIONER ENG:** On all matters?

**ATTORNEY RUTLEDGE:** Yes.

**PRESIDING COMMISSIONER ENG:** Okay. Sir, to the best of your ability, please raise your right hand. I'll have to swear you in. Okay. Do you solemnly swear or affirm that the testimony you give at this hearing will be the truth, the whole truth and nothing but the truth?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. You can relax. I'm going to put this over. Sir, these documents, do you know if they're already in your C file or no?

**INMATE VASQUEZ:** Some of them are and some of

them aren't.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. Because I did notice that you did review your C file, but that was back in June, correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. All right. So first off, what I'm going to do is read into the record the statement of facts, which is relatively short. And I'm going to take that from the probation officer's report. And it begins on page two of the, of that report.

"On May 7, 1991, approximately 11:08 p.m., the victims were standing in the front yard talking. The defendant and co-defendant drove and stopped directly in front of the victims. Vasquez was the driver and Hernandez was the passenger. The defendant and co-defendant asked the victims where they were from. The victims gave no reply. And Hernandez then held up a handgun. He fired four shots one of which struck victim, Zohnie, Z-O-H-N-I-E, fatally wounding her. The defendant and co-defendant then drove away out of sight."

I was going to add a little more into that where, and I'm going to take that from the July, 2004 Board

report. It states that, "Mr. Vasquez was arrested on July 19th, 1991 by the Los Angeles Sheriff's Department. And then, on August 28th of 1991, he entered a plea of guilty to the murder charge."

Now, sir, it was a very, very short summary of what happened that night. And basically I would like to know from you if that's an accurate depiction of what occurred on that fateful night in May of 1991?

**INMATE VASQUEZ:** Yes, Ma'am, it is.

**PRESIDING COMMISSIONER ENG:** It's very accurate?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. I also see, and I have to only go back to what's in the July, 2004 Board report that states in your version that you and Mr. Hernandez had been drinking quite a bit or no?

**INMATE VASQUEZ:** Yes, we were, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Describe quite a bit to this Panel.

**INMATE VASQUEZ:** I think we started around five, five-thirty in the afternoon. We kept going back to the store and getting beer. I don't know exactly how much we drank, but it was for a while, it was for a couple hours.

**PRESIDING COMMISSIONER ENG:** It was just beer?

**INMATE VASQUEZ:** We smoked some marijuana. There

was some other drugs around. I'm not exactly sure what were there.

**PRESIDING COMMISSIONER ENG:** Who was going and buying the beer?

**INMATE VASQUEZ:** I was.

**PRESIDING COMMISSIONER ENG:** You were underage, weren't you?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So nobody asked for your ID when you went into a store to purchase the beer?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And your, your crime partner, Mr. Hernandez, was quite a bit younger than you; correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Were both of you members of the, what's the name of the gang? What was the name of the gang?

**INMATE VASQUEZ:** It was Canvas Street.

**PRESIDING COMMISSIONER ENG:** Canvas Street Gang?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And were both of you members?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So, you were, were

you over at somebody else's house or apartment drinking and you were smoking some dope, etcetera?

**INMATE VASQUEZ:** We were in front of Mr. Hernandez' house.

**PRESIDING COMMISSIONER ENG:** For quite a few hours?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So then what, describe to this Panel what brought you to go driving around and end up in front of the victim's place?

**INMATE VASQUEZ:** From what I understood, and it's a dumb reason, that somebody had shot -- because I was away from the gangs there for awhile -- and I happened to come back when somebody else got shot, just like that. And Mr. Hernandez wanted me to take him to Chancellor Street. And I took him.

**PRESIDING COMMISSIONER ENG:** So somebody from your particular, from the Canvas Street Gang had been shot?

**INMATE VASQUEZ:** That's what I understood at the time, yeah.

**PRESIDING COMMISSIONER ENG:** And is that the discussion that was going on in front of Mr. Hernandez' place with several other members of the gang?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So Mr. Hernandez is the one that wanted to go be driven over to where this, to this particular street?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** And did he ask you specifically or did he just make a statement?

**INMATE VASQUEZ:** I can't recall.

**PRESIDING COMMISSIONER ENG:** Well do you recall if you had basically volunteered to drive him?

**INMATE VASQUEZ:** I can't, Ma'am.

**PRESIDING COMMISSIONER ENG:** Did you borrow somebody's car?

**INMATE VASQUEZ:** Yes, yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** And the person you borrowed the car from?

**INMATE VASQUEZ:** His name was Desaline Velasquez.

**PRESIDING COMMISSIONER ENG:** And he just threw the keys to you and said go ahead?

**INMATE VASQUEZ:** Actually, I had had his car for awhile.

**PRESIDING COMMISSIONER ENG:** But was he present during this time?

**INMATE VASQUEZ:** He was there, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay.

**INMATE VASQUEZ:** But I didn't ask him if I could

take his car to go to the store.

**PRESIDING COMMISSIONER ENG:** So you had the keys. And then Mr. Hernandez, at some point in time, decides that he wants to what, go look for rival gang members?

**INMATE VASQUEZ:** Yes, Ma'am. Well, when we left, we went to a house. And that's when we picked up the handgun. And then from there we drove to Chancellor Street.

**PRESIDING COMMISSIONER ENG:** So at that point in time you were aware of what was going to happen?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Right?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. So you ended up in, so you went over to this street. And you what, spotted two of the victims?

**INMATE VASQUEZ:** It was kind of dark that night. I remember that. And I believe we seen somebody. I stopped the car. And that's when he yelled out and asked them where they're from. And he was saying where he was from. And that's when he started shooting.

**PRESIDING COMMISSIONER ENG:** Do you recall, and I'm sure things happened rather quickly in your mind, do you recall if he even waited for a response?

**INMATE VASQUEZ:** I don't believe he did.

**PRESIDING COMMISSIONER ENG:** So he, it appeared to you that what, that no matter what, he was going to shoot at these people?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Did you think, when you drove up, that they were the people, the rival gang responsible for the shooting?

**INMATE VASQUEZ:** Well, the area that they were in, I couldn't see who it was.

**PRESIDING COMMISSIONER ENG:** Did it matter to you? When you think back, did it really matter to you at that point?

**INMATE VASQUEZ:** As far as who he was shooting at?

**PRESIDING COMMISSIONER ENG:** Right.

**INMATE VASQUEZ:** To me, I should have stopped him. And he shouldn't have shot at anybody actually. I mean, it's a dumb reason why we even went. To me now, it does matter.

**PRESIDING COMMISSIONER ENG:** But back then, back then, you know, try and understand, it's one thing when you think of when you look back today, but back then, if you step back, you know, 15, 16 years ago, okay, and you think about what was going through your head.

**INMATE VASQUEZ:** I know I was scared. I don't

know exactly if it mattered or not who he was shooting at or not.

**PRESIDING COMMISSIONER ENG:** Okay. Had you used the weapon before?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** So now when you, after he shot the gun, how many times did he shoot, like four times, was it? Do you recall?

**INMATE VASQUEZ:** I don't, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Well after he shot the gun, what did you do?

**INMATE VASQUEZ:** He closed the door and we took off.

**PRESIDING COMMISSIONER ENG:** So he got out, he was out of the car or was he in the car when he shot?

**INMATE VASQUEZ:** He opened the door. And I believe when he opened the door, he stepped out of it. I don't know if he, I can't remember if it was his whole body or not, but he opened the door and then that's when he was yelling. And that's when he started shooting. And then he got back in (indiscernible).

**PRESIDING COMMISSIONER ENG:** Did you, were you able to see if any of the victims were hit at that point?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So he just jumped back in the car. And you took off --

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** -- right away? So when did you find out what the results of that shooting were?

**INMATE VASQUEZ:** When they arrested me.

**PRESIDING COMMISSIONER ENG:** Which was two and a half months later?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** You had no idea?

**INMATE VASQUEZ:** After that --

**PRESIDING COMMISSIONER ENG:** After that night, after the night of May 7th, okay, you had no idea if anyone had been hit by those bullets. Is that what you're stating?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So then you were arrested about two and a half months later?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** And that, what did the police say?

**INMATE VASQUEZ:** Well I was in the welfare office. And I was going to go get some general relief. And they called me to the back. And there was about two

or three officers that had their weapons drawn on me. And I didn't even know what was going on. And that's when they told me that I was under arrest for the murder.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. Commissioner, do you have any questions about the crime right now?

**DEPUTY COMMISSIONER THOMPSON:** None now.

**PRESIDING COMMISSIONER ENG:** Okay. We may go back. You know, what went through your head? And did you know, did you know the victim?

**INMATE VASQUEZ:** Me and her were pretty close. She was a real good friend of mine.

**PRESIDING COMMISSIONER ENG:** If she was a real good friend, how is it that you didn't know that she was dead?

**INMATE VASQUEZ:** Well, after that happened, I didn't even associate. I just left. I mean, I just completely didn't talk to nobody. I just, I stayed home with my, well, she was girlfriend and my kid. And I just didn't want to do nothing about nothing. I --

**PRESIDING COMMISSIONER ENG:** Was Ms. Zohnie, was she a member of a rival gang?

**INMATE VASQUEZ:** Well she was, she was in a, she was one of our home girls. She was from Canvas Street,

too.

**PRESIDING COMMISSIONER ENG:** So you ended up killing one of the girls that was affiliated with your own gang?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** How old was she?

**INMATE VASQUEZ:** I think she was in her twenties, I believe.

**PRESIDING COMMISSIONER ENG:** So what do you think of now when you think of this young woman that was shot down by supposedly friends? What do you think about Michelle Zohnie now?

**INMATE VASQUEZ:** It hurts me a lot. And I know that what I did was wrong. And that's something that I deal with every day.

**PRESIDING COMMISSIONER ENG:** What do you think of, do you think you made those choices that you made that night just because of being part of this, being a member of this group?

**INMATE VASQUEZ:** Well I should have used, I don't want to blame my, what I did on what I was in. I mean, I should have used my head. I should have used better judgment. There was a lot of things I could have done. And I didn't do it.

**PRESIDING COMMISSIONER ENG:** But part of being in

a gang, did that have to do with if somebody makes a decision, everyone else follows along?

**INMATE VASQUEZ:** In a sense, yes. And in a sense, no.

**PRESIDING COMMISSIONER ENG:** Tell me how it wouldn't.

**INMATE VASQUEZ:** There's some people that are like, in order to get into -- to get into the gang, and if an older homeboy wants them to do something, they do it. But if you've been around a while and everybody knows you they really don't tell you nothing or look down on you when you don't want to be a part of something.

**PRESIDING COMMISSIONER ENG:** Would they have thought that you would be less of a man if you didn't go and shoot or possibly kill someone to get back?

**INMATE VASQUEZ:** Well the people that I knew of, they wouldn't have thought that.

**PRESIDING COMMISSIONER ENG:** Are you saying that the people that, that were in your gang weren't like that?

**INMATE VASQUEZ:** Well, it's because the people that were there that night I was pretty close with. I mean, besides being a part of the gang, they, I mean, they knew my family. They, I considered them, I

considered them friends when I knew them.

**PRESIDING COMMISSIONER ENG:** Okay. And tell me something about this particular gang and what, how would you define this gang?

**INMATE VASQUEZ:** When I was around them, I remember partying a lot. I don't remember if, us too much going out and, you know, looking for trouble. You know, a lot of them, they were just laid back. A lot of us stayed at my house. That's when I (indiscernible) by being part of the gang. There was other people that were from a different area that would be more, more trouble makers than where I was from. We were just more laid back.

**PRESIDING COMMISSIONER ENG:** So, what would you say was the whole purpose of your Canvas Street Gang?

**INMATE VASQUEZ:** Back then I was just with them because I thought that the purpose to me was just to be bonded with somebody, to be, you know, to feel close to somebody because at that time, I didn't have no where to stay. I got thrown out of my house. And these were the people that I knew from my sisters. So I got pretty close with these people. And then that's when I got in. The purpose, I can't see no purpose for it.

**PRESIDING COMMISSIONER ENG:** But for you, but for you at that time, it did serve a purpose?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And that was like friends and sort of a, I mean, family for you?

**INMATE VASQUEZ:** That's what I looked at it as.

**PRESIDING COMMISSIONER ENG:** Were there, what else bonded the people in that gang together would you say?

**INMATE VASQUEZ:** I remember like every night we would either be at somebody's house drinking, you know. That's really all I could think was we were always going somewhere to party.

**PRESIDING COMMISSIONER ENG:** And did a lot of your friends typically carry weapons on them of different sorts?

**INMATE VASQUEZ:** I don't remember seeing too many weapons when I was around.

**PRESIDING COMMISSIONER ENG:** Okay. Well you, like when you say too many weapons, what did you see?

**INMATE VASQUEZ:** Well, you know, people walk around with sticks or something like that, but I mean, as far like knives and guns and stuff like that.

**PRESIDING COMMISSIONER ENG:** How about did your, did your friends typically go out and, I mean, rob or steal or break into homes or anything like that?

**INMATE VASQUEZ:** That's, I remember stealing

cars. As far as robbing people, I don't remember that. I mean, I wasn't a part of that.

**PRESIDING COMMISSIONER ENG:** Okay. Drug dealing?

**INMATE VASQUEZ:** There was some drug dealing around, spray paint on walls, stuff like that. As far as robbing people, breaking into homes, I can't.

**PRESIDING COMMISSIONER ENG:** What did you have to do to be accepted into the Canvas Street Gang?

**INMATE VASQUEZ:** I got jumped in.

**PRESIDING COMMISSIONER ENG:** What does that mean?

**INMATE VASQUEZ:** A couple people, you would have to, I think it was about two or three people, and you would fight with these two or three people for whatever time it was. And if you could stand it, they would let you be a part of the gang.

**PRESIDING COMMISSIONER ENG:** So would you say when you look back and take a look at your years affiliated with the Canvas Street Gang, would you say that it was violence oriented?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Violence in respect to within the gang and or outside of the gang?

**INMATE VASQUEZ:** Yes, Ma'am, in and out.

**PRESIDING COMMISSIONER ENG:** And how severe was the violence?

**INMATE VASQUEZ:** I remember like inside the gang they, you know, once you started partying with these people, you know, get drunk, there would be a fight every once in a while. I recall this one night. I was home. It was about two or three in the morning. And I was asleep with my girlfriend. And these two youngsters went to my house. And they had started trouble with these older guys. I believe it was in '88.

And these guys were out. They were looking for trouble. And they started trouble with these older guys that were having a party. And then they went to my house because they couldn't get to their own. I wound up getting out of bed and taking these two youngsters home. And on the way home I ended up getting beat up by the guys that they started trouble with.

**PRESIDING COMMISSIONER ENG:** But did you see a lot of shootings or stabbings?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Was there a lot of friction between the Canvas Street Gang and the other, this other gang that you thought these people belonged to?

**INMATE VASQUEZ:** The one that I remember the most was Chancellor because they would also go, a couple times they went to my house and throw bottles at my

house. They threw bottles at my mom. I remember things like that.

**PRESIDING COMMISSIONER ENG:** How do you view that type of behavior?

**INMATE VASQUEZ:** It's, it's wrong.

**PRESIDING COMMISSIONER ENG:** Why?

**INMATE VASQUEZ:** Because we don't, we don't understand what we put other people through. We don't, we don't think about their loved ones, what, I mean, because you can go and do something and not even think about what you're doing. You're trying to justify it for a dumb reason. And it makes no sense at all.

**PRESIDING COMMISSIONER ENG:** So what do you think you could do to, because, just because you've been incarcerated for 15 years doesn't mean that these gangs have gone away; right?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** They're still alive and well.

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Stronger and larger possibly than they ever were before. So what would you say to them?

**INMATE VASQUEZ:** Well, since I've been incarcerated, I've disassociated myself with them. I

don't have nothing, when we got arrested, I told Mr. Hernandez that, you know, I don't want to hear from nobody. I don't want nobody writing to me. I don't want to have nothing to do with nobody. I just want to do my time. And I just want to be left alone. And I had seen somebody else who was in the county for another reason. And I told him the same thing, that this is it for me.

**PRESIDING COMMISSIONER ENG:** But let's say you're released, you're on the outside. And all of the sudden you find yourself being a target from the younger kids that were like you back when you were, you know, 15-20 years old and not knowing any better? And they start throwing things at you or your wife or your children? What are you going to do?

**INMATE VASQUEZ:** I'll call the police.

**PRESIDING COMMISSIONER ENG:** What are you going to do if they start shooting at you?

**INMATE VASQUEZ:** I'll call the police.

**PRESIDING COMMISSIONER ENG:** So you understand what I'm getting at that just, you know, these things continue to happen?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** And how you viewed yourself being a part of it versus how you view yourself

today. Okay. We'll get back to that. Let me go back and take a look then at your prior criminality, shall we say, before you were arrested for this life crime. And I think now I know that I see here is that you have a juvenile record for grand theft auto. And you've even stated before that you had, you know, done the cars?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So you had the one arrest back in 1987, December of 1987?

**INMATE VASQUEZ:** Well as I said before, I was at my house. And I was in a Toyota truck with my girlfriend. And it was stolen by somebody else. And the officers happened to come up. It was about two or three in the morning. And they arrested me for being inside the truck. And they then they let me go about, I believe around seven or eight or something like that in the morning. And there was a car that I had stolen that was in front of my house. And I was getting ready to take it away from my house. And that's when I got arrested for grand theft auto.

**PRESIDING COMMISSIONER ENG:** Okay. And what happened?

**INMATE VASQUEZ:** I went to juvenile court. I had a 1,000 dollar fine. I had a thing call JAWS program. And I had to do, it was called (indiscernible) impact,

which was a, being at juvenile hall, I had to work and stuff.

**PRESIDING COMMISSIONER ENG:** Did they put you on probation or anything like that?

**INMATE VASQUEZ:** I think that was in summary probation, something like that.

**PRESIDING COMMISSIONER ENG:** Okay. What did you learn from that experience?

**INMATE VASQUEZ:** Really nothing.

**PRESIDING COMMISSIONER ENG:** Too young and, okay. And basically, you haven't had any adult arrests; is that correct, except for this life crime?

**INMATE VASQUEZ:** Well they had me, there was, I think it says a 211 or a robbery or something like that. And I was with a couple of gang members, my old homies.

**PRESIDING COMMISSIONER ENG:** Right.

**INMATE VASQUEZ:** And we were driving around. And they ended up stopping us. And they ended up saying that we were suspects in a robbery or something like that, a 211. So they arrested us. And they took us to Glenwood Sheriff Station. And then they let us go a couple hours later.

**PRESIDING COMMISSIONER ENG:** And you never heard anything else about that?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And that's been it?

**INMATE VASQUEZ:** And I had a traffic ticket. That's it.

**PRESIDING COMMISSIONER ENG:** Okay. And then it states here that you were, I guess born and raised in LA?

**INMATE VASQUEZ:** I lived in LA for a while. I lived in Thermal, towards Chowchilla, Palm Springs. And then I lived in Texas for a couple years.

**PRESIDING COMMISSIONER ENG:** Okay. All right. But you were born in what, it was, do I have the right date here?

**INMATE VASQUEZ:** Dwight Memorial Hospital.

**PRESIDING COMMISSIONER ENG:** April 16, 1971?

**INMATE VASQUEZ:** That's right.

**PRESIDING COMMISSIONER ENG:** Did your parents divorce and then your mother remarried?

**INMATE VASQUEZ:** I don't know how old I was. I really don't remember my biological father.

**PRESIDING COMMISSIONER ENG:** So you, you remember Rudy?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So you were the oldest. You had five siblings, so there's six

total?

**INMATE VASQUEZ:** No, there was --

**PRESIDING COMMISSIONER ENG:** Or five total?

**INMATE VASQUEZ:** There was five, me and my four sisters.

**PRESIDING COMMISSIONER ENG:** Wow. Okay. So you're the oldest and only son?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. So this thing states that both of your parents have problems with drugs?

**INMATE VASQUEZ:** Drugs and alcohol.

**PRESIDING COMMISSIONER ENG:** And alcohol. So this doesn't have anything to do with your biological father. It's your mother and her other husband, Rudy; correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So drug addiction and alcohol. And your parents have been arrested numerous times or what?

**INMATE VASQUEZ:** I think they were in and out of jail a couple times. I don't remember exactly how many times.

**PRESIDING COMMISSIONER ENG:** But if one was arrested and in jail, was another one at home with the

kids or --

**INMATE VASQUEZ:** Sometimes they weren't even around for a couple days when we were younger.

**PRESIDING COMMISSIONER ENG:** Okay.

**INMATE VASQUEZ:** I don't know if it was because they were arrested or they were out there doing what they were doing.

**PRESIDING COMMISSIONER ENG:** How old were you when you, you know, when you remember that first happening?

**INMATE VASQUEZ:** I would, I believe it was like in 1979 or 1980 when I first discovered that my mom and dad were drug addicts.

**PRESIDING COMMISSIONER ENG:** Okay. So that would make you what, about eight or nine years old?

**INMATE VASQUEZ:** About that, Ma'am.

**PRESIDING COMMISSIONER ENG:** So your younger sisters, what did you do? Did you look out for them?

**INMATE VASQUEZ:** I did, I tried my best.

**PRESIDING COMMISSIONER ENG:** Okay. All right. So you attended Pacific Palisades High School up through the 11th grade. Did you drop out?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. How come you dropped out?

**INMATE VASQUEZ:** When I started going to school, me and my girlfriend we already had our daughter. So, it was hard for me to go to school and try to finish school and try to take care of my daughter.

**PRESIDING COMMISSIONER ENG:** Was this Elsa Herrera?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Was your girlfriend?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So how old were you when you and Elsa had your first child?

**INMATE VASQUEZ:** I believe, my daughter was born in 1988. I was 17. And Denise was I think a year younger than me. She was 16.

**PRESIDING COMMISSIONER ENG:** Okay, but did you marry or you didn't marry?

**INMATE VASQUEZ:** I ended up getting married in prison to her.

**PRESIDING COMMISSIONER ENG:** But when you were 17, she became pregnant. You were, both of you were living at your respective parents' homes?

**INMATE VASQUEZ:** Well, I lived with her at her mother's house because at the age, I was about 16 or 17 when my mom and dad kicked me out of the house. And from there on I stayed with her and her mother.

**PRESIDING COMMISSIONER ENG:** Why did they kick you out?

**INMATE VASQUEZ:** When I grew up, my dad used to beat my mom a lot. And I finally said that I, I thought I was at the age of where I could stand up. And I finally decided to stand up for my mom. And I let him know that he wasn't going to do that no more. And I was confronting my dad about it. And at this time my mom starts jumping on my because I'm sticking up for her. So both of them ended up throwing me out of the house.

**PRESIDING COMMISSIONER ENG:** So you left there and you went right to your girlfriend's house?

**INMATE VASQUEZ:** Not right away. I was out on the streets for about a week or two.

**PRESIDING COMMISSIONER ENG:** Were you living, sleeping on the streets or you were staying at friends of yours, like, because you were a member of the gang at that point; correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So were you finding shelter --

**INMATE VASQUEZ:** I was --

**PRESIDING COMMISSIONER ENG:** -- with any of the other gang members?

**INMATE VASQUEZ:** I was going from here and there,

you know, wherever I could stay with a couple people.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. So you had your daughter. And then you had a son?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So your son was born just before you did the life crime?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. So are you in touch with them?

**INMATE VASQUEZ:** My daughter has ended up moving to Texas. I haven't had recent contact with her. She's staying with her boyfriend. And my son is in the process of trying to finish a semester of school and move with his mom to Detroit.

**PRESIDING COMMISSIONER ENG:** So you finally married, is it Elsa?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. You finally married her when you became incarcerated. Are you still married or are you split up?

**INMATE VASQUEZ:** We're divorced.

**PRESIDING COMMISSIONER ENG:** You're divorced?

**INMATE VASQUEZ:** I still have contact with her, you know, every once in a while.

**PRESIDING COMMISSIONER ENG:** Okay. What does she

think about your life crime?

**INMATE VASQUEZ:** You know, we never really ever talked about it. And I just let her know that, you know, I'm sorry for the things that I've done, excuse me, and for putting her in this situation for which she was in, abandoning her and my kids. But as far as, you know, I never asked her about how she feels about me being here or what I was a part of or what I did.

**PRESIDING COMMISSIONER ENG:** How about your two kids? Have you ever discussed it with them?

**INMATE VASQUEZ:** I never really talked to them about it, but I let them know that I'm sorry for not being there for them. And I let them know that when you make bad decisions, that we got to suffer the consequence and not just, like me, I let them know that what I did hurt them also because I wasn't there to help them or raise them.

**PRESIDING COMMISSIONER ENG:** Has your son, how would you feel if your, both your daughter and your son were members of a gang?

**INMATE VASQUEZ:** That would be bad.

**PRESIDING COMMISSIONER ENG:** Do you know for a fact that they are or are not?

**INMATE VASQUEZ:** No, they're not.

**PRESIDING COMMISSIONER ENG:** What would you say

to them?

**INMATE VASQUEZ:** Well I would let them know that, you know, being a part of something like that, it, it produces nothing good. It's nothing but negativity and the means of it is to take (indiscernible) instead of giving it to you. And I've tried to, you know, encourage them to always do the right thing and not to be a part of those things.

**PRESIDING COMMISSIONER ENG:** So has either one of them, have either one of them had any problems with the law?

**INMATE VASQUEZ:** No, Ma'am. They haven't.

**PRESIDING COMMISSIONER ENG:** And how old is your daughter now?

**INMATE VASQUEZ:** My daughter is 18.

**PRESIDING COMMISSIONER ENG:** And she moved to Texas with her boyfriend?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** How does that make you feel?

**INMATE VASQUEZ:** At first it got me upset because I wanted her to finish college. And I just talked to her in November or something like that. And I just let her know that, you know, that I was upset, but whatever happens that I'm with her, you know. I'm behind her. I

ain't going to turn my back on her. I'm going to be upset with her, that I'm going to love her. And whenever she needs me, whatever she needs, I'm here for her.

**PRESIDING COMMISSIONER ENG:** So your son is getting ready to move to Detroit with Elsa?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Why are they moving to Detroit?

**INMATE VASQUEZ:** I don't know. As a matter of fact, Denise left in the beginning of this month. She drove with my daughter to Detroit. She never explained to me why she wants to move to Detroit. But she ended up moving from LA. And my son is going to finish school. And he's go over there with her.

**PRESIDING COMMISSIONER ENG:** Have I left anything out that you feel that we should add into the record regarding your history, your, you know, your personal history or your prior record? I do have another question. Wait a minute. Your mother and your stepfather --

**INMATE VASQUEZ:** Separated.

**PRESIDING COMMISSIONER ENG:** Separated?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Any contact with

either one?

**INMATE VASQUEZ:** I have contact with my mother. She's doing real good now. She don't use drugs no more. She's staying with my grandmother in Texas. My dad, he's, he don't want to learn his lesson.

**PRESIDING COMMISSIONER ENG:** How about your sisters?

**INMATE VASQUEZ:** My sisters, I haven't had recent contact with them, but when I talked my mom or my grandmother, I always ask about them. I have a sister that stays in Texas. She's doing good. As far as I know, all my other sisters are doing all right.

**PRESIDING COMMISSIONER ENG:** Are the other three in LA?

**INMATE VASQUEZ:** I have, one of my sisters stays in La Puente. One of my sisters stays in Paris, which I believe in Riverside. And my younger sister stays in West Covina somewhere.

**PRESIDING COMMISSIONER ENG:** But you haven't spoken to them or seen them?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** When was the last time you saw your mother?

**INMATE VASQUEZ:** It was last year. I don't remember the exact month. It was last year.

**PRESIDING COMMISSIONER ENG:** Okay. Right now, if you think of anything else, we can get back to it, but right now, Commissioner Thompson is going to go over your post conviction package.

**DEPUTY COMMISSIONER THOMPSON:** Thank you. We're looking at a period of October the 5th, 2005 to today, January of 2007. And you have been housed here at CTF that entire period and for some years before that period; is that correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Okay. And you are in the general population at the mandatory classification score of 19. You are in medium A custody. And as far as disciplinaries are concerned, you have only three, two 128As, the last of which was in April on the 2nd, 2002. And that was failed to attend a class. And one 115, which was August the 4th of 1994 for disruptive behavior; is that correct, anything else?

**INMATE VASQUEZ:** Yes, Ma'am. That's correct.

**DEPUTY COMMISSIONER THOMPSON:** Okay. Then, okay, in vocational training during the period we're looking at, they say none in the period, but you have been in vocational landscaping in another time further back in your history. Did you ever get a certification of completion for vocational landscaping?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** So you did get it. Any other vocational training?

**INMATE VASQUEZ:** When I was at North Facility, I started machine shop, but I wasn't able to complete it because they were moving us from over, over North to here, Central.

**DEPUTY COMMISSIONER THOMPSON:** So the one certificate of completion is vocational landscaping. And then the vocational machine shop, but you didn't, you attended, but didn't complete that because they relocated at that time. Any vocational training at this time?

**INMATE VASQUEZ:** None, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Okay. Educationally you did get your GED certificate in a period after the one that we're looking at. And congratulations for that. And you have attended some other academic programs; is that correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** And I think even received certificates, laudatory chronos at least for having been involved in those educational programs and for your participation and consistency; is that correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** And are you in any educational type of program at this point?

**INMATE VASQUEZ:** I have this stuff right here that I'm doing right now. It's not completed, but it's just stuff that I'm doing right now.

**DEPUTY COMMISSIONER THOMPSON:** Certificates of attendance, I think or achievement, I believe they call them. You have a number of those in your file, but while they acknowledge you're going ahead in this, you haven't graduated, if that would be the appropriate word, from the program; is that right?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** What kind of programs are they?

**INMATE VASQUEZ:** One is called, I'm taking one from the streets called Crimanon.

**DEPUTY COMMISSIONER THOMPSON:** I see that was, you have a handwritten note, among other things, in there about Crimanon. Now the aim of that program is to get your thinking straight about what you should do in the community and what your expectations and resources are. Is that the general theme?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Do you feel good about those programs?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Are they helping you at all or is it just a means to fight extreme boredom?

**INMATE VASQUEZ:** No, the way I look at these is whatever I, whatever I sign up for, I try to take, try to get something from it.

**DEPUTY COMMISSIONER THOMPSON:** And that's born out by receipt of a number laudatory chronos that when you undertake something, you finish it if you're able to, and that you do try to do whatever you sign up for and learn something from it. That seems to be the general tone of the many numerous certificates and laudatory items. What you submitted, and Commissioner is looking over now, a large number of those are already in your file. Those that are in 2007 and in some of the latter parts of 2006 haven't made it, but almost everything else is already in your file. You're aware of that?

**INMATE VASQUEZ:** When I went to see my counselor, some of that stuff wasn't in there. That's why I brought it with me.

**DEPUTY COMMISSIONER THOMPSON:** And a good thing that you did. No problem there. But actually, they have, other than the 2007, those certificates and those

chronos, have not, but their in tone duplicates of the good things that have been said. You just continue a good and positive kind of behavior. Now, your work record, I think you've been, well you've been a number of different services, culinary. And I think you've worked as a clerk in the prison industry authority and textiles at least briefly. And what is your work assignment right now?

**INMATE VASQUEZ:** I'm a janitor in the wing.

**DEPUTY COMMISSIONER THOMPSON:** Janitor, so you've done janitorial and porter and clerk and landscaping, I suspect would we call that yard crew, perhaps?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** And does that kind of summarize the assignments you've had, you've received uniformly positive supervisor's reports no matter where you were placed. They say you were a good worker. And you get along with your other workers, companions in whatever assignment it is and that they have appreciated having your supervision in their care. And that is a tone that runs throughout. Did we leave out any other work assignments? It's yard, porter, janitor, I think you took a turn at culinary. And that's what I can find most recently. Is that an accurate reflection?

**INMATE VASQUEZ:** Recently, yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Okay. And in group activities, you have been very active throughout apparently your entire period of incarceration. Alcoholics Anonymous and Narcotics Anonymous in particular and then Anger Management and Fathers Behind Bars, I think was one program, and then many others. And all of them earned you chronos that are laudatory for your participation and for your attendance. And I think at one point you were elected secretary of one of the Alcoholics Anonymous groups?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** And all of that is documented. So you have acquired a significant history of laudatory chronos among which are some of the most recent that haven't yet been filed. You haven't had any psychiatric treatment apparently anytime during your incarceration; is that correct?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Okay. And I think that they list as part of the AA group attending A Sober Path as one of the segments of the AA program. And I believe that kind of covers it. Does that, is there anything you want to ask or any point you want to bring up?

**INMATE VASQUEZ:** None, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Nothing that I left out that you want to be sure we address?

**INMATE VASQUEZ:** That's pretty much everything.

**DEPUTY COMMISSIONER THOMPSON:** Okay. Appreciate that. And then turning to your most psychiatric evaluation, that apparently was in January of 2005?

**INMATE VASQUEZ:** Yes.

**DEPUTY COMMISSIONER THOMPSON:** Is that your recollection?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** I believe you have a copy of it. And it goes into a great deal of detail about you as a human being, your juvenile, your family, your sexual orientation, more areas than you probably knew you had. Anyway, they got finally to those things that probably interest us the most, of the risk for future violence. And there's one, two, three paragraphs about what has emerged in research literature in the field of psychological evaluation and what he used and what he didn't use.

But after he got through that, we came to a conclusion that indicates overall, Mr. Vasquez appears to fit into a category that represents a low to moderate risk for violence in the community. And that is really the only, well, not the only, but one of the primary

things that interests us, is his final assessment. He tells you in huge detail what his study approach was and what he used.

And then he comes along to the very last paragraph in his conclusion. However, while Mr. Vasquez has shown some participation in programming, and I would add that it's more than some, opportunities during his long incarceration in prison, he has not fully availed himself of the opportunities for self-improvement in order to be better prepared for release. Mr. Vasquez needs to intensify his current level of participation by resuming his participation in a self-improvement activity and by increasing his employment skills.

As I remember you have worked, but not related it to things you might do on the outside other than there was, I believe, an allusion to sewing machine operator that I remember and landscape activities that would certainly transfer to the community. Have you done any other, well, you tried metal --

**INMATE VASQUEZ:** Machine shop, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Okay. Machine shop, thank you. And but that terminated through no fault of your own. Have you tried to enroll in anything job wise or vocationally since then?

**INMATE VASQUEZ:** I haven't yet.

**DEPUTY COMMISSIONER THOMPSON:** Well, apparently it would help you if you did, at least, with respect to the psychologist. You know, he's worried about your employment skills, which he hopes if you work at it, you'll improve your transition to a lower level of risk and help to insure the successful adjustment to the community. And that report was written by an Eric Rueschenberg, PhD, Forensic Psychologist, Healthcare Services Division, California Department of Corrections. It was signed off on January the 17th, 2005.

Were you aware, I think I found a copy of it in that number of documents you gave us in that folder at the beginning of the hearing. So you have read that?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** And were aware of it's content?

**INMATE VASQUEZ:** Yes, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Anything that I didn't touch on that you would like to bring up or include at this point?

**INMATE VASQUEZ:** No, Ma'am.

**DEPUTY COMMISSIONER THOMPSON:** Thank you very much. And I'll return it to the chair.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you, Commissioner. Mr. Vasquez, let's talk about your future

plans and parole plans. Okay. All I can go by is the October, 2006 Board report just states that all relative documents and information remain the same as in the prior report, which I can go back to the July, 2004. It states here that you would like to seek an out-of-state parole to San Antonio, Texas. Is that still valid or has that changed?

**INMATE VASQUEZ:** That's the same, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And this is with your maternal grandmother?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Elvira, Elvira?

**INMATE VASQUEZ:** Elvira.

**PRESIDING COMMISSIONER ENG:** Elvira Echartea?

**INMATE VASQUEZ:** Echartea.

**PRESIDING COMMISSIONER ENG:** Echartea. Sorry about my messy pronunciation, E-C-H-A-R-T-E-A, because we do have letter. It states here that she's indicated that she's investigated support programs in San Antonio that would help you to transition to life outside the prison. Okay. And I know that with this, but what I'll go ahead and do, it states here that you have alternate plans, too, to reside in South Whittier, in South Whittier Community Church?

**INMATE VASQUEZ:** I had hoped to, but I never got

a response from them.

**PRESIDING COMMISSIONER ENG:** Okay. So that's no longer valid?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. That's what I wanted to be sure because, so we'll cross that one off. That's not valid. Okay. So right now, we're just talking about the out-of-state to San Antonio, Texas.

**INMATE VASQUEZ:** I have --

**PRESIDING COMMISSIONER ENG:** And then the Amity Foundation --

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** -- which I'll read that into the record. Okay. So, let's go ahead and read this into the record. And if I leave anything out, you remind me, okay?

**INMATE VASQUEZ:** Okay, Ma'am.

**PRESIDING COMMISSIONER ENG:** I got a letter dated, and I checked, I went through this. And I believe I have most of them except for these last two. So, I have a letter dated March 19th, 2006 from the Saint Rose of Lima Catholic Church located in Texas from Juan Alvara, who is the pastor. And it's a general support letter for Mr. Vasquez' freedom, his parole. It states that his mother and grandmother and aunts live in

San Antonio and are deeply committed Catholics. And all of them look forward to working and cooperating towards helping Adam to start a new life as a self-respecting, productive citizen. Actually, there's a few copies of that letter. Then we have a letter dated July 3rd, 2006 from Nicholas Lichtenberger, L-I-C-H-T-E-N-B-E-R-G-E-R. And this is your uncle?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. And it's a general support for your release, but I also, okay. This states that as his uncle and a peace officer in the State of Texas, I will be a constant contact with Adam and will expect him to respect the law. Good behavior and good deeds with be reinforced with personal visits and phone calls. Should Adam decide that he would like to live in Laredo, I will provide him with housing until he is able to provide for himself. And he gives his address in Laredo, Texas. So, okay. So it states here it has been difficult to travel to California to visit with Adam. However, my mother, Elvira is --

**INMATE VASQUEZ:** Elvira.

**PRESIDING COMMISSIONER ENG:** Elvira Echartea --

**INMATE VASQUEZ:** Echartea.

**PRESIDING COMMISSIONER ENG:** -- Echartea, goodness, so his sister is your mother?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. All right. Sister Evelyn Herrera had visited with Adam and provided the family with details of the visit. So, he's offering his support. Okay. June 21st, 2006, this is from your grandmother, Elvira E-C-H-A-R-T-E-A, San Antonio, Texas, who is your maternal grandmother. And she states that she would be happy to make him a partner in my small house rental business. So, I'm assuming, I didn't, unless I'm missing it, did, she's supplying you with housing also?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So who lives with your grandmother right now?

**INMATE VASQUEZ:** I believe she lives alone, I believe.

**PRESIDING COMMISSIONER ENG:** But your mother is living there in San Antonio also?

**INMATE VASQUEZ:** Yeah, my mom was staying with my grandmother, but my aunt just bought a house next door to my grandmother. So, my mom is staying with my aunt right now.

**PRESIDING COMMISSIONER ENG:** How old is your grandmother?

**INMATE VASQUEZ:** I believe my grandmother is 77,

77, 76.

**PRESIDING COMMISSIONER ENG:** She's getting up there in years. Okay. She owns her own home, though, or no?

**INMATE VASQUEZ:** She owns a couple homes.

**PRESIDING COMMISSIONER ENG:** Okay. Is she in a financial position to support you financially?

**INMATE VASQUEZ:** Yes, yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. You have a letter dated June 28th, 2006 from Rachel Vasquez. And this is your mother. Okay. And she does state that I am of meager means. So my monetary support will not be one of my attributes, but I wanted to share all I possess. He will have my undivided emotional and religious support. She plans to spend as much time as she can to make up for all that was lost. So I bet you see a, quite a different woman before you today than when you were eight or nine years old?

**INMATE VASQUEZ:** A whole lot different.

**PRESIDING COMMISSIONER ENG:** Okay. How long has she been off the drugs and alcohol?

**INMATE VASQUEZ:** I think it's been about seven or eight years, I think.

**PRESIDING COMMISSIONER ENG:** And she's living with your aunt?

**INMATE VASQUEZ:** Right now she's living with my aunt.

**PRESIDING COMMISSIONER ENG:** And has your aunt ever had a problem with the law or with drinking or drugs?

**INMATE VASQUEZ:** As far as I know, no.

**PRESIDING COMMISSIONER ENG:** And then we've got this letter, and I don't know if this is still viable, April 10th, 2005. It's a little old. And I don't know why it's in, by Denise Gallippo, G-A-L-L-I-P-P-O?

**INMATE VASQUEZ:** I believe the only letters that I have right now are the ones you just read. All others were from the previous hearing.

**PRESIDING COMMISSIONER ENG:** Okay. All right. So I will not read these 2005 letters. These aren't, yes, they're a little old. Then these other two that I found in the folder that you provided to us, this one is dated January 18th, 2007 from Melva Fry, F-R-Y. She's an active member of two 12 step programs, AA and NA, since '94. So what is she offering?

**INMATE VASQUEZ:** She didn't mention, she didn't mention in her letter, but when I spoke to her, she offered to be my sponsor.

**PRESIDING COMMISSIONER ENG:** Okay.

**INMATE VASQUEZ:** She was in a hurry to get the

letter off to me because I told her I was going to the Board this month.

**PRESIDING COMMISSIONER ENG:** Yes, the only place I see and unless I've missed it, you'll have to point it out to me, is I see next to the last paragraph she states that now with this said, I truly believe that Mr. Adam Vasquez can also be a great candidate to walk the path of AA, NA way of living in residing in a treatment facility where he can find a foundation for starting a new way of life and learn to walk life on life's terms with a new attitude and adjustment, because introduced to others who that have been in the same situation -- Mr. Vasquez -- and worked for millions of human beings of all walks. Okay.

She's been working for the County of Ventura for over 10 years now. Well, unfortunately, she does not say that she's going to be your sponsor or anything else. So, it's just sort of background information about AA and NA, but okay, but at least she mentioned you in the letter.

Then we have a letter dated December 5th, 2006 from Amity Foundation. And they're stating that they would be willing to accept you in their residential facility as with any stipulation that court orders post-release. And we're well aware that they've worked with

offenders in California. They've got a good program in place for reentry to a larger community. So this organization provides housing, counseling, vocational placement and they have continued onsite education. The parolees interested in helping other parolees be successful and probably offer an apprenticeship program onsite. So what are you planning on doing with these folks?

**INMATE VASQUEZ:** Well, my main goal is to go to this program here. And whatever time I got to stay in California, I want to stay there and really take advantage of any program they have to offer me until I can go to Texas with my grandmother.

**PRESIDING COMMISSIONER ENG:** Okay. And this letter is signed by Mark Faucette, F-A-U-C-E-T-T-E, the project director. Will it cost you anything to go to Amity?

**INMATE VASQUEZ:** As far as I know, no, Ma'am.

**PRESIDING COMMISSIONER ENG:** But you do have to participate in their programs. And don't you have to work also in order to help?

**INMATE VASQUEZ:** I didn't receive any of that information. I know that I got to participate in the program.

**PRESIDING COMMISSIONER ENG:** Okay. So where did

you find out about Amity?

**INMATE VASQUEZ:** There was this guy that I know for a while. And I was explaining to him my situation where I had the person, himself, for your church, he didn't write to me. So, he gave me the address of this place here. And I wrote to him. And he sent me a letter.

**PRESIDING COMMISSIONER ENG:** Okay. Did I miss anything?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Did I get the most current information into the record?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** So still your first choice would be to be able to go home to your grandmother; is that correct? Or is your first choice to go to Amity and then be able to go to Texas?

**INMATE VASQUEZ:** Well my first, I mean, I really want to go with my grandmother, but from what I was told, that I can't leave California without reporting to a parole officer, filing the proper paperwork and if they approve it then I can go. So my first choice would be Amity Program.

**PRESIDING COMMISSIONER ENG:** Have you looked into transferring your sentence over to Texas?

**INMATE VASQUEZ:** My grandmother looked into it through the Department of Correctional. And they said that they wouldn't do it.

**PRESIDING COMMISSIONER ENG:** They don't have the --

**INMATE VASQUEZ:** Out-of state transfer.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. All right. So we've covered everything then to your satisfaction regarding your parole plans?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** I'll probably still have a couple of questions, but I want to state that we sent out Penal Code Section 3042 notices. And those notices go to agencies that have a direct interest in your case. And we do have in possession a letter that is dated December 26th of 2006 from the Los Angeles Sheriff's Department Headquarters.

Specifically this is from, it's signed by Raymond Peady, P-E-A-D-Y, Captain of the Homicide Bureau. This is the organization that was the investigating agency into the life crime. And they basically go in and state that, they give a little synopsis of the life crime. And based on that, they state, based on these facts, it's the opinion of this department to parole Inmate Vasquez is inappropriate and should be denied.

We also have Ms. Glidden, who is the representative from the Los Angeles County District Attorney's office, who is present, who I'm sure will be giving a final statement regarding your parole suitability prior to us taking a recess for deliberations. So on that, I think I'm going to now go back, and between my fellow Commissioner and myself, ask any follow-up questions before we move on.

A couple of things I want to ask you about is what have you gotten out of, you know, you've been doing a lot of different programming. And I didn't quite get very clearly on what you personally have gained from attending any of these types of programs, and how you might use what you've learned in everyday life today, and how it can help you. So sort of summarize it. Tell me which, one program, one particular step, something that has really, really hit home for you. Tell me, tell the Panel what that might be.

**INMATE VASQUEZ:** I think it would have to be the Impact program. It would have to do with several things. The main thing of it was victim awareness. And the last time I seen my sister, she was like, she couldn't understand why I'm not out of prison. And I told her that she should put herself in Michelle's family's shoes. What if it was me that was shot and

taken away? How would you feel? And the biggest thing that I got from that is, the things that I do, the decisions that I make is, I try to think of the other person and the other person's family because I know I wouldn't want that to happen to me. It would really hurt me.

I learned empathy and then I also shared with her about the ripple effect, how things affect other people. And when I go, when I go to like (indiscernible), when I attend NA, AA, that's the main thing that I look at is that how could I use the things that I have to help people with understanding that the choices they make, that they don't, they, it's not just on them that suffer, but it's their loved ones. It could be the child, the mom, the grandmother, the wife.

I was sharing with somebody the other day who has been in and out of prison. He's a youngster who is in my group right now. And he keeps saying that he's fed up with this, that he's getting, supposed to be three strikes. And I told him that you can't think for yourself. You got to think about what you're putting your family through. Everybody in prison, they walk around with this thing about respect, that if you disrespect or you respect me. And I told him that he's so much focused on respect that he needs to start

respecting his family and that he needs to understand that if that was your child that somebody was trying to steal from or take something from, how would he feel. And he said he wouldn't like it. And that's why, what I like.

**PRESIDING COMMISSIONER ENG:** Okay. Commissioner, do you have any other questions?

**DEPUTY COMMISSIONER THOMPSON:** No, I think I'm fine in that respect.

**PRESIDING COMMISSIONER ENG:** I have another question for you. When you look back, okay, in all honesty, today when you look back, do you, would you say that you had a serious drinking problem or a drug problem?

**INMATE VASQUEZ:** I know I had a problem. How serious it was, I know I had a problem with drinking and using drugs.

**PRESIDING COMMISSIONER ENG:** Why do you say you had a problem? How do you define that problem?

**INMATE VASQUEZ:** Because I would like, because I had a cycle when, you know, on the weekends I would drink and to me, a normal person doesn't, I could have used that money for something better instead of wasting it on drugs or alcohol. An everyday person doesn't do that. And to me, comparing myself to an everyday

person, I knew I had a problem.

**PRESIDING COMMISSIONER ENG:** Were you drinking a lot, like on a daily basis or weekly where --

**INMATE VASQUEZ:** I don't know, for a while there I was drinking on a daily basis. And then I cut back and it was like a weekly basis.

**PRESIDING COMMISSIONER ENG:** Okay. Would you drink to excess where you would always get drunk or --

**INMATE VASQUEZ:** There was a couple times that I woke the next morning and I didn't remember nothing.

**PRESIDING COMMISSIONER ENG:** And do you feel that you knew what an alcohol and drug problem looked like?

**INMATE VASQUEZ:** At the time, I didn't.

**PRESIDING COMMISSIONER ENG:** But how did you see your mother and father?

**INMATE VASQUEZ:** I was sharing with somebody the other day. And it's, he thought it was kind of humorous, but it was sad. When I first discovered they were using drugs, I was going through my dad's closet because it was Christmastime. And I was in there looking for our presents. And when I went through the closet a bag of stuff falls out. And I go inside the bag. And that's when I found their drug paraphernalia. And that's when I knew they had a problem.

**PRESIDING COMMISSIONER ENG:** Did you notice

anything different about their behavior around when you and your sisters were home?

**INMATE VASQUEZ:** In the beginning, my mom would always pass out. She would OD. And he would always have to take my mom to the restroom and bring her back. And then after a while when my dad, when he used to get, when he wasn't using drugs, he had a real nasty attitude.

**PRESIDING COMMISSIONER ENG:** So your mother, were they both doing drugs more than drinking? Did they drink to get drunk often, too or no?

**INMATE VASQUEZ:** I remember them just like drinking like, I don't remember them drinking all the time like for parties, you know. Drugs, I could say that was a daily basis.

**PRESIDING COMMISSIONER ENG:** Right.

**INMATE VASQUEZ:** Three or four times a day.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. So would you say that your issue for you personally was more drinking or was it more drugs or equal?

**INMATE VASQUEZ:** I would say it was more drinking.

**PRESIDING COMMISSIONER ENG:** Okay. Okay. Commissioner, any questions?

**DEPUTY COMMISSIONER THOMPSON:** No.

**PRESIDING COMMISSIONER ENG:** Okay. Ms. Glidden, at this point in time, do you have any questions to pose to Mr. Vasquez through the Panel?

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** Yes, I would like to ask the Panel to ask the inmate if he knew that the victim was pregnant at the time that she was killed.

**PRESIDING COMMISSIONER ENG:** Sir, did you have any idea that Ms. Michelle Zohnie was pregnant at the time?

**INMATE VASQUEZ:** When I went to court, they brought it up, but before that, I wasn't aware of it.

**PRESIDING COMMISSIONER ENG:** Okay. Ms. Glidden.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** And it's my understanding also that the other, that her fiancé was also shot. Would you ask him if that is true. I see the police department letter doesn't say that, but I believe that's true. And I wonder if we could ask the inmate that question.

**PRESIDING COMMISSIONER ENG:** Yes. Sir, do you recall?

**INMATE VASQUEZ:** The gentleman's name was Frank Anthony Mendez.

**PRESIDING COMMISSIONER ENG:** Right. Okay. Mr. Mendez, was that her fiancé?

**INMATE VASQUEZ:** Yes, Ma'am. That was her

fiancé.

**PRESIDING COMMISSIONER ENG:** Okay. Okay.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** And my question was, he was shot also, wasn't he? Didn't he get wounded also?

**PRESIDING COMMISSIONER ENG:** Were you aware if he was wounded also?

**INMATE VASQUEZ:** I know he was shot, but as far as to the extent, I don't know how wounded he was.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** That's --

**PRESIDING COMMISSIONER ENG:** Okay.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** That's my understanding. And so I would like to just correct that letter that was sent by the Sheriff's Department. Because they indicate Mendez was uninjured, which is not true. He was shot also.

**PRESIDING COMMISSIONER ENG:** All right.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** Thank you. And I also noted that the, in the paragraph that was read from the most recent psychological report was recommending participation in self-help and increasing his employment skills. And then I also noted that in the October, '05 to January, 2007 there's been no vocational training. I guess my question is, first of all, is that accurate? And secondly, does the inmate

plan to increase his vocational skills as recommended or does he feel that he needs to do that in order to get a job when he gets out?

**PRESIDING COMMISSIONER ENG:** Sir, do you understand the question?

**INMATE VASQUEZ:** Yes, Ma'am. I understand it.

**PRESIDING COMMISSIONER ENG:** Okay. And what is your response?

**INMATE VASQUEZ:** I do plan to take more, another vocation in the future.

**PRESIDING COMMISSIONER ENG:** Okay. Would you like to add anything else?

**INMATE VASQUEZ:** The reason why I haven't taken it, signed up for it right now is because I'm trying to take advantage of all these other programs they have to offer like I signed up for another Anger Management. And me going to voc, going to voc me when they feel I'm participating in these other self-helps that are offered. So that's why I'm trying to take what I can right now than when I signed up. But when I started taking voc, I would have my self-help.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** My final question I would ask the Panel to address with the inmate is, in his description of jumping into the gang, my understanding having been a prosecutor for many

years, that it's normally also a requirement to commit a crime when jumping in. And he mentioned having to fight with other members of the gang. So my question is, did he also have to commit a crime in order to jump in.

**PRESIDING COMMISSIONER ENG:** Okay. Do you understand?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay.

**INMATE VASQUEZ:** When I was jumped in, that wasn't part of getting in at the time that I got jumped in.

**PRESIDING COMMISSIONER ENG:** So you didn't have to commit any crime?

**INMATE VASQUEZ:** No, Ma'am.

**PRESIDING COMMISSIONER ENG:** Your particular situation just had to do with fighting?

**INMATE VASQUEZ:** People of that gang.

**PRESIDING COMMISSIONER ENG:** Within the gang?

**INMATE VASQUEZ:** Yes, Ma'am.

**PRESIDING COMMISSIONER ENG:** Okay. This fighting, no weapons?

**INMATE VASQUEZ:** No weapons at all, just with hands.

**PRESIDING COMMISSIONER ENG:** Were you aware of any, subsequent to you entering into the gang, were you

aware, did it change with other members where it was required for them to go out and commit a crime also, were you aware of this?

**INMATE VASQUEZ:** The little time that I was there, it was like a year or two I think, I had jumped somebody in myself. So the time that I was around, it didn't change.

**PRESIDING COMMISSIONER ENG:** Okay. Sorry about that, asking a follow-up.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** I have no further questions.

**PRESIDING COMMISSIONER ENG:** Okay. Counsel, do you have any questions to ask your client?

**ATTORNEY RUTLEDGE:** No questions.

**PRESIDING COMMISSIONER ENG:** Okay. At this point, we'll move on unless, Commissioner, you have --

**DEPUTY COMMISSIONER THOMPSON:** No questions.

**PRESIDING COMMISSIONER ENG:** -- okay, to final statements. Ms. Glidden.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** Thank you. It sounds to me as if Mr. Vasquez still has some work to do to fulfill recommendations that have been made in the past and to assure that he will not be a danger to the community and have to, you know, will be able to get a job and not repeat his previous behavior. So at this

time, it is the position of the District Attorney's Office of Los Angeles that he is still unsuitable for parole and would pose an unreasonable risk of danger to the community.

Due to the especially callous and dispassionate facts of the life crime where, based solely on the trivial motive of gang affiliation, inmate and his gang associate, shot and killed Michelle Mae Zohnie and wounded her fiancé. And I noted that in the last decision that after being shot, Ms. Zohnie, and she was shot in the abdomen and apparently the baby that she was carrying was killed as well, and before she died, she rushed over to see that her other child, who was apparently present, was okay.

I see that on page two of the '05 decision that she heard the baby crying after she had been shot and immediately going in to check on her baby to make sure the baby was okay, just an incredibly tragic murder. Ms. Zohnie, who it's been established was pregnant, was standing in front of a house in a residential neighborhood, talking with her friend when this act of street terrorism was perpetrated by the inmate and his fellow gang member. She and her friend were particularly vulnerable since they were just standing in front of a home and talking. And the whole community

was put at risk by this kind of behavior. Multiple victims were attacked as well as the other people that were put at risk.

The inmate has an unstable social history, as has been discussed, with his mother and father and drug use and his own drug and alcohol use and gang affiliation. He had a prior juvenile record in that a petition was sustained finding him responsible for the theft of an automobile. He was placed on probation, home on probation. And since his incarceration, as we know, he had two 128As and one 115 for misconduct. The most recent 128 was in 2002.

I also was drawn to the last paragraph of the most recent psychological report, which stated that he falls into the, a category that represents low to moderate risk for violence in the community. And it recommends that he still needs work in self-help, vocational training. And it sounds to me like he has finally started addressing the AA and NA on a consistent basis, which I think is an absolute requirement for assuring that he doesn't relapse to drug and alcohol abuse and which, I'm sure, would relate to his risk of committing another violent act.

For, so for those reasons, I do feel that at this time, the inmate is still, would pose an unreasonable

risk of danger to the community and is unsuitable for parole for that reason. Thank you.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. Mr. Rutledge, final statement.

**ATTORNEY RUTLEDGE:** Thank you, Commissioner. You know, I think we lose perspective, it's often the use of, you know, trivial and callous. And all killing is trivial. This is not any more trivial or less trivial than any killing. This is a killing that happened. And so to use the word trivial, I don't feel really appropriate because it's, all killings are trivial. It's not an aggravating factor. It's just a factor that happens with a killing.

Callous, it's a tragedy that his young woman was killed. And it's a tragedy that she was pregnant at the time. That's a tragedy, sure, but it's just callous in that there wasn't, you know, any torture or anything along those lines to show, it was a drive by shooting. That's what happened. And it's --

**DEPUTY COMMISSIONER THOMPSON:** Excuse me, Counsel, I think we have a tape issue.

(Thereupon, a recess was held off the record.)

**DEPUTY COMMISSIONER THOMPSON:** You're back on tape.

**ATTORNEY RUTLEDGE:** Thank you, Commissioner. And when the psychologist mentions the fact that it would be good for him to upgrade vocationally, you know, the standard is an unreasonable risk to society. The fact that somebody doesn't have a job, doesn't mean that they're an unreasonable risk to society, they're a danger. So we can't say that a person who doesn't have a job is a danger.

And in fact, that's not the case at all. He does have marketable skills in landscaping. In addition, his number one choice for his parole plans is to go into this program where, in fact, they're going to provide a residence. And they're going to provide him training, vocational training. It's a very good program. So, that's not, would not equate to an unreasonable risk to society in any shape or form.

Plus, I would note that the psychological exam was back in 2005. And one of the things that was emphasized was to do more self-help. And as the Deputy Commissioner has pointed out, that's exactly what he's been doing. He was asked to do more self-help. And he's been doing that. There is a reality when you're in custody that you have to balance what you're going to do. Am I going to do self-help or am I going to do the vocational? And so, he felt that, and I think it's

appropriate, that he should be doing the self-help. And that's what he's been doing.

This is a gentleman also that he made an early admission. He made a tragic error of judgment. And he's been living with it ever since. And what more of a tragedy when he finds out that it was a close friend of his. No killing is right. But when you see how that turns out that it ends up being a friend, it's even worse. I guess, I would have to equate it to, here you're in a gang you can somewhat compare it to the military. And they have a term in the military called friendly fire. And that's kind of what happened to her. She ended up getting taken down in friendly fire, which is just a tragedy.

But he did, as soon as he got caught, he admitted to the police what happened. He didn't hide it. He didn't minimize it. He was forthright. He didn't put them through a bunch of hoops. In court he came and he pled guilty. He didn't put the court through a bunch of hoops. And with the Panels he's been forthright with the Panels, this is what happened, I know I did wrong. And so, he's not playing games. He knows what he did.

He can't change the fact that he had an unstable childhood. And to say that he's an unreasonable risk to society because his mom and step dad were drug addicts,

it's unfair. You can't put that burden on him. But the beauty of it is that his mom has pulled out. She's doing well, been clean six, seven years now. And so, she's a good example to him. And although she says she doesn't have much to be able to give, but she does have a love of a mom. And that's a big thing in itself.

He doesn't have a violent history in the past. This isn't a sophisticated gang. We haven't heard anything about it. It not like it was a bunch of homeboys that hang out and get themselves into trouble. They're mostly into drinking and doing some drugs and steal some cars once and a while. But he doesn't have a violent history. The only history he does have is theft. So he's even admitted that, you know, not just that theft that he got caught with, that's kind of what they did. They stole cars.

He's worked hard when he's been in here. He's got great laudatory chronos for everything that he's done. He throws himself into it 100 percent. He earned his GED. As I pointed out earlier, he's been doing a lot of self help. The ultimate of the psychologist's report also was they (indiscernible) moderate risk to society. So, he's not an unreasonable risk to society.

And I'd like to, I keep pointing to that, but I think we get lost also in the fact that we think, well,

there's a risk. That's not the standard. The standard, as the Panel knows, is an unreasonable risk. All of us are a risk. Something could happen with all of us. And he has programmed very well. So, he hasn't got into that category as being an unreasonable risk.

As I pointed out also, he's got great parole plans to go into the facility. And he's working towards being able to go to Texas where he's got his family that has residential, multiple residential options for him as well as job opportunities there. He would work really hard. I would ask that the Panel give him a date today and (indiscernible). Thank you very much.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you. Mr. Vasquez, this is an opportunity for you, you don't have to, but you can if you like, to make a final statement regarding why you feel you're suitable for parole.

**INMATE VASQUEZ:** The last couple times I've come to my hearing, I've never said nothing because I feel that it's unfair, like I was telling Mr. Rutledge, because I feel it's unfair that one of these days I'm going to have an opportunity to get out and go live life. And Michelle, she don't have that opportunity to go out and live life, to be with her family. And I want to go out there. I want to live life.

And I want to, you know, I've done a lot of things in here that changed me. I did a lot of things out there that were childish. And in here it's sad that it took this for me to be man. And when I do go out there, I'm not going to do the things I did. My life is different now. And I'm sorry for what I did. That's all I have to say.

**PRESIDING COMMISSIONER ENG:** Okay. Thank you for your comments. We'll now recess for deliberations. The time is 10:36.

**ATTORNEY RUTLEDGE:** Thank you, Commissioners.

**R E C E S S**

--oOo--

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

**DEPUTY COMMISSIONER THOMPSON:** Okay. Okay. You're on the record.

**PRESIDING COMMISSIONER ENG:** Okay. The time is 11:01. Everyone who was in the room prior to recess has since returned. But this time we've added another correctional officer for security reasons. In the matter of Adam Vasquez, V-A-S-Q-U-E-Z, CDC number H-10787, the Panel has reviewed all the information from the public and in light of the following circumstances, have concluded that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

The Panel finds that the commitment offense was, in fact, carried out in a very callous manner in that the inmate and his crime partner showed a total indifference into who the would-be victims would be when they set out to drive over to, I can't remember the name of the street, to the street where they ended up committing the shooting. Multiple victims were attacked whereby one ended up being, being killed. The offense was carried out in a very calculated manner, whereby

both the inmate and the crime partner set out to search for someone to shoot over on Chancellor, which was a residential area.

It was carried out in a manner which demonstrates a very callous disregard for human suffering and human life in that the weapon was discharged four times. And that then the inmate and his crime partner took off in the car not knowing or really caring if anyone was hit by the gunfire, injured or killed. And then to, and then the inmate found out about two and a half minutes, two and a half months later, when he was arrested, that in fact, (indiscernible) was the one that, who suffered the death from the results of that shooting.

The motive for the crime we find it appears to be a gang retaliation whereby again, both the inmate and his crime partner targeted to go and find someone to basically shoot over on Chancellor. These conclusions are drawn from the statement of facts whereby Mr. Vasquez along with his passenger, Juan Francisco Hernandez, had driven up at approximately 11:08 in the evening to where the victim, Michelle Zohnie, Z-O-H-N-I-E, was standing with a group of people in the front yard of a residence.

And when they drove up, Mr. Hernandez asked the

victims where they were from. And when there was no reply, Mr. Hernandez brandished a handgun and fired four shots, one of which ended up killing Michelle Zohnie and wounding another. Vasquez and Hernandez then drove away out of sight only to be arrested in July of 1991. (Indiscernible) of a previous record, Mr. Vasquez, the only altercation he had had with police had been as a juvenile when he was arrested for grand theft auto, in which case I believe Mr. Vasquez stated that he had, it was, possibly he got summary probation.

But he does have a very, comes from a very unstable social history in that it, and we had discussed it that both of his parents, his mother and his stepfather, both had apparently serious problems with drug addiction and would disappear for days sometimes on end. And apparently his stepfather turned out also to be an abuser. And whereby the inmate had used to witness his mother being beaten by his stepfather to the point when he was old enough, by around the age of 16, where he, the inmate stood up for his mother against his stepfather. And thereby, it ended up his mother turned on him along with his stepfather and threw him out of the home.

It appears that around that time Mr. Vasquez had,

was possibly already affiliated with this Canvas Street Gang. And when he was thrown out of the home ended up really turning to his fellow gang members for help and for some shelter, but again, just the fact that his gang membership and affiliation is unstable in the matter of itself.

In terms of the institutional behavior, the only misconduct that this inmate has had on his record are two 128A counseling chronos, the last one being in April of 2002 for failure to attend class. And then he's had one serious 115 disciplinary report that dates back to August of 1994 for disruptive behavior.

The Panel found that the psychological report that is dated January 17th of 2008 and authored by B. Rueschenberg, R-U-E-S-C-H-E-N-B-E-R-G, appears to be somewhat supportive. However, this Panel finds it to be somewhat inconclusive in that Dr. Rueschenberg does state that, that Mr. Vasquez, in terms of static risk factors is in the low to moderate range for future risk. And he doesn't seem to have a prominent antisocial orientation. And he doesn't fit the clinical picture of a psychopathic personality. So psychopathy is not a significant risk factor.

And then he goes on to say if we review dynamic

risk factors, Mr. Vasquez also falls within the low to moderate range for future risk. He started to manifest adjustment problems in adolescence, which continued into early adulthood. However, while incarcerated in prison, he's manifested only occasional minor behavioral problems. And he appears to be earnest in his desire to maintain a pro-social orientation.

He concludes that Mr. Vasquez appears to fall into a category that represents a low to moderate risk for violence in the community. However, one thing that we find that was inconclusive is he states that, however, while Mr. Vasquez has shown some participation in programming opportunities during his long incarceration in prison, he's not fully availed himself of the opportunities for self-improvement in order to be better prepared for release. He needs to intensify his current level of programming by resuming his participation in self-improvement activities by increasing his employment skills.

Regarding Mr. Vasquez' parole plans. He did show that he has somewhat viable residential plans in San Antonio, Texas and then possibly in, I believe it was Laredo, Texas, with his uncle and a subsequent employment plan working for his maternal grandmother and

helping, I guess, her with her properties. However, that is in Texas. This inmate did provide the Panel with a letter from Amity.

However, the only concern that we have and that I recommend that you do this is do more research so that you're able to provide some details about everything that Amity is really going to do for you. The more information and the more you can engage a Panel in a conversation about it, it shows us that you have been very, very thorough and that you're not leaving it up to someone else to go and verify and find out all the information for you. You're taking control and charge of you own future.

And it wouldn't hurt, if you can, to get some backup to that, because if that falls through, we see a lot of letters from Amity, to be honest with you. So, the more you can provide to substantiate that this is truly a very, very viable option for you to parole to, the better off you're going to be. But it's also very, very good for you to have a backup plan. Should something happen, what happens if you're given a date and at that point in time Amity doesn't have any room, then what. Okay. So again, it's in your best interest to think about that in planning ahead. And make sure

that if plan A doesn't work, I've got a very, very good plan B and a very, very good plan C. Does that make sense to you, sir?

**INMATE VASQUEZ:** Uh-hmm.

**PRESIDING COMMISSIONER ENG:** Okay. Same thing with employment, the Panel understands it's very, very difficult to have definite employment lined up from when you're incarcerated. However, we like to see documentation that shows what kind of level of effort that you have taken upon yourself to go out and search, you know, sending out letters and trying to track who you're contacting in different areas, focused searches. How else are you going to do that once you get out.

So whether you're incarcerated or whether you're a regular old person out on the street, that if you find yourself without a job, what do people have to do to get employment in order to become financially independent. Okay. That's how you have to think while you're incarcerated, too. Okay. And oftentimes, you have to inundate, you know, people with resumes, etcetera.

So, food for thought, the more detailed plans and backup plans that you can provide, it's an indication of taking responsibility for your life and being thorough and not assuming other people are going to do that for

you. And I have to be honest with you, I really saying that I'm not sure if you have a marketable skill. I didn't get anything from the hearing. So that's of concern, too.

So if you have a Panel member sitting here and saying, I'm not sure if you've developed a marketable skill or not. So apparently that didn't come through loud and clear during the hearing. It's not to say that you don't have one. I, I put a question mark because I'm just not sure. Then when we discuss it, we're both like, well, possibly, you know, in landscaping. So it's just different things for you to think about and work on.

Okay. Regarding 3040 responses, this Panel does note that the representative from the District Attorney's Office of Los Angeles County was present and had stated their opposition to parole at this time along with we had a written response from the Los Angeles County Sheriff's Department who was the law enforcement agency that was responsible for investigating the case. And they also stated their opposition to parole at this time.

The Panel makes the following findings. Sir, you've done very, very good and you listened from the

previous Panel and really started doing some good things with the self-help. And we're just stating that you need to continue with your documented self-help. There's a lot of self-help out there. It doesn't mean that you have to actually go to a meeting and get a certificate.

You can also take a look at books and tapes or whatever that is available out there in different areas. And read or listen to it. And write a brief summary. It could be only three sentences or a paragraph about what, you know, what it was all about. And then write a brief thing about what you personally gained from that particular, you know, whatever you read or whatever you watched or whatever you listened to. What type of, did you learn a life lesson from that that you thought, wow, this is really, this is really good. This is something I can use every day and think about every day or something I can use if I find myself in a difficult situation where I have to make a choice and I don't want to make a bad choice that could lead to violence or something else. So those are things that you can continue to do.

And I want to commend you for that at this point in time, because I was very impressed with your response

when I asked you, you've done a lot of this self-help, is there anything in particular that you gained in any of these programs that you would say has been the most beneficial to you. And you were able to talk about that. And that's very good. So, you know, I, this Panel felt that you're doing all the right things and that you didn't, you showed that you're just not going just to be a body attending it and getting your certificates, that you did learn some key things about yourself, okay. I think you were able to discuss that with the Panel. So, you know, that's tremendous progress.

We do find that your gains are recent in that, in all fairness to you, that you need to be able to demonstrate an ability to maintain gains over an extended period of time. Remember, this Panel is just a first line. Okay. If and when you're given a date, it goes through a very rigorous review process. And that's why the more information you provide, the more documentation, the less people will have to guess about verifying certain things for you. And then after it goes through that review process, it goes to the Governor.

So we felt that you are on the right track.

However, we want to be sure that we give you enough information and feedback for you to work with to continue on a path towards success, if that makes any sense to you. We feel that you should be commended for again, initiating and maintaining your attendance and participation in a lot of these various self-help programs and then subsequently receiving the laudatory chronos. And you're also doing very good work reports.

However, these positive aspects of your behavior do not outweigh the factors of unsuitability. And one of the key things is your ability to maintain your gains over an extended period of time. You need to show a pattern. Okay. We went back and forth. We're giving you a one year denial, 12 months. Okay. You got a lot of work that you have to do. And we went back and forth because we weren't sure if that was going to be enough time for you to complete everything that you need to complete, but you're going to have work on a very tight timeline before you come back to another Panel. Okay.

We're recommending that you remain disciplinary free, that if available, you upgrade more vocationally. It's been told to you before. And I agree with your Counselor. You don't have to. However, it's in your best interest for your success to add as many vocations

as you can because that helps give you more marketable skills on the outside, gives you more choices, gives you a backup plan instead of putting all your eggs in one basket.

And that you upgrade educationally, it's always, we're not telling you, you have to do it. It's in your best interest for success. The more education that you can gain for yourself, like you were telling your children, and the more skills you can pick up to make you more marketable on the outside is only going to help you. We're not saying you have to do it. It's a recommendation. Same thing with any and all types of self-help that you can get.

The other recommendation we're making for you is that, and I'm not sure about this, but because of your gang affiliation relative to the life crime, that sort of hangs over. And that I know that this has happened with other, with other inmates where they've gone through this type of debriefing or official disassociation with a gang to really get themselves clear of it.

You may want to consider doing that and getting some distance and to be able to clear up any gang validation issue that might be hanging near or the

impression that there might be. Okay. So, again, 12 months goes by very, very quickly. You have a lot to do, a lot to firm up. But that basically concludes the reading of our decision.

**DEPUTY DISTRICT ATTORNEY GLIDDEN:** Commissioner, I wonder if I might, just for the record, say something before you conclude. That, I believe you misspoke in the early, in the statement of facts when you said killing one and wounding another. And I just wanted to --

**PRESIDING COMMISSIONER ENG:** That's right. You know, because I read that and that wasn't part of the POR that I read. It was actually in the Board report. So that's absolutely correct. We couldn't find anywhere where it really stated officially that another person was wounded. So I thank you, Ms. Glidden, that I do take that back because I read that statement of fact from the Board report. I should have taken it from the probation officer's report, which is more the official report. So, even though it is true that multiple people were attacked, because there were multiple people on the law, but only one was injured and subsequently died from it. So, thank you very much. Okay.

I wish you the best of luck. I'm going to ask my

fellow Commissioner if she has anything to add.

**DEPUTY COMMISSIONER THOMPSON:** Well nothing really to add. I think you've covered it very well, but I would like to stress that you do whatever you can to debrief and or remove any validation, allegations or statements so that that's out of your record. You said you were jumped into this group. So that's enough to call you a gang member.

And the next thing is, are you debriefed. And are you therefore, no longer considered validated. That could have a real impact on any parole that you may well do, you wind up with a special condition. And it's just a good thing to have it cleared up and out of your record, particularly as so much else is positive that is in your record. I would just add that for stress. But it certainly was covered.

**PRESIDING COMMISSIONER ENG:** Okay. Good luck, sir. The time is now 11:22.

**ATTORNEY RUTLEDGE:** Thank you, Commissioners.

**INMATE VASQUEZ:** Thank you, you ladies have a nice day now.

**PRESIDING COMMISSIONER ENG:** You too.

--oOo--

93

PAROLE DENIED ONE YEAR

THIS DECISION WILL BE FINAL ON: MAY 25 2007

YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

ADAM VASQUEZ H-10787 DECISION PAGE 15 1/25/07

Capitol Electronic Reporting

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Sarah M. Collins, as the Official Transcriber, hereby certify that the attached proceedings:

In the matter of the Life Term Parole Consideration Hearing of:

ADAM VASQUEZ

CDC Number: H-10787

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JANUARY 25, 2007

8:57 A.M.

were held as herein appears. Further, this transcript is a true, complete and accurate record, to the best of my ability, of the recorded material provided for transcription.

Sarah M. Collins
March 11, 2007
Capitol Electronic Reporting

# EXHIBIT  "B"

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JANUARY 2005 CALENDAR
# LIFER PROGRAM UNIT
# CALIFORNIA TRAINING FACILITY AT SOLEDAD

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Adam Vasquez is a 33-year-old, never-married, Hispanic first-termer committed from Los Angeles County. He is serving a 15-year-to-life sentence for Second Degree Murder. The index offense occurred on 5-7-91, and Mr. Vasquez entered into CDC at Wasco on 10-9-91. He arrived at Soledad on 1-13-98. He is a United States citizen.

Informed consent, including the limits of confidentiality, was provided. Mr. Vasquez appeared to comprehend both the nature and purpose for the present evaluation, and he agreed to participate in the interview. Mr. Vasquez does not appear to have a mental disability or condition that would qualify under the Americans with Disabilities Act, and it was my conclusion that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. The interview was conducted on 1-12-05, lasting approximately one and one-half hours. Both the Central file and Unit Health Record were reviewed.

**DEVELOPMENTAL HISTORY:** The reader is referred to Dr. William Gamard's Report dated 5-29-03.

Mr. Vasquez was born at White Memorial Hospital in Los Angeles County. His developmental history appears to be unremarkable. There were no indications of prenatal and perinatal concerns, or birth defects. There were no signs of developmental abnormalities. He seems to have attained developmental milestones at the appropriate times and in the expected sequence. There were no indications of a history for hyperactivity or attention-deficit. He denied any experience of childhood abuse. His childhood medical history also seems unremarkable with the exception of several minor head injuries with no lasting effects.

He started to manifest serious adjustment difficulties in early adolescence. Prior to the age of 15, he exhibited various behavior problems, including several fights, petty theft. He became affiliated with the "Kansas Street" gang in Maywood, CA. His moniker was "Bullet."

**EDUCATION:** Per Dr. Gamard's Report dated 5-29-03.

Mr. Vasquez attended 2 elementary schools in Maywood and the Coachella Valley. He graduated from Oasis Middle School and he attended 3 different high schools, dropping

out in the 11th grade. He claimed that he received average and below average grades, and he had little interest in academics. There were no major disciplinary problems reported but he acknowledged being involved in several fights in junior high. His TABE test from 7-29-99 reflects a 10.3 overall grade placement level with a 12.9 reading level.

**FAMILY HISTORY:** Per Dr. Gamard's report.

In the present interview, Mr. Vasquez reported that his biological parents separated when he was an infant, and he was raised by his mother and stepfather. Both his mother and stepfather, Rudy, are about 50 years old. He has 4 younger half-sisters and 9 nieces and nephews. His mother had an alcohol problem but she has reportedly been clean and sober during the last 4 years, living with her mother in Arizona. Rudy is in prison on a parole violation and Mr. Vasquez was uncertain regarding his commitment offense. Mr. Vasquez readily divulged that his mother and stepfather were alcoholics and heroin addicts and that he had to assume a parental role with his siblings due to their impaired functioning. He reported that he had a "rough childhood" and his stepfather was prone to domestic violence, "beating my mother a lot." There does not appear to be a family history for serious mental or medical problems.

Currently, Mr. Vasquez has regular contact with his mother and maternal grandmother. He has "off and on" contact with his half-sisters and no recent contact with his father or stepfather. His last contact with his stepfather was in 2002 when his stepfather had been "clean for 10 months."

**PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:** Mr. Vasquez identified himself as exclusively heterosexual. He estimated that he reached puberty at age 12 or 13, and he became sexually active with a girlfriend at age 14. He denied any interest in non-normative sexual behaviors or fantasies, and there are no reported sex crimes. He estimated that he has had sexual relations with 4 different partners. He denied having sex with prostitutes, or having any history for sexually transmitted diseases.

**MARITAL/RELATIONSHIP HISTORY:** Per Dr. Gamard's report.

Mr. Vasquez has been maintaining monthly contact with his ex-wife, Denise, and his 2 children, Christina who is 16 and Adam who is 14, who live with their mother. He reported that both children are active in sports, and Christina recently started singing in a choir. Denise is re-married and living in Rosemead, CA.

**MILITARY HISTORY:** There is no record of military service.

Mr. Vasquez reported that he tried to enlist in the military in 1990 through the Impact program. He related that needed to complete his GED and pay a $1,000 probation fine to qualify for enlistment. He had not accomplished either of these items prior to the index offense.

**EMPLOYMENT/INCOME HISTORY:** Per Dr. Gamard's report.

Mr. Vasquez was 20 when the index offense occurred, and his employment experience in the community is therefore somewhat limited. He denied having serious problems in his relationships with co-worker and supervisors. He recalled being fired on one occasion because he lacked the skills and training to perform a riveting job. He received some occasional financial assistance from family members and Denise received AFDC payments.

Mr. Vasquez is not currently involved in a vocational training program. He is assigned as a porter and his Work Supervisor's Report described him as "an excellent worker" with outstanding ratings in all categories.

**SUBSTANCE ABUSE HISTORY:** Per Dr. Gamard's report.

Mr. Vasquez has numerous certificates in his record for attending NA meetings, but he has not had any participation in 12-step since his last appearance before the Board. He cited conflicts with his work schedule as the primary reason for his lack of attendance. When questioned about what he had learned through his participation in 12-step, he responded, "I learned that I used drugs to escape reality and responsibility…I wasn't taking any responsibility in my life (before the crime)."

**MENTAL HEALTH AND MEDICAL HISTORY:** Per Dr. Gamard's report.

Mr. Vasquez does not have a mental health history, either in prison or the community. He has been maintained in the General Population (GP), without mental health services. He denied any history for serious head injury, seizure disorder or other neurological conditions. He told the examiner that he considered hanging himself due to serious family problems when he was 14. He described this suicidal contemplation as being related to both a desire to end his life and a cry for help. He tested within the normal range of cognitive functioning on 12-4-02.

Mr. Vasquez does not seem to have any major medical problems. He completed 6 months of INH medication in 1997 following his exposure to TB.

**PLANS IF GRANTED RELEASE:** Mr. Vasquez reported that he still has plans to enter into a church-based residential program in Whittier, CA if released from prison. He stated that the program includes recovery programming. He reported that he has family support from his mother and grandmother and he also has a standing job offer. He has letters of support in his file.

At present, his prognosis for community living appears to be mostly favorable.

## CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Vasquez arrived for the interview promptly and he was appropriately groomed and dressed. He wore pressed clothes and his shoes were polished. He was clean shaven. He is short in stature with an average build. His demeanor was mild-mannered and polite. He was alert and well oriented in the three spheres. His speech was unremarkable, and his responses were adequately articulated and direct. His mood was euthymic and affect was broad and appropriate. He did not endorse any primary symptoms of depression or hypomania. His thinking was well integrated and purposeful. There were no indications of paranoid ideation. Memory and concentration were intact. Judgment and insight were adequate. He denied any thoughts or intentions of harm to self or others.

**DIAGNOSTIC IMPRESSION:**

| | |
|---|---|
| Axis I: | 304.3 Cannabis Dependence, in Full Remission in a Controlled Setting |
| | 305.9 Other Substance Abuse, in Full Remission in a Controlled Setting |
| Axis II: | 799.9 Diagnosis on Axis II Deferred |
| Axis III: | None |
| Axis IV: | Incarceration |
| Axis V: | GAF=85 |

Currently, Mr. Vasquez does not seem to have a mental disorder and he is not in need of mental health services.

**CRIMINAL HISTORY/REVIEW OF LIFE CRIME:** As illustrated above, Mr. Vasquez started to manifest significant adjustment difficulties during adolescence. He became affiliated with gang members and he started using drugs. His juvenile crime record shows a conviction for grand theft in 1987 at age 16. According to the Los Angeles County Probation Officer's Report (POR) dated 9-12-91, this offense involved Mr. Vasquez and some of his companions stealing a vehicle. In the present interview, Mr. Vasquez admitted to being arrested on 2 separate occasions for joyriding incidents with his associates. He recalled being in Juvenile Hall for about 2 weeks and being ordered into the "Jaws" work program.

The index offense is described in detail in the POR. Briefly stated, Mr. Vasquez and a 16-year-old companion, Mr. Hernandez, drove in front of a private residence where a young adult man and woman were standing. They asked where the victims where they were from. After the victims gave no reply, Mr. Hernandez held up a handgun and fired 4 shots, one of which fatally wounded the female victim. Mr. Vasquez then drove off.

In the present interview, Mr. Vasquez' version of the above offense was consistent with what he provided to Dr. Gamard in his prior evaluation. However, he admitted that he

knew that Mr. Hernandez had a gun and that he might use it in retaliation for a "homeboy being shot." He claimed that he was looking in "a different direction" when his associate shot and killed the victim. He described the victim as "a real good friend." He expressed regret that he did not take more charge of the situation, trying to persuade his companion to do some more drinking or "we could have went after some girls." He confided that he used very poor judgment when he resumed his association with former gang members after breaking up with Denise. He recalled "drinking and using some weed" shortly before the offense. He expressed that his sentence was a fair one and "I should have gotten more time."

**RISK FOR FUTURE VIOLENCE:** The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk for future violence. In the present evaluation, this approach was used to help estimate this individual's risk for future violence in the community. The information for providing an estimate of this individual's risk was obtained from both the clinical interview and the available records. There are certain clearly defined risk factors that have been identified and that are widely used and are supported by years of research in the risk assessment field. They have been cross-validated with various forensic populations, including United States males in correctional settings. However, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these risk factors. The evaluator has taken these above factors into consideration in determining how much weight to give each of these risk factors, and in formulating an overall estimate for risk for future violence in the community. Estimates of risk for violence will be stated categorically—low, moderate, or high.

A review of static risk factors places Mr. Vasquez in the low-to-moderate range for future risk. Mr. Vasquez does not seem to have a prominent antisocial orientation, nor does he not fit the clinical picture of a psychopathic personality. Therefore, psychopathy is not a significant risk factor. Since this estimate is based on static risk factors, it is not likely to change substantially over time.

Taking into consideration a review of dynamic risk factors, Mr. Vasquez also falls within the low-to-moderate range for future risk. As mentioned above, he started to manifest adjustment problems in adolescence which continued into early adulthood. However, while incarcerated in prison he has manifested only occasional minor behavioral problems and he appears to be earnest in his desire to maintain a pro-social orientation.

**CONCLUSION:** Overall, Mr. Vasquez appears to fall into a category that represents a low-to-moderate risk for violence in the community. This estimate for future violence is based on multiple determinants, including but not limited to, the clinical interview, background information, level of institutional adjustment and programming, and risk assessment procedures. As mentioned earlier, prior to the index offense Mr. Vasquez was experiencing multiple adjustment problems. He had dropped out of school, he was using marijuana and drinking, and he was associating with antisocial peers. He had no job skills training and he had a relatively low level of employability. He seemed to have

little sense of direction or purpose in his life. While in prison, Mr. Vasquez has clearly shown that he is sincere in trying to establish a more pro-social orientation by avoiding trouble and projecting a positive attitude in his relationships with staff and other inmates. However, while Mr. Vasquez has shown some participation in programming opportunities during his long incarceration in prison, he has not fully availed himself of the opportunities for self-improvement in order to be better prepared for release. Mr. Vazquez needs to intensify his current level of programming by resuming his participation in self-improvement activities and by increasing his employment skills. This will help Mr. Vasquez to transition to a lower level of risk and help to ensure his successful adjustment to the community.

Erich Rueschenberg, Ph.D.
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

January 17, 2005
Date

## III. EDUCATIONAL HISTORY:

Inmate Vasquez completed the 11th grade, and dropped out in the 12th grade. Subsequent to his incarceration, he completed a GED in 1992.

## IV. FAMILY HISTORY:

Inmate Vasquez's parents are still living. He calls his mother every couple of weeks, and writes to his father. He also receives letters from his sisters on and off. He is also in touch with his grandmother, who lives in Texas. He became close to her when he lived with her during the ninth grade after he got into trouble with a grand theft auto arrest, and had been sent to juvenile hall.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Vasquez is a heterosexual male. He denied any history of high-risk sexual behavior or sexual aggression, either prior to or since incarceration.

## VI. MARITAL HISTORY:

Inmate Vasquez got together with Dennise in 1987. She got pregnant and had two children, a girl and a boy, and then, after he had been in prison for about year, they married, in 1992, until they were divorced in 1994. He is in regular correspondence with her, and with his two children. He also said he recently got a letter of support from Dennise, which he wants to put a copy of in his Central file.

## VII. MILITARY HISTORY:

Inmate Vasquez denied any history of military service.

## VIII. EMPLOYMENT/INCOME HISTORY:

Prior to his incarceration, inmate Vasquez had only a few, brief jobs, such as working on a ranch, a four-month job on a Christmas tree farm, where fireworks were also sold, and also doing lawn maintenance.

Since his incarceration, he has completed vocational landscaping and horticulture. He has had a variety of jobs, such as being a clerk, a porter, and his present job as a janitor in culinary.

## IX. SUBSTANCE ABUSE HISTORY:

Inmate Vasquez tried cocaine, PCP, "crack" cocaine, and methamphetamine between the ages of 13 and 16. Also, between the ages of 13 to 17, he abused beer. In addition, he smoked marijuana regularly, about three to four days per week, for a period of three to four years until his arrest. He has been attending Narcotics Anonymous.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Vasquez's only medical problem has been a gunshot wound to the upper left leg when he was 17 years old (in 1988), a bullet which he states is still lodged in his buttock. Other than that, he has had no prior diagnoses or serious illnesses. He denied any history of medical or psychiatric hospitalizations. He denied any history of serious accidents or head injuries, a history of suicidal behavior, a history of seizures or other neurological conditions, or any significant impairments or disabilities. He is on no medications.

## XI. PLANS IF GRANTED RELEASE:

Should inmate Vasquez be given a parole date, he states that he has been accepted into a Christian residential treatment program in Whittier, California.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Vasquez appears to be younger than his stated age of 32. He was appropriately dressed and groomed. He was coherent, cooperative, calm and alert throughout the interview. His speech was clear and readily understandable. His flow of thought and affect were within the normal range. There were no hallucinations or delusions noted. He was fully oriented. His intellectual functioning was estimated to be within the average range. His attention and concentration were adequate for the purposes of this examination. There was no evidence of a mood or thought disorder. His insight and judgment appeared to be intact. He showed fair insight into his commitment offense.

### CURRENT DIAGNOSTIC IMPRESSIONS:

**AXIS I:** 1) Marijuana Dependence, in institutional remission.
2) Alcohol Abuse, in institutional remission.
**AXIS II:** No Contributory Personality Disorder.
**AXIS III:** History of gunshot wound.
**AXIS IV:** Incarceration.
**AXIS V:** GAF = 85.

Should this inmate at this time be given a parole or release date, his prognosis for maintaining his present gains in the community is excellent.

## XIII. REVIEW OF LIFE CRIME:

Inmate Vasquez described the circumstances surrounding his commitment offense. He admits to driving into an "enemy" area, and driving to the particular street where the crime occurred a couple of times, looking for enemies.

He was the driver, and the passenger was a fellow gang member who was a couple of years younger than he was. He knew his partner was armed, and stopped in front of one house, where his partner yelled out at some people there, asking them where they were from. When he received no answer, he fired a number of shots from his handgun, and they drove off.

Inmate Vasquez acknowledged that his partner later bragged about the shooting. He stated that at the time, he didn't know that anyone was hurt, and was shocked to find out that, of the two people that were shot, the victim that died was a young woman who had been a friend of his (in fact, he said that, although they were not lovers, he had visited her house a couple of times, where he had spent the night and taken a shower).

Asked his mistakes on that day, inmate Vasquez said, "I shouldn't have ever allowed it to happen. Since I was older than he was, I should have stood up, and not let it happen. After it was done, I didn't know anybody was hit, but I could have checked it out, if anybody got hurt."

Inmate Vasquez agreed that shooting from a car an unarmed person is a cowardly act, and said, "I felt kind of bad because my grandfather taught me not to fight like that." He agreed that he had been drinking beer that day, but did not try to blame his behavior on alcohol. He said, "I take full responsibility for my behavior. I know I was wrong, and I take responsibility."

Asked about his gang affiliation, inmate Vasquez said that he had belonged to this gang for a while when he was younger, then had dropped out, then got involved again for a period of two years prior to this crime. Inmate Vasquez denied being involved with other criminal activity in the gang, and told of getting involved in only one fight. He denied any knowledge that this particular gang had been involved in any other drive-by shootings.

## XIV. ASSESSMENT OF DANGEROUSNESS:

**A.** This inmate has only received one CDC-115 violation during his entire incarceration (in 08/94 for disruptive behavior during an emergency situation, in which another inmate tried to kill himself). Therefore, it is felt that he would pose a less than average risk for violence when compared to this Level II inmate population.

**B.** If released to the community, his violence potential is estimated to be no higher than the average citizen in the community. This is based upon the following considerations:

Inmate Vasquez has no documented history of arrests for violent behavior prior to this crime, and no evidence of any involvement in physical altercations since his incarceration. During the crime, he was not the shooter.

He has matured considerably from the young, 20-year-old youth he was when he committed the crime. He has sincere regret for his crime, for which he takes full responsibility. Furthermore, there is no evidence of any gang affiliation since his imprisonment, and he states that he has refused to cooperate with attempts by Sorenos to incorporate him, saying that he has told them he had his involvement in the past, and does not wish to get involved again. Although his regret for his crime appears to be very sincere, he was not able to articulate the state of mind he was in at the time, as well as his willing cooperation in driving around and looking for "enemies". In other words, he continues to minimize his involvement in the criminal thinking and gang mentality at the time. He did not admit to the intention of driving onto the street (which, typically, would have been done after a lot of excited and angry talk about retaliation).

## XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has generally done so during his incarceration period.

B. This inmate does not have a mental health disorder which would necessitate treatment, either during his incarceration period or following parole.

C. As this inmate denies having prior problems with alcohol or drug abuse, he was advised to continue in 12-step programming.

William Gamard, Ph.D

**WILLIAM GAMARD, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

B. Zika, Ph.D.

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

WG/gmj

D: 05/29/03
T: 05/30/03

# EXHIBIT "C"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 2006 CALENDAR

VASQUEZ H10787

I. **COMMITMENT FACTORS**:

A. **Life Crime**: All relevant documents, including hearing transcripts have been considered and all information remains the same.

1. **Summary of Crime:** All relevant documents, including hearing transcripts have been considered and all information remains the same.

2. **Prisoner's Version:** All relevant documents, including hearing transcripts have been considered and all information remains the same.

3. **Aggravating/Mitigating Circumstances**:

a. **Aggravating Factors**: All relevant documents, including hearing transcripts have been considered and all information remains the same.

b. **Mitigating Factors**: All relevant documents, including hearing transcripts have been considered and all information remains the same.

B. **Multiple Crime(s):** N/A.

1. **Summary of Crime:** N/A.

2. **Prisoner's Version:** N/A.

8/31/06

II. **PRECONVICTION FACTORS**:

A. **Juvenile Record**: All relevant documents including hearing transcripts have been considered and all information remains the same.

B. **Adult Convictions and Arrests**: All relevant documents, including hearing transcripts have been considered and all information remains the same.

    C. **Personal Factors**: All relevant documents, including hearing transcripts have been considered and all information remains the same.

## III. POSTCONVICTION FACTORS:

A. **Special Programming/Accommodations:** N/A.

B. **Custody History**: All relevant documents, including hearing transcripts have been considered and all information remains the same. Vasquez was received at CTF on 1/13/98 and has remained at CTF in the general population with MED A custody. Vasquez has been assigned as a Porter. (See Post Conviction Progress Reports)

C. **Therapy and Self-Help Activities**: Documents from previous hearings remain valid. Vasquez has participated in Alcoholics Anonymous. (See Post Conviction Progress Reports)

D. **Disciplinary History:** Documents from previous hearings remain valid. Vasquez continues to remain disciplinary free.

E. **Other:** Vasquez attended his Subsequent #2 Parole Consideration Hearing on 10/5/05. Parole was denied for 1 year. The Board recommended that Vasquez remain disciplinary free, learn a trade, and get self-help.

## IV. FUTURE PLANS:

A. **Residence**: All relevant documents have been considered and all information remains the same.

B. **Employment:** All relevant documents have been considered and all information remains the same.

C. **Assessment:** In review of Vasquez' parole plans, this counselor does not foresee any problems, however, it is recommended that Vasquez update his support letters prior to his hearing.

## V. USINS STATUS: N/A.

## VI. SUMMARY:

**A.** Prior to release the prisoner could benefit from:

1. Continuing to be disciplinary free.
2. Participation in self-help and therapy programs.
3. Upgrading vocationally and educationally.

**B.** This Board Report is based on a through review of Vasquez' Central File and a (1) hour interview with Vasquez.

**C.** Per the Olson Decision, Vasquez was afforded an opportunity to review his Central File. Refer to CDC 128-B dated 6/9/06 in the General Chrono Section of the Central File.

**D.** No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATIC REPORT
SUBSEQUENT PAROLE CO..IDERATION HEARING
OCTOBER 2006 CALENDAR

4

R Brown 7-24-06

R.B. Brown, Date
Correctional Counselor I

CCII 7-24-06

D. Carnazzo, Date
Correctional Counselor II

FC(b) 7-24-06

I. Guerra, Date
Facility Captain

C&PR 7-26-06

D. S. Levorse, Date
Classification and Parole Representative

VASQUEZ H10787 CTF-SOLEDAD OCT/2006

BOARD OF PRISON TERMS STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/13/05 to 6/7/06 | | | **PLACEMENT**: Remains housed at CTF in the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None noted during this review period.<br>**ACADEMICS**: None noted during this review period.<br>**WORK RECORD**: Vasquez is assigned as a Porter.<br>**GROUP ACTIVITIES**: Vasquez successfully completed 12 weeks of prescribed studies in the CTF-Central Chapel, per 128B dated 9/11/05. Vasquez has also been actively attending the Alcoholics Anonymous Group at CTF Central Facility, per CDC 128B dated 10/6/05.<br>**PSYCH. TREATMENT**: None noted during this review period.<br>**PRISON BEHAVIOR**: Remained disciplinary free during this review period.<br>**OTHER**: Vasquez was elected as the secretary by the AA Group "A Sober Path" which meets once a month. Vasquez received numerous Certificates of Achievement located in the Miscellaneous Section of the Central file. |

CORRECTIONAL COUNSELOR'S SIGNATURE: [signature] DATE: [handwritten date]

VASQUEZ H10787 CTF-SOLEDAD OCT/2006

BOARD OF PRISON TERMS STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 8/23/04 to 4/30/05 | | | **PLACEMENT**: Remained at CTF in the general population.<br>**CUSTODY**: MED A.<br>**VOC. TRAINING**: None noted this period.<br>**ACADEMICS**: None noted this period.<br>**WORK RECORD**: Vasquez is assigned as a Porter since 10/8/03. He received satisfactory ratings verified by CDC 101 dated 12/8/04.<br>**GROUP ACTIVITIES**: Vasquez participated in Alcoholics Anonymous as verified by CDC 128B dated 3/31/05.<br>**PSYCH. TREATMENT**: None noted during this period.<br>**PRISON BEHAVIOR**: Vasquez remained disciplinary free during this period.<br>**OTHER**: Vasquez participated in the 34th Annual Children's Holiday Festival verified by CDC 128B dated 12/20/04.<br><br>Vasquez requested enrollment in the "Living With Hepatitis C" support group verified by CDC-128C dated 3/9/05. It should be noted he does not meet the group criteria, however, his attempt to obtain self-help should be recognized. |

COPY TO INMATE ON 5-24-05

CORRECTIONAL COUNSELOR'S SIGNATURE [signature] DATE 5-13-05

VASQUEZ H10787 CTF-SOLEDAD

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

5-13-05

K. Heinly, Date
Correctional Counselor I

5-15-05

J. Soares, Date
Correctional Counselor II

(FC(A)) 5/16/05

I. Guerra, Date
Facility Captain

CPPR 5/17/05

D.S. Levorse Date
Classification and Parole Representative

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 14, 2000

This is the third psychological evaluation for the Board of Prison Terms on inmate Adam Vasquez, CDC# H-10787. This report is the product of a personal interview, conducted on 04/14/00, as well as a review of his Central file and unit health record. This interview was a single contact with this individual for the sole purpose of preparing this report.

I. IDENTIFYING INFORMATION:

Inmate Vasquez is a 28-year-old, divorced, Hispanic male. His date of birth is 04/16/71. He stated his religion is Christian. His most unusual physical characteristics are his short stature and young appearance. He denied a history of aliases. In the past, he has gone by the nickname of "Bullet".

II. DEVELOPMENTAL HISTORY:

He denied any history of birth defects or abnormalities of developmental milestones, a history of cruelty to animals, a history of arson, or a childhood history of physical or sexual abuse as either a perpetrator or a victim. His medical history included a significant spinal cord injury as a child for which he was hospitalized for a period of time. He also had pneumonia on one occasion.

III. EDUCATIONAL HISTORY:

Inmate Vasquez stated he dropped out of school in the ninth grade, but eventually achieved his GED. Vocationally, he is currently participating in the landscaping vocation here at CTF.

IV. FAMILY HISTORY:

Both of his parents are alive and are approximately 40. He stays in contact with his parents, as well as

his four sisters. Both of his parents are recovering drug addicts. Other than that, no family members have ever had any significant drug or alcohol problems, psychiatric problems or criminal problems. He stated that he gets along well with all of his family members.

V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Vasquez stated that he is a heterosexual male. He denied any history of sexual aggression.

VI. MARITAL HISTORY:

Inmate Vasquez has been married once and has two children from that marriage with whom he stays in contact.

VII. MILITARY HISTORY:

The inmate denied any military history.

VIII. EMPLOYMENT AND INCOME HISTORY:

In the past, he has been employed at several jobs in the community, including working on a ranch, working on a Christmas tree farm, worked in the fireworks industry and also did lawn maintenance. Currently, he desires to find employment in the landscaping field when he paroles.

IX. SUBSTANCE ABUSE HISTORY:

Inmate Vasquez admitted to using PCP and cocaine on a handful of occasions, but admitted to using marijuana for approximately three to four years, approximately three to four times per week. He also acknowledged being an alcoholic. He currently attends Narcotics Anonymous and finds it helpful in understanding what he did and why he did it.

X. PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Vasquez has had approximately three to four head injuries, but none of them were ever significant enough to be hospitalized. He has had one suicide attempt at the age of 13, when he tried to hang himself.

Apparently, he has had no psychiatric problems since that time. He denied any other history of serious accidents or head injuries, or a history of seizures or other neurological conditions. He is not currently taking any medications.

XI. PLANS IF GRANTED RELEASE:

When he paroles, he would like to eventually live with his grandmother in Texas. Given the information he provided to me, it would appear his parole plans are viable and his prognosis for community living is positive.

CLINICAL ASSESSMENT

XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Vasquez appeared younger than his stated age. He was appropriately dressed and groomed. He was coherent, cooperative, calm, very polite and alert. His speech, flow of thought and affect were generally within the normal range. His intellectual functioning was also estimated to be within the average range. There was no evidence of a mood or thought disorder. His judgment appeared to be sound. He showed some insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I: Polysubstance Abuse (especially marijuana and alcohol), in institutional remission.
AXIS II: Personality Disorder, NOS, with Antisocial Features, improved.
AXIS V: GAF = 85.

His prognosis is very positive for being able to maintain his current mental state in the community upon parole.

XIII. REVIEW OF LIFE CRIME:

Inmate Vasquez essentially agreed with the description found in his Central file regarding his commitment offense. He stated that he was not the shooter in this crime, but was participating in a gang at that time.

Asked for his thoughts and feelings regarding this crime, he stated that he "feels bad" and that "nobody deserves to die like this." He also stated that he feels very bad for the victim's family, as well as for her fiancé. He expressed what I would consider a moderate amount of remorse for this crime which appeared to be genuine.

XIV. ASSESSMENT OF DANGEROUSNESS:

A. In consideration of several factors, including his relative lack of CDC-115 violations (the only one being in 1994), as well as his minimal criminal history, his violence potential within a controlled setting is estimated to be below average relative to this Level II inmate population.

B. If released to the community, his violence potential is estimated to be only slightly more than the average citizen in the community.

C. The most significant risk factors which would be precursors to violence for this inmate would be: 1) Continued abuse of alcohol and drugs, and/or, 2) A continued gang lifestyle. His violence potential would be much higher should he engage in either of these behaviors in the future.

XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has generally done so during his incarceration period.

B. This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

C. As this man has acknowledged a past problem with drugs and alcohol, I would recommend, upon parole:

1) Abstinence from all alcohol and illegal drugs.

2) Monitoring.

VASQUEZ, ADAM
CDC NUMBER:  H-10787
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


            3)  Mandatory attendance at self-help groups such
                as Alcoholics Anonymous or Narcotics Anonymous.


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SJT/gmj

d:  04/14/00
t:  04/15/00

# EXHIBIT "D"

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**D E C I S I O N**

**DEPUTY COMMISSIONER MEJIA:** We're back on record for our decision in Mr. Vasquez's matter.

**PRESIDING COMMISSIONER FISHER:** All right. Thank you. I want to note for the record that everyone who was previously in the room and identified themselves have returned to the room. Mr. Vasquez, the Panel reviewed all of the information received from the public and relied on the following circumstances in concluding that you're not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. This is a one year denial. It's largely based on your commitment offense. You know, it just -- we're just not comfortable that it's been long enough yet. This was the murder of Michele Zohnie. Her fiancé was wounded in this attack. She was pregnant at the time that she was shot in the stomach. And there's -- I asked Mr. Vasquez if he knew about it because there was no indication in the file as to whether or not the baby had died as a result of the shooting. It's his understanding that in fact it did. It also

doesn't say how pregnant she was. It's just a tragedy. It was a horrible, horrible, pointless crime. I mean this is just -- this is a classic example of why gang shootings are so -- such a waste, just an incredible waste. You know, I guess it was just sort of the luck of the draw that it turned out to be somebody that you knew. But either way somebody was going to get killed that night for not being affiliated with the same gang that you were. I just can't say enough how much I'm offended by the fact that for this kind of a reason people will go out and just take somebody else's life. I just -- I just think it's horrifying. You know, not to mention the fact that there -- this was a neighborhood. There's somebody -- One of the witnesses was talking about hearing the gunshots and hearing the victim crying after she'd been shot and immediately going in to check her baby to make sure the baby was okay. I mean, there were other people living in that area. Anybody could have been hurt or killed. And it's just that senseless, stupid kind of street violence that makes this kind of a crime so heinous. Mr. Vasquez does not have an escalating pattern of criminal conduct. He has only one prior

conviction. That was as a juvenile and it was for grand theft auto. He does have an unstable social history, some of that is not of his own making. But he also was involved in using substances. He was involved with a gang. He does have the prior arrest and conviction. And he dropped out of school. His institutional behavior though has been -- has been commendable. He's only had one 115, that was back in 1994. He's only had two 128(a) counseling chronos. The last one was in 2002. And he has been programming. He got his GED. He got vocational landscaping. He has been participating in substance abuse programming. He has had some classes through Coastline and unfortunately wasn't able to continue that. But he's done some other self-help such as the bible studies that he's doing, the Life Skills, the Impact.

**DEPUTY COMMISSIONER MEJIA:** Anger Management.

**PRESIDING COMMISSIONER FISHER:** The Anger Management. Thank you. (Indiscernible) so he's been working on it. What we -- What we don't see at this point, Mr. Vasquez, coming from the background that you came from we'd like to see

you do more self-help, you know. I think that Ms. Tardiff is right. It's not surprising that you ended up in a gang considering your life at home. And apparently you certainly did the right thing as far as your sisters were concerned in taking care of them. They certainly support you. And I'm happy that you'll be going back into a situation where your mom has gotten control of her life. But you know, you came with a lot of baggage. And you've done some work but we'd like to see you do a lot more. And I just want to encourage you not to get discouraged. But just try really hard. And I think that I was telling Commissioner Mejia that I've seen situations in the past where people are so remorseful for their crime that it takes them awhile to get to the point where they feel like they deserve to get out and so they don't work as hard as they could. And I don't know if that's maybe what slowed down your getting started. But obviously you're ready because in the last few years you've been doing a lot. So you just need to keep that up. Okay. And just don't be discouraged. And that completes the decision. Do you have any comments?

**DEPUTY COMMISSIONER MEJIA:** Yeah. Mr. Vasquez, I told the Commissioner, you know, I really, you know, like the way you are programming. But just like she said, you can't -- sorry about that.

[Thereupon, the tape was turned over.]

**DEPUTY COMMISSIONER MEJIA:** But I need to tell you this because I really think that you are one of those inmates that deserves to be released. Okay. So you cannot slack off on your self-help. (Indiscernible) you saying you haven't been -- you can't do that. You have to be consistent. Just like what you're doing now, you got to (indiscernible) be resourceful of everything. You cannot show that you have a gap at all because that could be used against you. You can never have anymore -- You're doing good on disciplines. You can't get any of those. Not even one.

**ATTORNEY TARDIFF:** No 128's either.

**DEPUTY COMMISSIONER MEJIA:** No 128 either.

**PRESIDING COMMISSIONER FISHER:** Nothing.

**DEPUTY COMMISSIONER MEJIA:** It will draw you back. So I'm just letting you know just focus on those. No disciplinary and get

self-help. You're going to be -- You know, you will be one of those guys I think -- that I'm sure will -- if I had the power to do it -- give you a parole date. Okay.

**PRESIDING COMMISSIONER FISHER:** Don't hesitate to do work on your own either. If you can't get into a program, use books.

**DEPUTY COMMISSIONER MEJIA:** Right.

**PRESIDING COMMISSIONER FISHER:** And just write a book report and bring it back to the Panel. But what you need to focus on is that not only do you need to get a date from a Panel. After you get a date from one of us or two of us, your paper is going to go to Decision Review and then it's going to go to the Governor's Office. So you want to be a really complete package so that when they're just looking at you on paper and they don't have you sitting across from them you look good enough on paper that they'll sign it off. Okay. So that's your focus, is just really work on filling in any of those gaps, really work on the self-help, you know. Like I said, you came -- you came to prison with a lot of baggage. And you want to be sure that when you get out there nothing causes you to stumble. Okay.

**DEPUTY COMMISSIONER MEJIA:** Make sure those things gets into the --

**ATTORNEY TARDIFF:** Yeah.

**PRESIDING COMMISSIONER FISHER:** Okay.

**ATTORNEY TARDIFF:** And what about his pink copy?

**DEPUTY COMMISSIONER MEJIA:** What pink copy?

**ATTORNEY TARDIFF:** His copy of the decision.

**PRESIDING COMMISSIONER FISHER:** He really wants to go --

**DEPUTY COMMISSIONER MEJIA:** The pink slip?

**ATTORNEY TARDIFF:** Yeah, the pink slip.

**DEPUTY COMMISSIONER MEJIA:** Okay. There you go.

**ATTORNEY TARDIFF:** Thank you.

**DEPUTY COMMISSIONER MEJIA:** Good luck to you, Mr. Vasquez.

**INMATE VASQUEZ:** Thank you, Sir. Thank you, Ma'am. You guys have a nice day.

**PRESIDING COMMISSIONER FISHER:** You too.

--oOo--

**PAROLE DENIED ONE YEAR**

**THIS DECISION WILL BE FINAL ON** FEB - 2 ______________

**YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, Marsha Mees, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 48, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ADAM VASQUEZ, CDC No. H-10787 on OCTOBER 5, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 22, 2005 at Sacramento County, California.

Marsha Mees
Transcriber
**PETERS SHORTHAND REPORTING**

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

DEPUTY COMMISSIONER MEJIA: We're on record.

PRESIDING COMMISSIONER MOORE: All right. Let the record show that all interested parties have returned to the room, Adam Vasquez, CDC number H, as in Henry, 10787. This Panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or threat to public safety if released from prison at this time. The paramount reason would be the timing and the gravity of the committing offense. Mr. Vasquez, this will be a one year denial. The offense was carried out in an especially vicious and callous manner. There were multiple victims attacked and one was subsequently killed. The offense was carried out in a manner which demonstrates an exceptionally insensitive disregard for human suffering and the motive for the crime was inexplicable or very trivial in relationship to the offense. This is where the prisoner and his crime partner were members of a street gang that were -- went to a rival neighborhood, stopped in front of a house

where the victim, Michele Zohnie and Frank Anthony Mendez were standing. The victim was actually known to the prisoner. The passenger -- or the crime partner in this particular event, fired several rounds into the front yard of the residence, killing the victim, Ms. Zohnie also wounding her boyfriend Frank Anthony Mendez. They then fled the scene, the prisoner and his crime partner fled the scene. The prisoner was arrested several months later (inaudible). Previous record, the prisoner has a history of unstable or tumultuous relationships with others, dropping out of school at an early age and developing a problem with alcohol and drugs at an early age. He was a member of a street gang. He failed to profit from society's previous attempts to correct criminality. Such attempts included juvenile probation. The prisoner has an unstable social history of prior criminality which includes as a juvenile grand theft auto and then as an adult, an arrest for 211, robbery that was released. Institutional behavior, the prisoner has not sufficiently participated in beneficial self-help and therapy programs at this time. He's failed to demonstrate evidence of positive change. Misconduct while incarcerated includes a single

128 for failure to attend class April 2nd of 2002. Psychosocial report was inconclusive. Parole plans are adequate. 3042 notices, the Hearing Panel notes responses to 3042 notices indicate opposition to a finding of suitability, specifically the District Attorney's office of Los Angeles County was present here today in opposition to a finding of suitability as well as other information bearing on suitability would be that the prisoner's counselor, a CCI J. Paris wrote that the prisoner would pose a moderate to low degree of threat if released to the public at this time. Remarks, the Panel makes the following findings: That the prisoner still needs therapy and self-help in order to face, discuss, understand, and cope with stress in a nondestructive manner so that the prisoner can better understand the causative factors that would cause the prisoner to be involved in such a lifestyle which led up -- led him up to being involved in the death of another human being and risking the life of another human being. Until progress is made, the prisoner continues to be unpredictable and a threat to others. The prisoner's gains are recent and he must demonstrate the ability to maintain these gains

over an extended period of time. According to that last 128, he needs to stay 128 free as well as 115 free. He should be commended for no 115s since '94, however. He has participated in NA/AA. He has positive work reports in dining hall, a porter or janitor, clerk achieving a vocation in landscape horticulture. He participated in the Inmate Peer Education program as well as he has studied through Coastline College and achieving GED back in 1992. However, these positive aspects of his behavior do not outweigh the factors of unsuitability at this time. As I said this is a one year denial, Mr. Vasquez. Continue to remain disciplinary free, continue to try to participate in beneficial self-help programming and therapy programming to better understand the causative factors that caused you to live the lifestyle that he was that led you to cause the demise of a young person that you knew, a young woman that you knew, as well as wounding her boyfriend. This will conclude the reading of our decision. The time is 1400 hours. Good luck to you.

**DEPUTY COMMISSIONER MEJIA:** Yeah, keep up the positive programming and look forward to, you know, you going to that college, Coastline College. Work on that. The more education you

get, the better. Okay? Good luck to you.

INMATE VASQUEZ: Thank you. Is that it?

DEPUTY COMMISSIONER MEJIA: Yeah.

PRESIDING COMMISSIONER MOORE: That's it.

INMATE VASQUEZ: You guys have a nice day.

DEPUTY COMMISSIONER MEJIA: Okay.

PRESIDING COMMISSIONER MOORE: You too, sir.

--o0o--

PAROLE DENIED ONE YEAR

FINAL DATE OF DECISION NOV 24 2003

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, Sandy Tillman, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 45, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ADAM VASQUEZ, CDC No. H-10787 on AUGUST 26, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 15, 2003, at Sacramento County, California.

Sandy Tillman
Transcriber
CAPITOL ELECTRONIC REPORTING

**CALIFORNIA BOARD OF PRISON TERMS**

**D E C I S I O N**

**DEPUTY COMMISSIONER STARN:** We're back on the tape.

**PRESIDING COMMISSIONER BORDONARO:** Thank you. Back on the record in the case of inmate Vasquez, and everyone who was previously in the room has returned. The Panel has reviewed all the information received from the public and relied on the following circumstances in unanimously concluding that the prisoner is not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison: The commitment offense was carried out in an especially cruel manner. Multiple victims were involved. There was one killed in the incident. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. And the motive of the crime was inexplicable and very trivial in relation to the offense. These conclusions are drawn from the Statement of Facts wherein the prisoner and his crime partner were members of a street gang that went into a rival neighborhood, stopped in front of a house where there was -- the victim was

standing, Michelle Zohnie. She was -- actually known the inmate. The passenger or the crime partner fired several rounds into the front yard of the residence, killing Ms. Zohnie and also wounding her boyfriend at the scene. They then fled the scene. The inmate was arrested several months later and did plead guilty to the crime. His previous record, he does have a prior record. He has a GTA, grand theft auto, as a juvenile. He received probation. He only has an arrest as an adult, a 211 where he was released. But he was a member of a street gang. He also dropped out of school and abused alcohol and drugs at a relatively early age. Institutionally, he's not sufficiently participated in beneficial self-help and therapy programs, although he's doing extremely well. He does have one 128(a) counseling chrono in 1993 for failure to report, and one 115 in '94 for disruptive behavior. The psychological report dated April 15th, 2000 by S. Terrini is not entirely supportive of release. He gives the inmate an Axis II Personality Disorder NOS with Anti-Social Features, Improved, Poly-Substance Abuse in Institutional Remission. He does talk about his violence, under assessment of dangerousness, that if released to the

community, his violence potential is estimated to be only slightly more than the average citizen in the community. He was a resident of LA at the time and does not have residential plans under -- for parole in that county. He does not yet have acceptable employment plans. He does have a very supportive family; however, they are not in Los Angeles and they are in Texas and I believe San Bernardino?

**INMATE VASQUEZ:** Yes, Sir.

**PRESIDING COMMISSIONER BORDONARO:** But are not in Los Angeles County, which is where he will be paroled to, at least initially. We also note the District Attorney of Los Angeles County is opposed to a finding of suitability, and also the correctional counselor, Walters, writes that this inmate would pose a moderate degree of threat. The Panel makes the following findings: That the prisoner does need therapy in order to face, discuss, and understand the causative factors that led to this life crime, and until progress is made, he continues to be unpredictable and a threat to others. His gains are recent. He must demonstrate an ability to maintain gains over an extended period of time. Nevertheless, the prisoner should be commended for receiving his

GED, for completing a vocation in landscape and horticulture, for his self-help in AA and NA, Impact, Mind Transformation. There is a Drug Relapse Prevention Program. He had a course that was called Building a New You. He's also taken courses in Sexually Transmitted Diseases, Hepatitis, HIV/AIDS, and Tuberculosis. And actually he should be commended because he's done very well. He does have that one 115, but it is going on seven years now for that single 115 during his incarceration. And these are all positive aspects; however, they do not yet outweigh the factors of unsuitability. In a separate decision, the Hearing Panel finds it's not reasonable to expect that parole will be granted at a hearing during the following two years. The specific reasons for this finding are as follows: Firstly is the comment offense. It was carried out in an especially cruel manner. Specifically, he and his crime partner were members of a street gang, armed themselves. The inmate was the driver. The shooter was the passenger who was his crime partner. Went into a neighborhood specifically looking for members of a rival gang, came across two people or more at a location. It was dark. Fired a shot, killing

Michelle Zohnie, who was a pregnant woman who was in her front yard saying goodbye to her boyfriend, who was also wounded. This offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. And the motive of the crime was inexplicable or very trivial in relation to the offense. We also will note that the recent psychological report dated 4/15, 2000 authored by Stephen Terrini indicates a need for a longer period of observation and evaluation and treatment. And also, the prisoner has not completed the necessary programming which is essential to his adjustment and needs time to gain that programming. He needs to more fully participate in self-help and therapy programming. Because of these reasons, a longer period of observation and evaluation of the prisoner is required for the Board to find the prisoner suitable for parole. So, the Panel recommends that the prisoner becomes and then remain disciplinary-free, as it's available to him, to upgrade vocationally and educationally. I note that he has completed a GED and one vocation, but it is always good to continue to upgrade in those areas. And as it's available to him, to

participate in self-help and therapy programming. We'll also be asking for a new psychological report to be performed prior to the next BPT hearing in accordance with the guidelines set forth between CDC and BPT. That concludes the reading of the decision. Mr. Vasquez, the Panel was unanimous in several things. One of them was your honesty and your truthfulness. That's going to go a long way for you. You weren't the shooter, so I think that if you keep on the track you are you'll see the light of day. You were sentenced to life with the possibility of parole, as you know. But you're doing a very good job. We were impressed, duly impressed. And I don't say that. You can ask your defense counsel. I don't say that to a lot of inmates, especially on your Initial. We rarely see somebody come in who already has their GED complete, who has one vocation, who has got the self-help that you've got. So, you know, you're doing a very good job. Don't take -- You know, we could have -- We -- By law, we could give you up to five, but we're giving you two because we feel that you're doing a very, very good job. The psych report wasn't totally favorable, so we're going to ask for a new one in two years. Stay involved with AA and NA.

You're going to need to know the steps and how they apply to your life and how you can use those on the outside. And then also tighten up your parole plans in Los Angeles County, which is going to be difficult to do because you don't have family there, but your sister might be able to help you, Friends Outside. They can at least contact halfway houses. Those halfway houses won't say yeah, we'll take you, but they'll say this is our program, when you receive a parole date then we can reserve a bed for you. Those are the type of things they'll do because they won't really make a commitment until you have a parole date. But we need to see that you have some place to go. We're not going to release you to the streets. And maybe somebody will help you to find a job. And because you're going to have to go to LA at least temporarily. As was explained to you before, Texas doesn't have to take you. They may not. They may. They may have somebody from California that they want to get rid of worst than someone they want to take, so they might trade you. They do that a lot. And so, but we don't know then until once you're out because you can't apply for the interstate until -- the parole until that happens. So, it could take months for you to

transfer to Texas. So, keep your parole plans in Texas, but also develop those in LA. It's very important, okay?

**INMATE VASQUEZ:** Yes, Sir.

**PRESIDING COMMISSIONER BORDONARO:** But I think you're going a good job and I want to wish you the best of luck. Mr. Starn?

**DEPUTY COMMISSIONER STARN:** Yes. Just to reiterate, your correctional counselor says you pose a moderate degree of threat. You've got to work with your correctional counselor for one thing. Okay, that's first. Number two, work with your psych because your psych again was not totally supportive. You need to talk with him, work with him, be honest as you've been before. But any rate, you need to work on your correctional counselor, on your psych report to bring down your level of dangerousness. You need to know the steps with AA and NA. You can't come in here and say I've been in AA and NA and have all these certificates and not know the steps. It's just not going to work because gentlemen, such as this gentleman here, they know the steps, they know what -- and you should know them. All right? Parole plans, again, you're going to need to work on establishing something in Los Angeles

County for yourself both in terms of a place to stay and a place to work. And if you need to go through Friends Outside or whatever, you can do that, but you need to do that. Otherwise, you're looking very good and you're doing a great program.

**PRESIDING COMMISSIONER BORDONARO:** Mr. Angele?

**COMMISSIONER ANGELE:** I concur with the Chair and just wish you good luck.

**PRESIDING COMMISSIONER BORDONARO:** All right. Last thing is don't get any 115s because those are nails in the door. You've got to stay away from those, which you've been doing. And so, you know, and I didn't vote for your parole date today, but I can in the future. If all those things come together, I can do that.

**DEPUTY COMMISSIONER STARN:** Sorry.

**PRESIDING COMMISSIONER BORDONARO:** That's all right. I'm going to adjourn the hearing now at 4:10 p.m. Good luck.

**INMATE VASQUEZ:** Thank you, Sir. Thank you, Ma'am.

**COMMISSIONER ANGELE:** Is one of the tapes still on?

**PRESIDING COMMISSIONER BORDONARO:** Yeah,

the main tape's still going.

**DEPUTY COMMISSIONER STARN:** Yeah.

**--o0o--**

**PAROLE DENIED TWO YEARS**

**EFFECTIVE DATE OF THIS DECISION___________________**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 51, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of ADAM VASQUEZ, CDC No. H-10787, on MAY 16, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 26, 2001, at Sacramento County, California.

Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT   "E"

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**JULY 2004 CALENDAR**

**VASQUEZ, ADAM** **H-10787**

INMATE COPY

## I. COMMITMENT FACTORS:

A. **Life Crime:** PC 187, Murder 2nd, Los Angeles County Case #VA0088488. Sentenced: 15 years to Life. MEPD: 08-19-01. Received in CDC: 10-02-91. Victim: Michele May Zohnie, age unknown.

1. **Summary of Crime**: On May 7, 1991 at approximately 11:08 p.m., the victim, Michele May Zohnie, was standing with a group of people in the front yard of a residence in Bell, California. Vasquez, along with his passenger, Juan Francisco Hernandez, asked the victims where they were from. When the victims gave no reply, Hernandez brandished a handgun. He fired four (4) shots killing Zohnie and wounding another. Vasquez and Hernandez then drove away out of sight. Vasquez was arrested on July 19, 1991 by the Los Angeles Sheriff's Department. On August 28, 1991, Vasquez entered a plea of guilty to the murder charge. Sources cited: Probation Officer's Report, page 2.

COPY TO INMATE ON 8-31-04

2. **Prisoner's Version:** Vasquez admits his culpability in the crime. He states that on the day of the murder, he and Hernandez had been drinking quite a bit. He further admits to being aware of where they were going when they headed into the neighborhood of rival gang members. As they approached the victims, he and Hernandez began yelling at them. They asked them where they were from. Vasquez indicated he did not hear what they were saying or if any response was given, before Hernandez began shooting. Vasquez stated the he "made a big mistake" in that he had previously disassociated himself from his gang affiliations but had gone back to "hanging out." He expressed remorse for the victim, noting that Michele Zohnie had actually been a close personal friend of his. He indicated that she freely associated with everyone in their neighborhoods and was generally well liked.

3. **Aggravating/Mitigating Circumstances:**

   a. **Aggravating Factors:** The crime involved great violence resulting in the death of one victim and great bodily harm to another.

   b. **Mitigating Factors:** Vasquez had a minimal prior criminal record.

    B. **Multiple Crime(s):** N/A

1. **Summary of Crime**: N/A

2. **Prisoner's Version:** N/A

## II. PRECONVICTION FACTORS:

A. **Juvenile Record:** 12-19-97, Maywood Police Department, Grand Theft Auto, Petition sustained.

B. **Adult Convictions:** None

C. **Personal Factors:** Vasquez was born in Los Angeles, California on April 16, 1971 to Adam and Rachel Vasquez. His mother has remarried Rudy Grijalva and he was the oldest of five (5) siblings. Vasquez describes his upbringing as unstable as both of his parents have problems with drug addiction. He attended Pacific Palasades High School up to the 11th grade. He had a sporadic work history. There is some record of drug use, including occasional use of marijuana and some experience with cocaine and PCP. His prior gang affiliation was with the Kansas Street Dukes in Maywood, California. Vasquez was 20 years old at the time of his arrest. Although, Vasquez no longer has a relationship with Elsa Herrera, he still has contact and maintains a good relationship with her and their two (2) children, Christina Vasquez (15) and Adam Vasquez (13).

## III. POSTCONVICTION FACTORS:

A. **Special Programming/Accommodations:** None required

B. **Custody History:** Vasquez was received into CDC on 10-02-91 at Wasco State Prison Reception Center. His classification score was calculated at 52 points and he was subsequently endorsed for placement at the Correctional Training Facility (CTF), Soledad. He arrived at Soledad on 11-22-91, where his custody was established at Close B. He remained at CTF until his transfer to North Kern State Prison (NKSP), he continued at Close B custody with a classification score of 46 points. In 1995, his custody was reduced to Medium A. He remained at NKSP until 1998, when he returned to CTF-Soledad. This transfer was for Level II placement. Vasquez remains at CTF Soledad at Medium A custody with a mandatory classification score of 19 points.

C. **Therapy and Self-Help Activities:** Vasquez was initially assigned to an academic program at CTF Soledad. He marked very good progress in his studies

with consistent grades of A's and B's. He soon achieved passing scores for a GED and was awarded a certificate on November 24, 1992. He worked briefly in the PIA Textiles program prior to his transfer to NKSP. At Kern, he was initially assigned to the Recreation Department. He received a very positive work report for his position. In November 199, he was assigned to a CCII clerk's position. He remained in this job for the next two and one-half (2 ½) years. During this time, he received several exemplary work supervisory reports. At his 1996 Annual Classification, he was recognized as a critical worker and given an override to remain in his position at NKSP. The following year he moved on to a vocational program at the behest of the Board of Prison Terms. He made good progress in Vocational Landscaping until his transfer to CTF in January 1998. At CTF, he worked in a variety of positions including canteen, library, and clothing room assignments. He was able to reestablish his vocation in landscaping in February 1999 at North Facility. He continued to make good progress in this assignment. Since 1995, Vasquez has been a regular participant in Alcoholic Anonymous and Narcotic Anonymous. He has also participated in several elective programs including the Marie C. Romero Adult School Voluntary Drug Relapse Prevention Program, Mind Transformation Charter-Development Program, Inmate Peer Education Program and the Impact Program at CTF. Vasquez continues to regularly participate in the AA and NA program offered here at CTF, receiving numerous Laudatory chronos.

**D. Disciplinary History:**

CDC 128A, Counseling Chrono, dated 03-25-93 for failure to report.

CDC 115, Rules Violation Report, dated 08-04-94 for disruptive behavior, Guilty and assessed 30 days loss of credit and 30 days loss of privileges.

**E. Other:** Vasquez attended his Subsequent #1 Parole Consideration Hearing on 08-26-03. Parole was denied for one (1) year. The Board recommended that Vasquez remain disciplinary free, upgrade vocationally and participate in self-help programs.

## IV. FUTURE PLANS:

**A. Residence** Upon release, Vasquez would like to seek an out of State parole to San Antonio, Texas. His maternal grandmother, Elvira Echartea, has indicated that she will provide a home for him. She has also indicated that she has investigated support programs in San Antonio that will help Vasquez transition to life outside the prison. Alternately, Vasquez plans to reside in South Whittier Community Church, 13242 Meyer Road, Whittier, CA 90605 (562) 941-5808, Pastor Danny Alvarez.

    B. **Employment:** If paroled, Vasquez's grandmother has expressed her desire to help him start a landscaping business in San Antonio. If Vasquez is not granted out of State parole, he has been offered employment by Crown Paper Converting, P. O. Box 3277, Ontario, CA 91761, (562) 923-5226, fax (909) 923-5024, as evidenced by a letter in Vasquez's Central file authored by Steven A. Godoy.

C. **Assessment:** In review of Vasquez' parole plans and with the support of family and friends. This counselor does not foresee any problems providing support letters are submitted prior to his hearing.

## V. USINS STATUS: N/A

## VI. SUMMARY:

A. Considering the commitment offense, prior prison record, and prison adjustment this writer believes Vasquez would pose a moderate to low degree of risk to the public if released. Vasquez has been incarcerated for over ten years and during this time he has matured physically and mentally and has displayed responsibility in a controlled environment. Although Vasquez received a couple of CDC 128A's (1993, reporting late to work and 2002, not reporting to class), he has not received a CDC 115 since 1994 (10 years). Vasquez has programmed in a positive manner and has kept himself in group sessions on a consistent basis. He received positive reports from satisfactory to exceptional ratings from a long work history within the department. He continues to maintain a good rapport with staff and peers. While assigned to the culinary, Vasquez received a Laudatory chrono from his supervisor for his extraordinary demeanor and his exceptional work habits. He was commended for his ability to complete any task without complaining and completing the job with enthusiasm. He was also commended for his respect toward staff and other inmates. During our interview, Vasquez displayed remorse and sorrow for the victims and their families. A combination of the above factors, as well a support letters from family and friends, point Vasquez in the direction of a successful parole.

B. Prior to release the prisoner could benefit from:

1. Continuing to be disciplinary free.

2. Continuing to participate in therapy and self-help activities.

C. This Board Report is based on a thorough review of Vasquez' Central file and a one (1) interview with him.

**D.** Vasquez was afforded an opportunity to review his Central file per the Olsen Decision, refer to CDC 128B dated 04-23-04, located in the General chrono section.

**E.** No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 03-15-03 to present | | | **PLACEMENT**: Remained at CTF. **CUSTODY**: Remained at Medium A. **VOC. TRAINING**: None noted during this period. **ACADEMICS**: None noted during this period. **WORK RECORD**: Assigned to the culinary through 07-17-03 receiving a Laudatory chrono dated 06-15-03 for displaying exceptional work habits and extraordinary demeanor. On 07-17-03, Vasquez was assigned to F-Wing as a porter and had receibed supervisor reports with average to above average ratings. **GROUP ACTIVITIES**: Vasquez continues his participation in AA and NA programs. **PSYCH. TREATMENT**: None noted during this period. **PRISON BEHAVIOR**: Vasquez has remained disciplinary free since the last report and has a good rapport with both staff and inmates. **OTHER**: None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| [signature] | 8-23-04 |

VASQUEZ H-10787 CTF-SOLEDAD JULY/2004

BOARD OF PRISON TERMS STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

8-23-04

K. L. HEINLY Date
Correctional Counselor I

8-23-04

D. PHERIGO Date
Correctional Counselor II

8-23-04

I. GUERRA Date
Facility Captain

C&PR 8-27-04

D. S. LEVORSE Date
Classification and Parole Representative

# EXHIBIT   "F"

The Judges Decision
①

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MELVYN COLEMAN,

Petitioner,

No. CIV S-96-0783 LKK PAN P

vs.

BOARD OF PRISON TERMS, et al.,

Respondent.

ORDER

_______________________________/

Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On December 22, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondent has filed objections to the findings and recommendations.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a de novo review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.



2
Judges decision

Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed December 22, 2004, are adopted in full; and

2. The petition for habeas corpus will be granted unless, within 60 days, respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

DATED: May 19, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

bd

United States District Court
for the
Eastern District of California
December 22, 2004

* * CERTIFICATE OF SERVICE * *

2:96-cv-00783

Coleman

v.

Board of Prison Term

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on December 22, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Tami M Warwick TM/PAN
Attorney General's Office for the State of California
PO Box 944255 AR/LKK
1300 I Street
Suite 125
Sacramento, CA 94244-2550

Ann Catherine McClintock
Federal Defender
801 I Street
Third Floor
Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: ______________________
Deputy Clerk



The case pages 1-11

FILED

DEC 2 2 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States District Court

Eastern District of California

Melvyn H. Coleman,

Petitioner,

vs.

Board of Prison Terms, et al.,

Respondents.

No. Civ. S-96-0783 LKK PAN P

Findings and Recommendations

-oOo-

Petitioner seeks a writ of habeas corpus.

In his November 14, 1997, second amended petition petitioner claims his federal due process guarantee was violated because the California Board of Prison Terms (Board) has failed to conduct a fair parole suitability hearing.

In 1974 petitioner was convicted of first degree murder, attempted murder, first degree robbery, first degree burglary and other charges. The victims, Mr. And Mrs. Stewart, returned to their home while petitioner was burglarizing it; he then

the case

approached before they got out of their car and robbed and shot them, killing Mr. Siewart and seriously wounding Mrs. Siewart. Petitioner had a prior juvenile record.

Under California law, a prisoner including a convicted murderer serving an indeterminate term (i.e., seven years to life) is entitled to a hearing before a panel composed of members of the Board to determine his suitability for parole. By statute, parole at some point normally is appropriate and the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." Cal. Penal Code § 3041(b). Procedures governing suitability hearings are set forth in Penal Code § 3041.5 (providing prisoners with notice and an opportunity to be heard and requiring a written statement of reasons if the panel refuses to set a parole date). Regulations prescribe factors for the panel to consider in determining whether each prisoner is suitable or unsuitable for parole. 15 CAC § 2281.[1]

[1] Factors supporting a finding of unsuitability include: (1) whether the prisoner's offense for which he is confined was committed in an "especially heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior to the offense; (3) whether the prisoner has an unstable social history; (4) whether the prisoner has committed sadistic sexual offenses; (5) whether the prisoner has a lengthy history of severe mental problems related to the offense; and (6) whether the prisoner has engaged in serious misconduct in prison or jail. Factors supporting a finding of suitability include: (1) whether the prisoner has a juvenile record; (2) whether the prisoner has experienced reasonably stable relationships with others; (3) whether the prisoner shows signs of remorse; (4)

the case

Petitioner presents evidence that under Governors Wilson and Davis the Board disregarded regulations ensuring fair suitability hearings and instead operated under a sub rosa policy that all murderers be found unsuitable for parole. The record shows that between 1992 and 1998 less than one percent of the prisoners in this group were released on parole. During the previous period the parole rate had been about four percent. Petitioner presents sworn testimony that the policy was enforced by (1) appointing Board members less likely to grant parole and more willing to disregard their statutory duty; (2) removing Board members more likely to grant parole; (3) reviewing decisions finding a prisoner suitable and setting a new hearing before a different panel; (4) scheduling rescission hearings for prisoners who had been granted a parole date; (5) re-hearing favorable rescission proceedings and hand-picking panels to ensure the desired outcome; (6) panel members agreeing upon an outcome in advance of the hearing; and (7) gubernatorial reversal of favorable parole decisions. See e.g., declaration of former BPT Commissioner Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to petitioner's March 27, 2003, motion for discovery); deposition of Leddy taken in In re Fortin, et al., San Diego Superior Court

---

whether the prisoner committed his crime as the result of significant stress in his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she committed the crime; (6) whether the prisoner lacks any significant history of violent crime; (7) whether the prisoner's present age reduces the probability of recidivism; (8) whether the prisoner has made realistic plans for release or has developed marketable skills that can be put to use on release; and (9) whether the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. 15 CAC § 2281.

the case

case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89, 95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to petitioner's March 27, 2003, motion for discovery); deposition of former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT, C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82, 85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

The unrefuted record shows the no-parole-for-murderers policy existed and continued under Governor Davis. In In re Rosencrantz, the California Supreme Court took note of evidence presented in the state trial court establishing that the Board held 4800 parole suitability hearings between January 1999 through April 2001, granting parole to 48 murderers (one percent). 29 Cal. 4th 616, 685 (2003). Of those 48, the governor reversed 47 of the Board's decisions and only one murderer out of 4800 actually was released on parole. Id. Petitioner in Rosenkrantz also submitted evidence of the following interview of Governor Davis reflected in the April 9, 1999, edition of the Los Angeles Times: " '. . . [T]he governor was adamant that he believes murderers - even those with second-degree convictions - should serve at least a life sentence in prison. [Para.] Asked whether extenuating circumstances should

---

[2] Meanwhile, the annual cost to taxpayers of conducting these "pro forma" hearings is enormous, amounting to millions of dollars per year. See Exhibit 7 to petitioner's March 27, 2003, motion for discovery (California Legislative Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison Terms criticizing proposed $19 million annual budget and noting huge cost of additional incarceration resulting from no-parole policy).

the Case

be a factor in murder sentences, the governor was blunt: "No. Zero . . . They must not have been listening when I was campaigning. . . . If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . . . We are doing exactly what we said we were going to do."'" 29 Cal. 4th at 684.

Respondent does not refute the alleged facts. Instead, respondent argues that, assuming arguendo prisoners in California have an interest in a parole date protected by the due process clause, constitutional requirements are met so long as there is "some evidence" supporting the findings petitioner is unsuitable. See Oppo. at 7:20 (so long as "some evidence" standard is met, "the Board decisions could not have been arbitrary.") For the reasons explained, this court rejects that claim. As this court previously has found, there always will be "some evidence" that can be used to explain a denial or rescission under the circumstances. Federal due process requires more.

California's parole scheme gives rise to a protected liberty interest in release on parole. McQuillion v. Duncan, 306 F.3d 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334

the case

F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616 (2003).[3]

Therefore, petitioner is entitled to the process outlined in Greenholtz, viz., notice, opportunity to be heard, a statement of reasons for decision, and limited right to call and cross-examine witnesses. The determination that petitioner is unsuitable for parole must be supported by some evidence bearing some indicia of reliability.

These guarantees do not exhaust petitioner's right to due process. The fundamental core of due process is protection against arbitrary action:

> The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in Bank of Columbia v. Okely, 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."

Hurtado v. California, 110 U.S. 516, 527, (1884). "The concessions of Magna Charta were wrung from the king as guaranties against the oppressions and usurpations of his

---

[3] That is so because the parole statute, Penal Code § 3041, uses mandatory language ("The panel or board shall set a release date unless it determines" further incarceration is necessary in the interest of public safety) which "'creates a presumption that parole release will be granted," unless the statutorily defined determinations are made. Board of Pardons v. Allen, 482 U.S. 369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12). As of 1988, by amendment of the state constitution, a parole date given can be withdrawn by the Governor under the same factors considered by the Board.

the case

prerogative." Id. at 531. "The touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974), citing Dent v. West Virginia, 129 U.S. 114 (1889).

A government official's arbitrary and capricious exercise of his authority violates the essence of due process, contrary to centureis of Anglo-American jurisprudence. See Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power."); United States v. Lee, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."); U.S. v. Nixon, 418 U.S. 683, 695-96 (1974) (rule of law is "historic commitment"); Accardi v. O'Shaughnessy, 347 U.S. 260, 267-68 (1954) (Attorney General must abide by regulations and cannot dictate immigration board's exercise of discretion in decision on application to suspend

the case

deportation; remedy is new hearing where board will exercise it's discretion free from bias).

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. See Withrow v. Larkin, 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to courts); Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process claim based on allegations that prison disciplinary hearing officer was biased and would suppress evidence of innocence); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process").

Courts too numerous to list have recognized that the right to a disinterested decision-maker, who has not prejudged the case, is part of the fundamental guarantee against arbitrary and capricious government conduct in the California parole context. See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal. App. 4th 549, 563 (2001) ("some evidence" standard is "only one aspect of judicial review for compliance with minimum standards of due process" (citing Balisok) and Board violates due process if its decision is "arbitrary and capricious"); In re Minnis, 7 Cal. 3d 639 (1972) (blanket no-parole policy as to certain

the case

category of prisoners is illegal); In re Morrall, 102 Cal. App. 4th 280 (2003) (same). The guarantee of neutral parole officials in a suitability hearing is just as fundamental as the right to a neutral judge in a court proceeding. Compare Sellars v. Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California parole officials, analogous to judges, are entitled to absolute immunity).

The Ninth Circuit previously has acknowledged California inmates' due process right to parole consideration by neutral decision-makers. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990). In that case the appellate court found that a neutral parole panel at a new hearing would reach the same outcome and so denied relief. The record in this case simply will not permit the same conclusion. The requirement of an impartial decision-maker transcends concern for diminishing the likelihood of error. As the Supreme Court clearly held in Balisok a decision made by a fact-finder who has predetermined the outcome is per se invalid -- even where there is ample evidence to support it. 520 U.S. at 648.

Petitioner presents a convincing case that a blanket policy against parole for murderers prevented him from obtaining a parole suitability determination made after a fair hearing. Respondent offers nothing to counter petitioner's showing.

Accordingly, the court hereby recommends that the petition for habeas corpus be granted unless, within 60 days of the district court's adoption of these recommendations, respondent

provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these findings and recommendations are submitted to the United States District Judge assigned to this case. Within 20 days after being served with these findings and recommendations, respondent may file written objections. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge may accept, reject, or modify these findings and recommendations in whole or in part.

Dated: DEC 2 1 2004.

Peter A. Nowinski
Magistrate Judge