1 | PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**FILED**

MAY 13 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

2 | Name   VASQUEZ,      Adam      A.
3 |      (Last)       (First)       (Initial)

Prisoner Number ___ H-10787

4 | Institutional Address   P.O. Box 689, Soledad, CA  93960

5 | Correctional Training Facility – Central

6 |

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

7 |

8 | ADAM ANTHONY VASQUEZ,

9 | (Enter the full name of plaintiff in this action.)

10 |           vs.

B. CURRY, Warden, et al.,

FIRST AMEDNDED PETITION

Case No. CV08-00268 SI
(To be provided by the clerk of court)

**PETITION FOR A WRIT
OF HABEAS CORPUS**

11 |
12 |
13 |
14 | (Enter the full name of respondent(s) or jailor in this action)

15 |

16 | <u>Read Comments Carefully Before Filling In</u>

17 | <u>When and Where to File</u>

18 |      You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |      If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS ·     - 1 -

1

INTRODUCTION

2    Pursuant to this Court's Order filed April 22, 2008, and in accordance with established

3  procedure, Adam A. Vasquez (Petitioner), hereby submits this FIRST AMENDED PETITION for writ

4  of habeas corpus appended to the Case Number, as shown above. As the Court will please note,

5  the Title Page herein as well as that previously submitted lists the Warden, et al., as respon-

6  dents so Petitioner therefore respectfully incorporates by reference all papers, pleadings,

7  exhibits and attachments previously submitted under the case name and number. An amended copy

8  of the previous filing is provided with more-intelligible pagination.

9

10    It is well-settled that where, as here, an inmate challenging continued confinement the

11  warden, as general custodian of the inmate is the primary named party.

12    Further, an apology is warranted to this Honorable Court for any confusion the methodology

13  utilized may have caused and Petitioner will endeavor to succintly state and brief those issues

14  labeled as "Grounds" contained in the Original filing.

15

16

DISCUSSION

17    As this Court recently and very appropriately determined in Carlin v. Wong, case no.

18  CV06-04145 SI, "A California prisoner with a sentence of a term of years to life with the

19  possiblity of parole has a protected liberty interest in release on parole and therefore,

20  a right to due process in the parole suitability proceedings. See Hayward v. Marshall (9th

21  Cir. 2008) 512 F.3d 536, 542–47 (citation omitted).

22    "The Ninth Circuit ha[s] clearly established that a parole board's decision deprives

23  a prisoner of due process with respect to this interest if the board's decision is not

24  supported by 'some evidence in the record,' or is 'otherwise arbitrary.' Irons v. Carey (9th

25  Cir. 2007) 505 F.3d 846, 851." (Carlin, slip opn. at pp. 6–7.) While a prisoner's due process

26  rights are rapidly evolving in favor of a judicious application of same, it certainly commands

27  no less in any sense. The discussion noticed herein is a well-written, reasonable take on

28

1   the logic of parole decision review and reflects this Court's high standards.

2       The federal Constitutional claims and violations alleged herein are as follows:

3

4                                    Ground I

5   PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION
    WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE
6   INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY
    AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS THEREON.
7

8       On January 25, 2007, Petitioner had his fourth parole hearing. He was denied parole due

9   to a Finding of unsuitability; the commitment offense being the crux of the alleged reasoning

10  behind the Finding. Although Petitioner didn't participate in the actual shooting, the panel

11  members found he has committed a crime warranting continued confinement. The panel found

12  Petitioner's crime to be "very callous" (previously submitted Exhibit "A", at p. 79). But

13  the only exception authored in present state case law is one that is 'exceptionally' callous.

14      Therefore, Petitioner, as an aider and abettor, cannot be found to have committed this

15  crime as a perpetrator, merely as an adjunct who has accepted full responsibility.

16      As the Court may be aware, recent decisions have held that when the petitioner isn't

17  the actual murderer, a Finding of "especially cruel, callous and/or heinous" factors must

18  be present to be legally sustained where no circumstance of the crime was more than the minimal

19  elements necessary to convict. This continued use of the crime has therefore become a gordian

20  knot from which Petitioner may not reasonably expect to escape from without assistance from

21  the courts.(See In re Montgomery (2007) 67 Cal.Rptr.3rd 721, where it was noted that:

22      "Because the overarching consideration is public safety, the test
        in reviewing the Board's decision denying parole 'is not whether
23      some evidence supports the reasons cite[d] for denying parole, but
        whether some evidence indicates a parolee's release unreasonably
24      endangers public safety.' In re Barker (2007) 151 Cal.App.4th 346,
        366 (italics in original.)

25      ¶ "Court review of a Governor's decision ensures, among other due
        process rights that the decision be supported by some evidence, the
26      same standard for reviewing Board decisions.

27      ¶ "While the [] discretion in reviewing parole suitability is very

28

                                    >-2-<

broad, it is not absolute. The requirement of due process embodied in the California Constitution (cite omitted), places some limitations upon that discretion. In exercision his discretion, the Governor, <u>like</u> <u>the</u> <u>Board</u>, is constrained by the procedures specified by statute. The precise manner in which the specified factors relevant to parole suitability are considered and balanced is within the [Board's] discretion, but [it's] decision <u>must</u> <u>reflect</u> <u>an</u> <u>individualized</u> <u>consideration</u> of all the specified criteria and it cannot be arbitrary or capricious. <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, 677; <u>In re Scott</u> (2005) 133 Cal.App.4th 573, 590-591. (Emphasis added.)

"For purposes of our review, we accept the Governor's finding that Montgomery's crime was sufficiently egregious to support denial of parole after the initial hearing. However, this finding does not end the analysis. 'Establishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, <u>but</u> <u>it</u> <u>is</u> <u>not</u> <u>the</u> <u>final</u> <u>step</u> <u>under</u> <u>the</u> <u>regulations</u>. Due process affords an inmate 'an individualized consideration of all relevant factors.' <u>In re Tripp</u> (2007) 150 Cal.App.4th 306, 319, quoting <u>Rosenkrantz</u>, supra, at p. 655. (Emphasis added.)

¶ "While an accomplice is treated the same as the perpetrator for purposes of determining guilt and imposing sentence (e.g., <u>People v. Prettyman</u> (1996) 14 Cal.4th 248 259), <u>continuing</u> <u>to</u> <u>do</u> <u>so</u> <u>in</u> <u>making</u> <u>a</u> <u>parole</u> <u>suitability</u> <u>determination</u> <u>violates</u> <u>the</u> <u>prisoner's</u> <u>due</u> <u>process</u> <u>right</u> to 'an individualized consideration of all relevant factors.' In determining whether [he] poses a current public safety risk, it is certainly relevant that [Petitioner did not shoot the victims]. Coupled with the absence of any violent criminal history, his exemplary prison record and the almost unanimous opinions of prison psychologists that [he] poses a "low risk" for violence, <u>the</u> <u>only</u> <u>rational</u> <u>conclusion</u> <u>is</u> <u>that</u> <u>[he]</u> <u>poses</u> <u>little</u> <u>or</u> <u>no</u> <u>threat</u> <u>to</u> <u>public</u> <u>safety</u>.

¶ "Our decision conforms with most recent decisions in this issue. (See, e.g., <u>In re Elkins</u> (2006) 144 Cal.App.4th 475; <u>In re Lee</u> (2006) 143 Cal.App.4th 1400; <u>Scott</u>, supra. With due respect to our colleagues in Division 4 of this court we disagree with its opinion in <u>In re Jacobsen</u> (2007) 154 Cal.App.4th 849. 'Our laws ... provide for mechanisms by which even murders, in limited circumstances, are entitled to be paroled. The judiciary has an obligation to execute those laws.'" <u>Lee</u>, supra, at p. 1414. <u>Montgomery Ibid</u>. at pp. 731-733. (Emphasis added in original and added where noted.)

To emphasize the standard recently annunciated in <u>In re Singler</u> (3rd App. 2008) 73 Cal.Rptr.3d 864, which apparently repudiated <u>Jacobson</u>, supra:

¶ "... the relevant test is not whether some evidence supports the reasons cited for denying parole, 'but whether some evidence indicates [an inmate's] release unreasonbly endangers public safety.' 'Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers

public safety.' (Lee, supra, p. 1409.) 'For example, a seriously
troubled adolescence, even for an 80-year-old inmate, might constitute
'some evidence' of 'a history of unstable or tumultuous relationships
with others.' (Cite omitted.) It would be necessarily be some evidence
of an unreasonable danger to pubic safety.

¶ "It appears, however, that in granting review and transferring
the matter back to [Judge Scotland, P.J.] for reconsideration in
light of additional authorities, the California Supreme Court believes
[I] construed the standard of review articulated in Rosenkrantz [su-
pra], too narrowly and w[as] too defferential to the Board's finding.
[I] reach this conclusion because of the specific citatons to author-
ity included in the [ Order], i.e., authorities interpreting Rosen-
krantz in a manner that appears to give courts greater leeway in
reviewing the Board's finding that an inmate remains a danger to
public safety.

¶ "'Yet, the predictive value of the commitment offense may be very
questionable after a long period of time. [Citation.] Thus, denial
of release solely on the basis of the gravity of the commitment
offense warrants especially close scrutiny.'

¶ "The [Supreme Court] has transmuted the Rosenkrantz standard into
one that permits the court to reweigh evidence, recalibrate relevant
factors, and reach and independent determination whether the inmate
continues to pose an unreasonable risk to public safety." Singler,
supra, at pp. 874, 877, 878. (Emphasis added.)

### Ground II

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE
VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF
WITHOUT REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND
THAT PETITIONER IS UNSUITABLE TO PAROLE AND/OR AN UNREASONABLE RISK.

As to the second issue the gist of the allegation is that respondents have found

unsuitability where no nexus of logic can possibly reach. It is this lesser standard of proof,

i.e., 'some' evidence that Petitioner challenges due to the quasi-judicial nature of the

proceedings. The panel followed a regular routine by extolling the laudatory words of various

penological personnel and then patently ignored those very words (Exhibit "A" at pp. 39–40;

80–83.) This is exactly what virtually all court decisions now refer to as unacceptable.

The courts have almost unanimously denounced a panel denying suitability while overlooking

the very criteria that tends to establish suitability, i.e., in-custody behavior and accom-

1  plishments. The stricture critiquing unchangeable facts is well-established but Petitioner
2  will provide a recent cite where this Court concurred with the Ninth Circuit and noted this
3  disingenuousness. Carlin, supra, citing Hayward, supra, observed:

4       "The Court must review the record to determine whether the state court decision holding
5  that the parole board's findings were supported by 'some evidence' constituted an unreasonable
6  application of the 'some evidence' principle articulated in Superintendent v. Hill (1985)
7  472 U.S. 445; Irons. supra, p. 850. The Ninth Circuit recognized in Hayward that California
8  law makes clear that the '"findings that are necessary to deem a prisoner unsuitable for
9  parole,"'are not that a particular factor or factors indicating unsuitability exist, but that
10  a prisoner's release will unreasonably endanger the public safety.' Hayward at p. 543
11  (citations omitted.) Accordingly, the test here is not whether some evidence supports the
12  reasons cited for denying parole, but whether some evidence indicates that a parolee's release
13  unreasonably endangers public safety. Id.

14       "In applying this standard, the Court finds instructive the Ninth Circuit's recent
15  decision in Hayward, [where they] held that the Governor's reversal of the parole board's
16  determination that a prisoner was suitable for parole was unsupported by any evidence that
17  his release would threaten public safety. [] The court determined that the Governor's findings
18  were either unsupported by evidence in the record, [] or were based on unchanging factors
19  which occurred 27 to 50 years ago and did not constitute evidence that the prisoner would
20  pose a danger to public safety if released from prison []. These unchanging factors were Hay-
21  ward's criminal history, his unstable social history including gang involvement, and the
22  gravity of his commitment offense." Id. pp. 545-47; Carlin slp. opn. at p. 8.

23       The evidentiary standard of "some evidence" is mere gloss where such an important ruling
24  hinges. A person's liberty should be much more worthy of consideration when it has been said
25  a mere scintilla will suffice and, indeed, has in some truly meritorious cases.

26       Where, as here, evidence becomes citable, Petitioner expressly cites to the U.S. Supreme
27  Court decision in Cunningham v. CA (2007) 127 S.Ct 856, ___ U.S. ___, in which the majority

28

>-5-<

1  carefully weighed the parameters and noted that,

2  "Enacted in 1977, the DSL replaced the indeterminate sentencing regime
   in force in California for some 60 years. People v. Black (2005)
3  35 Cal.4th 1238, 1246. 'Under the prior regime, courts imposed open-
   ended prison terms. ... "In contrast, the DSL fixed the terms of
4  imprisonment for most offenses, and eliminated the possiblity of
   early parole. [cites omitted.] Brief for Respondent 7. (* fn. below.)
5  Through the DSL, California lawmakers AIMED TO PROMOTE UNIFORM AND
   PROPORTIONATE punishment." Id. p. 861, (Emphasis added to original.)

6  Even the dissenting Justices made note of this salient fact:

7  ¶ "A California trial court can also consider the 'general objectives
   of sentencing, including ... acheiving uniformity in sentencing.'
8  (Emphasis added to highlight P.C. § 3041(a) ["in a manner that will
   provide uniform terms for offenses of similar gravity and magnitude
9  in respect to their threat to the public. ..."]

10
11  ¶ "The California scheme--like the federal 'advisory' Guidelines--does
   require that this discretion be exercised reasonably. Indeed, the
   California Supreme Court, authoritatively construing the California
12  statute, has explained that [P.C.] § 1170(b)'s 'requirement that
   an aggravating factor exist is merely a requirement that the decision
13  to impose the upper term be reasonable.'" Ibid. pp. 877-78; citing
   Black with authority at p. 1255, (emphasis in original.)

14

15  Petitioner submits that his due process rights were violated when he was denied individual

16  consideration when the state court decisions came after he received his hearing. Cunning-

17  ham established what the DSL implies: "uniform and proportionate punishment."

18  Cunningham also established that a trial court has discretion to modify the sentence

19  when done so "reasonably." The flawed standard of Hill used by the panel and the state courts

20  does not meet FEDERAL guidelines, i.e., SUBSTANTIAL evidence, decided long ago in Santosky

21  v. Kramer (1982) 455 U.S. 745, established that the federal standard of review of a state

22  administrative agency decision that materially affects fundamental rights, is CLEAR AND

23  CONVINCING EVIDENCE "when the individual interests at stake in a state proceeding are both

24  'particularly important' and 'more substantial than mere loss of money.'" (citing Addington

25  v. TX (1979) 441 U.S. 418, 423-24), and when the detriment constitutes a "significant depriva-

26  * "Murder and certain other grave offenses still carry lengthy inde-
   terminate terms with the possibility of early release on parole.
27  (Brief for Respondent 7, note 2", emphasis added.)

28
                              >-6-<

1  tion of liberty" or "stigma" or when relief is required because the petitioner should otherwise

2  be "condemned to suffer grevious loss.", such as here.

3     There can be no argument to the premise that Petitioner's interests at stake here aren't

4  "particularly important" nor don't involve "a significant deprivation of liberty—or a grevious

5  loss." (Compare Davis v. B.P.T (2005) 200 OR.App. 366, 371-373 ["clear and convincing evidence"

6  is required in parole cases); Trantino v. N.J. State Bd. (2001) 764 A.2d 940, 976 ["substantial

7  evidence" required].

8     Of significance is the fact that when reviewing state decisions of state agencies for

9  evidentiary support, California's statutory law mandates courts to apply the substantial evi-

10  dence test. CA Civ. Code § 1094.5(c). This Honorable Court should set forth why civil law

11  grants such deference without including liberty interests as well, where "individual interests"

12  [in one's liberty] are at stake.

13     One could arguably submit that no other state whose parole statutes provide a protected

14  liberty interest allow it to be extinguished by the mere hint of any evidence whether reliable,

15  relevant, or ethereal such as that done with smoke and mirrors.

16     Substantial evidence is defined in Black's Legal Dictionary, 5th Ed. (1979) as,

17     "Such evidence that a reasonable mind might accept as adequate to support a conclusion.

18     It is that quality of evidence necessary for a court to affirm a decision of AN

19     ADMINISTRATIVE BOARD."

20  (Black's p. 1281, citing State v. Green (1974) 544 P.2d 356, 362 emphasis added.)

21     Petitioner submits the Court is empowered with the plenary power. to analyze this issue

22  and make any ruling such that a prisoner might reasonably rely upon a "clear and convincing"

23  standard such that administrative agencie's decisions aren't arbitrary nor capricious.

24

25                                 Ground III

26     The panel stated in the Decision that the psychologist's opinion was "somewhat supportive"

27  but, "this panel finds it to be somewhat inconclusive ..." (Exhibit "A", p. 82.) This equivoca-

28
                                    >-7-<

tion isn't too remote from that found in Carlin, supra, slip opn. pp. 9-10.

The final, but not all-inclusive issue, is the absence of any professionally-recognized standard underpinning the ultimate decision made by the panel denying parole suitability. Without a causal connection to the actual rendition of the hearing transcript this is nothing more than a make-weight pseudo-justification. If the allegations versed in the Decision (which is strikingly similar to the language noticed in Petitioner's Exhibit "D") are literally construed, it bolsters the assertion of a "no parole" policy and/or practice found un-constitutional and referenced in the previously attached Exhibit "F", an 'arbitrary and capri-cious' review is called for and rightfully warranted. (See Irons, supra, p. 851.)

Also, the recent case from this jurisdiction found similar behavior in the present administration and published in Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 (amended at 448 F.Supp.2d 1143.) "Although the statutory formulation restricts federal law to Supreme Court precedent, ... 'Ninth Circuit precedent may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law, and may also help ... determine what law is clearly established.'" Sims v. Rowland (9th Cir. 2005) 414 F.3d 1148, 1151, cert. den. (2005) 546 U.S. 1066; Robinson v. Ignacio (9th Cir. 2004) 360 F.3d 1044, 1057. "The commitment offense can negate suitability only if circumstances of the crime reliably established in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." Hayward, supra, p. 545; Scott, supra, p. 594-95; In re Dannenberg (2005) 156 Cal.App.4th 1387, 1398; Barker, supra, p. 372; (citing McCarns v. Dexter (C.D. Cal. 2008) 534 F.Supp.2d 1138, 1153.

"Thus, 'in the circumstances of petitioner's case, the facts no longer amount to ''some evidence'' supporting the conclusion that petitioner would pose an unreasonable risk of danger if released on parole.'" McCarns, supra, p. 1154; Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1086; Thomas v Brown (N.D. Cal. 2006) 513 F.Supp.2d 1124, 1136.(See also Wyrick v. Mendoza-Powers (E.D. Cal. 2007) WL 2695635.)

Rosenkrantz, supra, 444 F.Supp.2d at p. 1085, spoke to the petitioner's age and immaturity at the time of his offense and Judge Richman in Barker, also came to the conclusion that,

>-8-<

"Last, but by no means incidentally, the Board failed to consider Barker's age at the time he committed the crimes. In Elkins, supra], we agreed with the observations of the federal district court in Rosenkrantz, supra, that 'the general unreliability of predicting violence is exacerbated in [a] case ... by petitioner's young age at the time of the offense [and] the passage of [over] twenty years since that offense was committed.' ([Id.], p. 500.) There, granting the petition for habeas corpus, the district court talked of Rosenkrantz's age, one month past 18. (Rosenkrantz, at p. 1085.) This fact, the district court noted, 'further diminished' the 'reliability of the facts of [Rosenkrantz'] crime as a predictor for his dangerousness.' (Ibid.) Stating that '[w]hile [Rosenkrantz] was not legally a minor, he was very close to being one,' the district court confirmed the recognition by the [U.S.] Supreme Court that the 'evidentiary/predictive value of the conduct of such a young person is diminished.' (Ibid.) Then, after making the statement quoted by us in Elkins, the district court went on to quote various observations of the Supreme Court about young criminals: '"Their own vulnerability and comparative lack of control over their immediate surroundings mean (sic) juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.'" [See Stanford v. KY (1989) 492 U.S. 361, 395; (Brennen, J., dissenting).]. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' Johnson v. TX (1993) 509 U.S. 350, 363; Roper v. Simmons (2005) 543 U.S. 551; Thompson v. OK (1988) 487 U.S. 815, 835 (Stevens, J.) (plurality opinion) ['[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. ... Inexperience, less intelligence and less education make a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.']"[2] Rosenkrantz, p. 1085. These observations are a fortiori applicable to [Barker].

¶ "In sum and in short, the record [TWO 2nd and ONE 1st DEGREE MURDERS] before us contains no evidence Barker poses an unreasonable risk to public safety even under the deferential 'some evidence' standard." Barker, supra, pp. 768-69. (Emphasis added.)

---

[2]    Juvenile offenders should also receive consideration for the fact they were juveniles or very nearly so. People v. Bacigalupo (1991) 1 Cal.4th 103, 153; Roper v. Simmons (2005) 543 U.S. 551, 161 L.Ed.2d 1, 21-22. Petitioner was the same age as Rosenkrantz when convicted.

1

2

3

## CONCLUSION

It is axiomatic that the Penal Code mandates a fair process where an inmate subject to statutory authority is given a just and meaningful opportunity to benefit from his reformation and lack of risk of danger to public safety to gain his parole release. The courts have long been held the last, best bastion of our constitutional freedoms and a bulwark against their arbitray and capricious abrogation.

We all hold the freedoms of liberty, equality and justice as paramount in value amongst ourselves and to lessen the quality for one is to diminish those same rights to all who deserve to be able to enjoy the right of association and the freedoms embodied therein. This Court has the plenary power inherent in its office and should grant the writ submitted by Petitioner, Order his immediate release from custody or, at the very least, instruct Respondents to provide a new parole suitability hearing that in all ways conforms to the Courts oversight, and maintain original jurisdiction to see that this is so.

WHEREFORE, Petitioner respectfully prays this Honorable Court will grant the writ, Order all available relief prayed for there, and any and further relief as the Court may deem just and proper.

Respectfully submitted this 8th day of May, 2008, by:

Adam A. Vasquez, pro se

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSITITIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On January 25, 2007, Adam Vasquez (Petitioner) appeared before the Board of Parole Hearings (BPH) for his 3rd subsequent hearing (4th overall), during which Ms. J. Thompson was Presiding Commissioner and Ms. J. Eng was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts.

Petitioner was represented by Mr. R. Rutledge. A staff psychologist, Dr. E. Rueschenberg, Ph.D., testified utilizing a filed Report dated: 1-17-05, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 2000 and 2003 are attached as Exhibit "B". A copy of the

b. Supporting cases, rules, or other authority (optional): **(continued on attached pages)**
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

1   (continued from previous page):

2   2006 Counselor's board report is attached as Exhibit "C" and was prepared and filed but not cited to at the

3   Hearing. Copies of the 2005, 2003 and 2001 BPT Decisions denying parole are attached hereto as Exhibit "D"

4   and are clearly anecdotal evidence to further advance the allegation of a "no parole" policy and/or practice that

5   has been held to be unconstitutional as well as illegal by all courts that have ruled on the subject matter and,

6   with the Court's leave, are also incorporated by reference to this pleading as though fully set forth herein.

7        Also present at the hearing was d.d.a. Ms. J. Glidden, parole division.

8        Parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due

9   process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1] (2002) 29 Cal.4th 616,

10  661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him suitable for parole and set

11  his prison term and a parole date because, when his MEPD lapsed, his parole was evaluated to no longer pose

12  an unreasonable risk of danger to society or public safety. (Penal Code (PC) §3041(a); 15 California Code of

13  Regulations (CCR) §§ 2280, 2281(a).)

14       In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied parole if

15  the commitment offense was especially egregious when compared to other instances of the same offense. Such

16  cases, however, are exceptions, and not per the rule. Accordingly, the conduct of an up-to-life sentenced inmate

17  who committed second degree murder must be especially violent when compared to that of other second

18  degree murderers for parole to be denied on the basis of the offense in the case of an otherwise qualified

19  inmate. However, the offense cannot serve as a basis for denying parole interminably. In re Ramirez (2001) 94

20  Cal.App.4th 549, 569-570; Rosenkrantz V, 658. (cf: Biggs v. Terhune    (9th Cir. 2003) 34 F.3d 910; Irons v.

21  Warden (E.D. Cal. 2005) 358 F.Supp.2d 936; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 (Martin I);

22  Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1036 [Rosenkrantz VI].)

23       Here, Petitioner did not actively engage either victim nor intended any violent consequences and he was

24  therefore sentenced as an aider and abettor who cannot have committed any crime in any definitive criteria

25  which would suggest that his crime was committed in "an exceptionally cruel manner" nor with an "especially

26

27  [1] There have been seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80
28  Cal.App.4th 409; Davis v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002)
    29 Cal.4th 616; In re Rosenkrantz L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1036.

1 | callous disregard for the suffering of another" because he did not intend the logical consequences of the actual

2 | perpetrator and had no specific intent to do any harm to anyone such as this wanton murder of an innocent.

3 |        Substantive due process requires that the grounds set forth by a BPH panel for its decision must be

4 | supported by at least some credible, relevant evidence in the record. The panel was required to base its findings

5 | on a weighing of all relevant, reliable evidence. (15 CCR § 2281(b); In re Minnis (1972) 7 Cal.3d 639, 646; In re

6 | Rosenkrantz (2000) 80 Cal.App.4th 409, 424-427 (Rosenkrantz V); Rosenkrantz V, 655; Ramirez, supra, 566.

7 | The "some evidence" standard is satisfied if there is substantial, reliable evidence in the record that could

8 | support the conclusion reached. Powell v. Gomez (9th Cir. 1994) 33 F.3d 39, 40; Cato v. Rushen (9th Cir. 1987)

9 | 824 F.2d 703, 705. And federal due process requires substantial evidence having indicia of reliability Jancsek v.

10 | Oregon Bd. Of Parole (9th Cir. 1987) 833 F.2d 1389, 1390; In re Powell (1988) 45 Cal.3d 894, 904; Rosenkrantz

11 | V, 658; McQuillen, supra, 306; Biggs, supra, 915; Caswell v. Calderon (9th Cir.2004) 363 F.3d 832, 839.

12 |        Black's Law Dictionary 5th Ed. 1979 defines **SUBSTANTIAL EVIDENCE** as follows:
       "Such evidence that a reasonable mind might accept as adequate to support a conclusion.

13 |        *It is that quality of evidence necessary for a court to affirm a decision* of an *Administrative board*. (Black's p. 1281, citing State v. Green (1974) 544 p.2d 356, 362. emphasis added.)

14 |

15 |        The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a

person of life, liberty, or property without due process of law. A person alleging a due process violation must first

16 | demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause,

17 | and then show that the procedures that led to the deprivation were constitutionally insufficient. Kentucky Dept. of

18 | Corrections v. Thompson (1989) 490 U.S. 454; McQuillen, supra, 900.

19 |        In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a

20 | protected liberty interest in parole, and the denial of one or more of the procedural protections that must be

21 | afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in

22 | 1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release

23 | will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional

24 | liberty interest." McQuillen, supra, 901 (citing Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 7 and

25 | Board of Pardons v. Allen (1987) 482 U.S. 369, 373. Because no evidence supported the panel member's

26 | finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to "public safety," and the

27 | finding was inapposite to the record, parole denial on that basis subverted due process and substantiates those

28 | who contend that this state is without an excuse as to why the denial rate is what it is.

The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that his parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p. 84) the sole ground set forth by the panel in support of its Decision to AGAIN, for the second (4th) time, deny suitability and dismiss his warrant of parole which is tremendously long overdue! (His M.E.P.D. was 8-9-2001.)

Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence and abrogated due process because it is supported by **NO** EVIDENCE whatsoever. **All** of the competent, professionally-sanctioned evidence that addresses Petitioner's current **and** future dangerousness, parole risk, etc., found it to be "low to moderate," "less than the average citizen," or "below average," nor has it been for over a decade. "Significantly, *the evidence underlying THE DECISION must be supported by '"some indicia of reliability."'* Rosenkrantz VI, supra, at p. 1083, emphasis added. (See again Exhibit "B", Exhibit "A", at pp.48-49.)

Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in Petitioner's records that addresses his dangerousness and parole "risk" all assess these factors to be low. And, because not a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole relevant reason for finding him unsuitable for parole sensibly suggests this was an illegitimate (ongoing) basis for denial. Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1039, (Martin I), Martin v. Marshall 448 F.Supp.2d 1143, (Martin II), et al.

In Martin II, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual consideration and in her July 21, 2006 Memorandum and Order she stated:

"In light of the Board's apparent abandonment of its independent role"—**which occurred AFTER Governor Schwarzenegger took office---**, "*the court finds that a remand would indeed be futile.*" There can be no question but that the implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY THE WILSON, DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

In Rosenkrantz V, supra, at p. 655, the Supreme Court explained that parole release decisions "entail the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-case basis and the BPH's discretion in that regard is almost unlimited. Notwithstanding that the BPH's discretion is exceedingly broad, it is circumscribed by the requirements of procedural due process. (Rosenkrantz, id., Calif. Const. article I, § 7(a), and statutory directives mandating a fair and unbiased Hearing.)

1      Absent substantial evidence of the presence of unsuitability factors, there must be some relevant,

2   reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the

3   suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad

4   discretion in its parole decisions, the Findings must reflect "*an individualized consideration of the specified*

5   *criteria and cannot be arbitrary or capricious.*" Rosenkrantz V, supra, 677; "[t]he liberty interest is created, not

6   upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, 914.

7      The failure to properly consider the post-incarceration factors highlights the inherent misunderstanding

8   and application of the "some evidence" standard and triggers the required scope of judicial review of the federal

9   questions presented here.

10      There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances

11   Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears that

12   the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given to

13   subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC §

14   3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its Findings

15   under both sets of criteria and any balanced and reasonable interpretation should compel this approach

16   throughout the entire process due any inmate and to do so would virtually assure a Finding of suitability.

17      Factors TENDING to show suitability or unsuitability must be weighed and balanced within the

18   parameters of a standard of proof. Without this critical, reliable component, the process is inherently arbitrary,

19   capricious, and defective. This standard-less analysis would vitiate the individualized consideration held

20   appropriate in Rosenkrantz V. The crux of the matter is that of a standard of proof with indicia of reliability as set

21   forth below and reinforced with significant legal precedent.

22      The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's

23   decisions. It is only one aspect of *judicial* review employed by a habeas court. Edwards v. Balisok (1997) 520

24   U.S. 640, 647. And, if the Rosenkrantz V decision implies, as it does, that the "some evidence" standard should

25   be applied to the BPH Findings, then this is a clear and unreasonable application of well-established federal

26   Constitutional law set forth by the High Court. Nothing in Superintendent v. Hill (1985) (Hill) 472 U.S. 445, 456,

27   implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive body outside a

28   disciplinary committee within an exigent-circumstances prison setting that has no pressing need for more formal

1   evidentiary standards or anything warranting standard-less precedents

2          What IS implied by the Rosenkrantz V court, when it held that a habeas court can't reverse a decision
3   denying parole even if it determines that the evidence overwhelmingly preponderates towards a finding of
4   suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary and capricious
5   decision, and worse, stymies effective judicial review. This court is not obliged nor compelled to defer to a state
6   decision misapplying federal constitutional principles. Hubbart v. Knapp (9th Cir. 2004) 379 F.3d 773, 780;
7   referencing Mullaney v. Wilbur 421 U.S. 684, 691; see also Peltier v. Wright (9th Cir. 1994) 15 F.3d 860, 862.

8          In Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference to
9   the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable or
10  amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's contention
11  that respondents seek to avoid federal review by asserting that the "some evidence" standard 1) is applied by the
12  BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a finding of a defective pre-
13  Decision process.

14         If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with reliable,
15  articulate proof, it would have logically flowed that he is now MORE suitable than his previous hearing wherein
16  he encouraged that if he continued his positive programming and rehabilitation he would likely be found suitable.
17  (Exhibit "B".) All those laudatory words at his Hearing would have had a consistent ring of truth to them in that he
18  has progressed towards a more-suitable mien, not the reverse. This highly illegal "boilerplate" denial now rises to
19  the level of a federal due process violation. Biggs, supra, pp. 916-917; Martin I, supra, p. 1042.

20         Please note that the previous Decisions denying parole also gave advice; the present denial is almost a
21  carbon copy of the last panel's decision. This summary denial of suitability leading to parole now rises to the
22  level of a federal due process violation. Biggs, supra, p. 917; Martin I, supra, pp. 1048-49.

23         The High Court in Greenholtz (at p. 7) Allen (at p. 373) , supra, established that:

24         "While there is no constitutional or inherent right of a convicted person to be con- ditionally
           released before the expiration of a valid sentence, a state's statutory scheme, if it uses
25         mandatory language, creates a presumption that parole release will be granted when or unless
           certain designated findings are made, and thereby gives rise to a constitutional liberty interest."
26         (Citing McQuillen, supra, at 901.)

27         In the absence of any evidence in the record supporting the BPH's decision, remanding the case back to
28  be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II, supra, p. 1015-15;

1    Martin II, supra, p. 1145; Rosenkrantz VI, supra, p. 1087.

2    A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful

3    individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed form.

4    The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041 (b) to

5    "swallow" the due process required under the 14th Amendment, an ingestion violating the equal protection

6    guarantees and abridges Petitioner's civil rights under both state and federal Constitution's proscription against

7    this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268; Ramirez, supra, at 570;

8    Rosenkrantz V, at pp. 658, 683.

9    "Judicial oversight must be extensive enough to protect the limited right of parole applicants "'to
      be free from an arbitrary parole decision ... and to something more than mere pro forma
10    consideration.'" [citation omitted] The courts may properly determine whether the [BPH]'s
      handling of parole applications is consistent with the parole policies established by the
11    Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole
      statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ]
12    Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper
      function of judicial review to ensure that the [BPH] has honored in a "'practical sense'" the
13    applicant's right to "'due consideration.'"" [ ] Ramirez supra, at 564.

14    (Since it is clear that parole should be the rule and not the exception, a moderate or average risk cannot

15    be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception would

16    "operate so as to swallow the rule that parole is 'normally' to be granted. Rosenkrantz V, at pp. 658, 683.)

17    "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety
      ... {However] the [BPH] "'shall normally set a release date."' [citation omitted] The [BPH]'s
18    authority to make an exception ... should not operate to swallow the rule that parole is 'normally'
      to be granted. ...Therefore, a life term offense must be particularly egregious to justify the denial
19    of a parole date. In order to comply with the parole policy established by the Legislature in P.C.
      § 3041, the [BPH] must weigh the inmate's criminal conduct not against ordinary social norms,
20    but against other instances of the same crime or crimes." (Ramirez, supra, at 570, disapproved
      on other grounds, emphasis added as usual in published cases.)
21

22    The applicability of this standard to the review of decisions applies and Petitioner's right to due

23    consideration does not appear to have been honored in any practical sense by the panel in this case and their

24    Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with the controlling

25    rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell (2001) 94 Cal.App.4th

26    1017, 1030.)

27    In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found that

28    there was not some evidence that Smith's crime was more callous than the average second degree murder.

1    There was nothing to "distinguish th[e] crime from other second degree murders … the record provides no

2    reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and

3    counselor[s] concerning [his] dangerousness."

4        Surely the same must appear to be true here. (See Exhibits "B" and 2004 Correctional Counselor, Level

5    I (CC-I) Board Report as Exhibit "E", p. 4, attached.) The Second District Court of Appeals, in the case of another

6    life-term inmate named Smith,similarly found no evidence to support a parole denial based on the commitment

7    offense. In re Smith (2003) (Smith I) 109 Cal.App.4th 489.

8        Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed the

9    BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence

10   show[ed] no more callous disregard for human suffering than is shown by most second degree murder offenses."

11   (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th 538,

12   Scott II.)

13       On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton adopted the

14   Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and Wilson (and NOW

15   Governor Schwarzenegger, too. See infra at p. 3), had/have panels with a sub rosa "no parole" policy and

16   were/are carrying it out. Martin I , supra, pp. 1048-49; Martin II, supra, p. 1144; (see Coleman and Final Order,

17   attached as Exhibit "F".)

18       It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the state

19   can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a statute. Our

20   Court, in the entire history of the statute, has never construed it with any adequacy according to the plain

21   meaning to create guidance and instill compliance by both the BPH panels and those who serve the governors

22   otherwise, although it would seem enough time and toil has passed to have done so.

23       Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO

24   NOT reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the agency's

25   burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of judicial

26   guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of evidence

27   (or lack thereof) although these persons are arguably unqualified by a dearth of professional standing to make

28   these determinations upon which a federal liberty interest depends.

1    Determining the legality and weight and of evidence requires some specific legal training in evidentiary

2  law; not by lay persons, and which lack of training is visibly evident in the incongruously inapposite findings thus

3  made. (McQuillen I, supra, 907-912; Rosenkrantz V, supra, 680; Rosenkrantz II, supra, 424-426; Smith II, supra,

4  361; Smith I, supra, 501-506.) These are only a few of the published cases but unpublished absurdities

5  exponentially abound!

6    The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified factors

7  relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of whether the

8  *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.) This is the first

9  time a published decision on the BPH has even mentioned a burden of proof. This reference infers the BPH must

10  honor this evidentiary standard as faithfully to the letter as legally possible.

11    Yet there is no settled bright line rule for a court to determine if the BPH has met that standard.  Just the

12  opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not meet the

13  standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

14    The Third District Court of Appeals stated the following as fact:

15    "It is without doubt that a blanket no-parole policy would be contrary to the law, which
contemplates that persons convicted of murder without special circumstances may eventually
16    become suitable for parole and that, when eligible, they should be considered on an
individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In Roberts
17    v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's old
indeterminate sentencing law, the Court condemned a blanket parole policy that was contrary to
18    the statutory parole scheme then in place. It appeared that the statutory law *allowed a prisoner to
apply for parole after serving ONE YEAR* but that, **contrary to the statute, the parole authority
19    adopted a rule precluding application until one-half the sentence was served.**

20    The Court held that, "'while the prisoner had no right to apply to release on parole at any time,
***he was entitled to apply*** and have his application duly considered on an individualized basis.'" Id. at
21    640-641.

22    (Does this sound familiar? Emphasis added to original citation.)

23    "With respect to persons sentenced to indeterminate terms, the purpose of punishment is
satisfied by the requirement of service of a minimum period before eligibility for parole and, when
24    suitable for parole, by determination of a release date **in a manner that will provide** UNIFORM
TERMS for offenses of similar gravity and magnitude with respect to their threat to the public."
25    (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4[th] 280, 291-292.)

26    The arbitrary or capricious misapplication of statutory law violates both state and federal due process.

27  Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165 Cal.App.3d

28  763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary action of

I- H

1  government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

2      These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860, 862;

3  ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14[th]

4  Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's

5  deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in

6  which he is confined."].)

7      In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner may

8  derive a due process liberty interest from administrative regulations, as well as state law and the U.S.

9  Constitution.

10  Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from on p. 484, fn. 5;

11  Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these standards here, the BPH

12  violated Petitioner's right to constitutional due process but he is not challenging the BPH's right to conduct

13  professional psychological assessments as the main focus of the parole evaluation process, but does challenge

14  their "normal" practice of summarily dismissing and patently ignoring their own experts.

15      Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons v.

16  Warden    (E.D. Cal. 2004) 358 F.Supp.2d 936 (9th Cir. Review pending, filed on 5-18-05, No. 05-15275),

17  discussed this conundrum and noted that the propensity analysis thusly:

18      "To a point, it is true, the circumstances of the crime and motivation for it may indicate a
       petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after 15
19      or so years in the cauldron of prison life, not exactly an ideal therapeutic environment to say the
       least, and after repeated demonstrations that despite recognized hardships of prison, [petitioner]
20      does not possess these attributes, the predictive ability of the circumstances of the crime is near
       zero." [2]

21

22

23  [2] "It is worth noting, as has our [Calif.] Supreme Court (People v. Murtishaw (1981) 29 Cal.3d 733, 768, disapproved on other grounds in People v. Boyd (1985) 38 Cal.3d 762,, that a large number of legal and scientific authorities believe that, even where the passage of time is
24  not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (See, e.g., Monahan, Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility, 57 Wash. & Lee L. Rev. 901 (2000); Otto, On the Ability of Mental Health Professionals to 'Predict Dangerousness,' 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., The Accuracy of Predictions of Violence to
25  Others, 269, Jour.Am.Med.Assn. 1007 (1993); Diamond, The Psychiatric Prediction of Dangerousness, 123 Pa.L.Rev. 439 (1974); Dershowitz, The Law of Dangerousness: Some Fictions About Predictions (1970) 23 J. Legal Ed. 24. According to a Task Force of the American Psychiatric Assn., "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness.
26  (Am.Psych.Assn., Task Force Rpt. 8, Clinical Aspect of the Violent Individual (1974) at p. 28.) As our [Calif.] Supreme Court has also noted, "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated BEYOND DISPUTE the no
27  less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take place ('false positives'", thus branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306, 327.) (all emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II,
28  supra, footnote #9.

1    (Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion of
2    "need for more therapy" used as a ruse to deny suitability at p. 948.)

3        P.C. § 3041(a) governs parole suitability determination processes and does not define more than one
4    class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an indeterminate term.
5    Through application, however, the agency's discrimination amongst the class serving indeterminate sentences is
6    in violation of the right to equal protection ensconced in the Fourteenth Amendment. Equal protection is "[in
7    essence] a direction that [a person] similarly situated should be treated alike." (City of Cleburne v. Cleburne
8    Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457 U.S. 202, 216, "To state a claim ... for
9    violation of the Equal Protection Clause of the 14th Amendment a plaintiff must show that the defendants acted
10   with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."
11   Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194, cert. denied 525 U.S. 1154 (1999).)

12       Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner
13   inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969) 394
14   U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being considered
15   when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at 1012; Martin I ,
16   supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing Coleman, supra,   with
17   approval slip op. at 9] If it is established that a particular judgment was predetermined, then a prisoner's due
18   process rights will have been violated even if there is 'some evidence' to support the decision. [See Bakalis v.
19   Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making "body that has prejudged the outcome cannot
20   render a decision that comports with due process. ... The California Supreme Court has explicitly stated that a
21   blanket no-parole policy as to a certain category of prisoners is illegal. [In re Minnis; In re Morrall] " ... Because
22   petitioner cannot change the past, denying [P]etitioner parole based only on the facts surrounding the crime itself
23   effectively changes his sentence ... into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf:
24   Martin II, supra, at 1144: "In sum, the Board appears to have capitulated to the blanket no-parole policy
25   described by this court in its previous [Martin I] Order, abandoning its role as an independent assessor of
26   petitioner's eligibility. This capitulation is particularly troubling in light of the Board' vigorous assertions of
27   independence during the 2003 hearing." This Honorable Court should grant the writ and Order all appropriate
     relief including a complete discharge from custody and sanction full redress for Petitioner.

28

1

## CONCLUSION

2      WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available

3  remedies leading to his immediate release from custody be Ordered at the earliest possible moment and

4  forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above

5  should there be consideration of the "no parole" policy and/or practice by this or previous administrations.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ℐ- K

7. Ground 2 or Ground _____ (if applicable)

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE
VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF
REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI-
TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a. Supporting facts:

Nowhere is there any codification that avers petitioners must
prove his or her suitability. Only if an inmate is found unsuitable
does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz
at 658, 683.) Evidence must be specific, articulable, and have "some
indicia of reliability." Respondents have the burden of proof to
demonstrate, in the Record, why an inmate is not suitable and a
denial of more than one year requires that the BPH panel state for
the Record why it isn't likely that petitioners would be found suit-
able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to
the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041
(a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior
examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature
intended that some inmates will be suitable at an initial hearing
otherwise why would such a gratuitous mandate exist? Govenor's-
level review presumes a neutral, well-defined, professional body
that will follow all the state and federal laws. Only this practice
(continued on attached pages)

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

II

Ground 2, continued:

would meet the constitutional burden under the discretionary methods needed to quickly resolve an uncertain matter.

The "some evidence" relied on to deny parole must be relevant and reliable in establishing Petitioner is a _current_, unreasonable threat to public safety and must not be grounded in an incomplete or unreasonable assessment of the relevant factors.

In explaining what the "some evidence" standard meant, the Court in In re Rosenkrantz (2002) 29 Cal.4th 616 at 677, stated that "[o]nly a modicum of evidence is required." On its face, this standard could thus be seen as remarkably broad--that a scintilla of evidence (or the BPH's assessment of it)--would be enough to completely immunize BPH decisions from judicial review. However, such a reading would effectively serve to nullify the Rosenkrantz court's holding rejecting the Executive's position that factual decisions rejecting parole were immune from examination by the courts and in point of fact were required.

A disection of the "some evidence" standard itself--both conceptually and through a review of the application of the Rosenkrantz' standard (and its progeny)--makes clear that this is the meaningful standard. Properly understood, it strikes an appropriate balance between judicial deference to difficult BPH decisions and the protection of constitutional liberty interests.

The "some evidence" standard of review is laid out here:

> "[W]e conclude that the judicial branch is authorized
> to review the factual basis of a decision of the [BPH]
> denying parole in order to ensure that the decison comports
> with the requirements of due process of law, but that
> in conducting such a review, the court may inquire only
> whether some evidence in the record before the [BPH] sup-
> ports the decision to deny parole, based upon the factors

specified by statute and regulation. Rosenkrantz, 658.
"[a]s long as the [BPH] decision reflects due consideration
of the specified factors as applied to the INDIVIDUAL
PRISONER in accordance with applicable legal standards,
the court's review is limited to ascertaining whether
there is some evidence in the record that supports the
[BPH] decision." Id. at 677. (emphasis added).

Thus, the inquiry into whether there is "some evidence" is more complex than it might otherwise seem, as the standard MUST be applied within the context of the statutory framework in which it arises. This framework imposes at least 3 requirements on the "some evidence" standard if it is used to deny parole.

First, the BPH must base their decisons only on evidence that serves to establish that the inmate will or will not pose a continuing, "unreasonable risk of danger to society if relesed from prison." CCR, title 15, §2402(a), and PC §3041(b).

Second, the evidentiary basis for parole decisions must be based on the factors specified in the regulations after individualized considerations of all of the factors. Rosenkrantz at 677 ("The precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [executive branch], but the decision must reflect an individualized consideration of the specified criteria and CANNOT BE ARBITRARY AND CAPRICIOUS."); see also In re Stanley (1976) 54 Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the prisoner's record of crime. We abstain from any argument over the relative primacy of various parole factors. It is enough to say that the Adult Authority must apply all the factors.") (citing In re Minnis (1972) 7 Cal.3d 639). These factors naturally all relate to whether the inmate poses a continuing, unreasonable risk of danger to society if released from prison. (emphasis added).

Third, the evidence upon which the BPH relies must be relevant and reliable. CCR §2402(b) ("All relevant, reliable information available to the panel shall be considered in determining suitability for parole.") (cf. CCR §§2402(d)(1-9).

In sum, a court examining parole decisions must determine whether, after all consideration of all the factors enumerated in the statute and regulations, the decison was based on: 1) some evidence; 2) a reasonabe consideration of all the factors specified by the statutory guidelines; 3) evidence that is both relevant and reliable; and 4) factual determinations that suggest an inmate poses a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

A review of the post-Rosenkrantz legal panorama reveals that California courts of appeals and federal courts have routinely applied the above boundaries and checkpoints of relevance, reliability and reasonableness to the "some evidence" standard. The California Supreme Court has so far utterly failed to establish a brightline Plimsoll mark to define the full depth of the inquiry.

The courts continue to assess the reasonableness of the BPH's interpretation of the facts and circumstances used to legally sustain a finding of parole suitability denial. The court in In re Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the BPH was reasonably able to conclude that there was some evidence of the inmate's need of continuing therapy and her dangerousnes to the public. Though it found in the affirmative, the court took a close look at whether the BPH "could reasonably conclude that [her] defense, that Manson's influence overwhelmed [her], was exagerated such that she is fully responsible for the LaBianca murders" and whether "[t]he BPH could infer with sufficient

1  reasonableness to satisfy a minimal 'some evidence' standard that
2  [she] is a danger to the public and in need of continued therapy
3  and programming." Her denial was affirmed with instructions.

4         Judicial inquiry into the stated reasons for parole denial
5  have their place and numerous state and federal courts--in a wide
6  range of contexts--have similarly held the judicial inquiry into
7  the reasonableness of BPH determinations and conclusions is
8  appropriate, even when such determinations and conclusions are
9  accorded broad deference. (See, e.g., In re Farley (2003) 109
10 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody
11 determination is limited to determining whether the classification
12 decision is arbitrary, capricious, irrational, or an abuse of the
13 discretion granted those given the responsibility for operating
14 prisons. While we must uphold respondent's classification action
15 if it is supported by "some evidence" and we must afford great
16 deference to an administrative agency's expertise, where the agency's
17 interpretation of the regulation is clearly arbitrary or capricious
18 or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT."

19      Federal courts likewise require parole decisions to be
20 reasonable. As an example, in a parole rescission case, a federal
21 court in this state held: "the Court of Appeals conclusory findings
22 that there was 'some evidence' to support the rescinding, the BPH's
23 decision that parole was improvidently granted to petitioner are
24 contrary to clearly established federal law and, to the extent they
25 are fact-based, represent unreasonable determinations of the facts
26 in light of the evidence presented in the state court preceedings."
27 Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at
28 43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

948 ("Clearly, a conclusion by lay BP[H] commissioners that petitioner has not yet acheived required therapy for insight OR OTHER REASONS is not reasonably sustainable, and a state court's conclusion to the contrary is patently unreasonable.")

The federal liberty interest is made an adjunct to the state requirements of due process by and through the 14th Amendment to the U.S. Constitution and the substantial evidence of the federal standard must be overcome to meet federal guarantees to its citizens who, before they became entitled to state civil rights, were first bestowed by operation of their federal citizenship. A state cannot lawfully deny any federal right to its citizens but that is exactly what respondents are demanding of their agents in the BPH, and will no doubt now ask this Honorable Court to signoff on. That must not be allowed if the judiciary is to be truly separated from the Executive charades disguised is a legitimate exercise in freedom.

The goal of indeterminate sentences and the parole system is not only to punish, but also to provide for reformation and rehabilitation as the CDC's renaming suggests:

> "The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to past life and habits of a particular offender. ... Retribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence."

People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discussion of this topic, the Supreme Court stated the following:

> "[T]he purpose of the indeterminate sentence law, like other modern laws in relation to the administration of criminal law, is to migitate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender.

1    They seek to make the punishment fit the criminal rather
2    than the crime. They endeavor to put before the prisoner
     great incentive to well-doing in order that his will
3    to do well should be strengthened and confirmed by the
     habit of well-doing. [...] [The] interests of society
4    require that under prison discipline every effort should
     be made to produce a reformation of the prisoner. ...
5    The legislative policy [was to provide a system whereby]
     a hope was to be held out to prisoners that through
6    good conduct in prison and a disposition shown toward
     reformation, they might be permitted a conditional liber-
7    ty upon restraint under which they might be restored
     again to society. ... Although good conduct while in-
8    carceratd and potential for reform are not the only
     relevant factors, this court has acknowledged their
9    significance. Furthermore, the Authority has declared
     that these factors are among those of 'paramount impor-
     tance. In re Minnis, 7 Cal.3d 644-45.
10

11       The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12   these principles: "[E]ven before factors relevant to parole de-

13   cisions had been set forth expressly by statute and regulations,

14   we concluded that '[a]ny official or board vested with discretion

15   is under an obligation to consider all relevant factors [], and

16   the [BPH] can't, consistently with its obligation, ignore post-

17   conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18   Minnis at 645; emphasis added for illumination).

19       Petitioner has a Constitutional liberty interest in parole

20   decisions and "[P]arole applicants in this state have an expectation

21   that they will be granted parole unless the BPH finds, in its

22   reviewable discretion, that they are unsuitable for parole in light

23   of the circumstances specified by statute and regulation."

24   Rosenkrantz at 654 and at 659-61 this liberty interest is an

25   expectation protected by due process of law. (holding that the

26   California Constitution Art. V, §8(b) and PC §3041 "give rise to

27   a protected liber'y interest" in that "a prisoner granted parole

28   by the BPH has an expectation that the Governor's decision to affirm

1  modify, or reverse the BPH's decision will be based upon the same
2  factors the BPH is required to consider," and that "this liberty
3  interest underlying a Governor's parole review decision is protected
4  by due process of law.").

5      Federal courts have also unequivocally held that California's
6  parole system gives rise to a liberty interest constitutionally
7  protected by due process. See: Allen, infra at 376-78; Greenholtz
8  v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12
9  (holding a state's statutory parole scheme that uses mandatory
10  language may create a presumption that parole release will be
11  granted upon certain circumstances or findings, thus giving rise
12  to a constitutionally protected liberty interest); McQuillen, supra
13  at 902-3 n.1 (holding that because parole scheme uses mandatory
14  language and is largely parallel to the schemes found in Allen
15  and Greenholtz do give rise to a protected libety intrest in RELEASE
16  ON PAROLE, "California's parole scheme gives rise to a cognizable
17  liberty interest in release on parole.") Biggs v. Terhune (9th
18  Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest
19  is created, not upon the grant of a parole date, but upon the
20  incarceration of the inmate."

21      Rosenkrantz specifically rejected any position that a court
22  may not properly examine the factual basis of parole decisions
23  at 667, "[W]e conclude that the courts properly can review a
24  Governor's decisions whether to affirm, modify, or reverse a parole
25  decision by the BPH to determine whether they comply with due
26  process of law, and that such review properly can include a determi-
27  nation of whether the factual basis of such a decision is supported
28  by some evidence in the record that was before the BPH.

1    Post-Rosenkrantz, courts have reaffirmed the concepts of broad
2  executive deference but vigilent judicial review, by engaging care-
3  ful analysis, will ensure that the boundaries of due process are
4  respected and upheld. "[t]he exceedingly deferential nature of
5  the "some evidence" standard of judicial review set forth in
6  Rosenkrantz does not convert a court reviewing the denial of parole
7  into a potted plant." In re Scott (119 Cal.App.4th 871, 898, re-
8  cently affirmed).

9    The Court, in In re Dannenberg (2005) 34 Cal.4th 1061 at 1095
10  n.16 reaffirmed that effective judicial review is critical to due
11  process. Rejecting the dissent's suggestion that the opinion "per-
12  mits untethered pro forma parole denials that are insulated from
13  effective judicial review, thus contravening California life in-
14  mates' due process rights to individualized parole consideration,"
15  the majority made clear that the [BPH] must apply detailed standards
16  in evaluating individual inmates' suitability for parole on public
17  safety grounds, and that the Executive's broad discretion is subject
18  to meaningful judicial oversight.

19    There is no question that the discretion afforded to the BPH
20  with respect to parole decisions is great. However, the parole
21  system's very purpose is to provide for the reentry into society
22  of inmates who no longer pose a danger or unreasonable threat to
23  public safety, and those rights afforded thereunder are
24  constitutionally protected.

25    The BPH must abide by due process considerations, and the
26  courts are entrusted with ensuring that such considerations are
27  adequately respected and thus protected. Neither Rosenkrantz or
28  Dannenberg permits respondents to immunize themselves from re-

1   view by unreaonable and possibly unlawful assertion that certain
2   facts support a denial of parole. On the contrary, <u>Rosenkrantz</u>
3   and <u>Dannenberg</u> make clear that the courts have a vital and therefore
4   important role to play in ensuring that parole decisions are
5   actually supported by "some evidence" having a basis in fact, and
6   an indicia of reliability supported in the record.

7       Petitioner submits that there is a real danger that, improperly
8   understood, the guidelines articulated in <u>Rosenkrantz</u>, <u>Dannenberg</u>,
9   and the court of appeals will serve to provide respondents with
10  de facto immunity from judicial review, a result anathema to state
11  and federal due process protections. Properly understood, the "some
12  evidence" standard provides a fair and proper framework for review
13  of parole decisions in any venue, one that provides respondents
14  with an appropriate level of deference in making extremely difficult
15  decisions relating to inmates' liberty interests and public safety
16  concerns, while ensuring that statutory and constitutional liberty
17  interests are being adequately and lawfully safeguarded through
18  judicial review. And, when this standard is properly applied to
19  this case, there should be no doubt but that the BPH's denial of
20  suitability seems unsustainable and must be reversed, a new hearing
21  granted, and an Order with instructions issued.

22      WHEREFORE, Petitioner prays that the writ be granted in full
23  and all available relief be accorded to Petitioner to comply with
24  and comport to the state and federal Constitutions and the legal
25  adversarial process and resolution of a judicious nature in this
26  most important matter herein. Petitioner hereby incorporates by
27  reference, as though fully set forth, all papers, pleadings,
28  transcripts, exhibits and matters of record in the instant matter.

7  Ground 2 or Ground  _3_  (if applicable):

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE

TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY

LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING

UNDER STATUTORY CRITERIA AND RESPONDENTS'BURDEN IS NOT MET HEREIN

a. Supporting facts:
        This petition is intended to give legitimate meaning to petition-

er's fifteen (15) years-to-Life sentence by seeking an Order in this

Court granting the writ to discharge petitioner from state prison,

or alternatively, compelling the BPH to conduct a new parole

consideration hearing and correctly weight their statutory findings

to view suitability and consequent release to parole for Petitioner.

        The issues raised are of constitutional dimension, comporting

to petitioner's federal constitutional rights, and questioning the

legality of petitioner's continued confinement in the face of over-

whelming evidence of legally-sustainable proof of suitability and

unquestioned state-hired professionals and their proffered opinions

of reasonable assurance in adhering to concerns of public safety.

        There is NO evidence having indicia of reliability that this

petitioner poses an unreasonable risk of danger to the public and

P.C. §3041(a) and California Code of Regulations (CCR), Title 15,

Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria)

all make it clear that there IS A MANDATE, based on a legally-

sufficient standard, and that standard is subject to judicial review

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

**(continued from previous page)**:

for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a review of the "evidence" of unsuitability that is burdened upon respondents.

The California Supreme Court recognizes that prisoners have procedural due process protections in connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in its broad discretion, deny parole suitability.

This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV: "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and regulation**." Rosenkrantz IV, supra, 29 Cal.4th at p. 654. And, [O]ur past decisions make clear that the *requirement* of procedural due process embodied in [Art. I,  § 7, subd. (a)], places some limitations upon the broad discretionary authority of the BP[H]." Id. at p. 655.

Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either state or federal law, diminish nor extinguish the expectancy of release to parole and in no ways Petitioner's due process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and protected by, the Fourteenth Amendment's Due Process Clause.

Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights to Petitioners. Further, these regulations AS ORIGINALLY WRITTEN, made it even clearer that parole was to normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there had been an honest attempt to do so.

For respondents to abrogate this federal liberty interest they must provide substantial relevant, reliable evidence having some indicia of credibility that Petitioner poses a CURRENT *unreasonable* threat to the public safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3rd 931, where the court cautioned:

III A

1

2

3

4

5

6

"The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison. In re Scott (2005) 133 Cal.App.4[th] 573, 595, (however, In re Lowe (2005) 130 Cal.App.4[th] 1405 suggested "some evidence" applies to the factors, not dangerousness.) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the [inmate's] release unreasonably endangers public safety." Lee, supra, pp. 936-37.

¶The board and governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real world crime and law and order, has no obvious intersection with incorporeal realm of legal constructs." Id. at p. 940.

7    This is something they have patently failed to do, as testified by virtually all of their own witnesses as

8    noted in attached Exhibit "B", which has been previously generated BY RESPONDENTS and provided to all

9    concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being

10   accurate and meaningful to ascertain PRESENT DANGEROUSNESS.    .

11   "Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an

12   individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz IV at pp. 653-

13   54. "Such information shall include circumstances of the prisoner's social history; past and present mental state;

14   past criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the

15   crime; any conditions of treatment or control ...; and any other information that bears on the prisoner's suitability

16   for release." (Emphasis added.)

17   This extensive list of factors, including other relevant reliable information that must be considered, makes

18   it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This

19   is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is

20   exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate

21   their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that,

22   'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to

23   parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The

24   evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of

25   Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

26   The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of the

27   one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances—

28   was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

1 Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v.
2 E.P.A. (2003) 344 F.3d 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious
3 fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to
4 consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the
5 evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of
6 agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229,
7 1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless ... unless we carefully
8 review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors
9 ...[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act,
10 they must not rubber-stamp ... administrative decisions that they deem inconsistent with a or that frustrate the
11 congressional policy underlying a statute.")

12 Second degree murder is not a crime automatically allows one to be deemed unsuitable for release and
13 parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona
14 Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons,
15 Coleman, et al., there must be a base set of factors upon which a second degree murderer would have to be
16 paroled or the BPH would risk violating due process. To determine what would qualify as more than the minimum
17 necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of
18 second-degree murder.

19 The Sixth District Court of Appeals has explained that "[s]econd degree murder requires ... malice—i.e.,
20 the perpetrator must kill another person with the specific intent to do so; or he or she must cause another
21 person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for
22 life." In re smith (2003) 114 Cal.App.4th 343, 366, citing P.C. §§ 187-189; and CALJIC No. 811. (Noting "all
23 second degree murders by definition involve some callousness, i.e., lack of emotion or sympathy, emotional
24 insensitivity, indifference to the feelings and suffering of others" and that the facts of the instant crime were
25 callous, but not exceptionally callous.) Id. at pp. 366-7.

26 From this instructive dialog, the limits on the "minimum necessary to sustain a conviction" of second
27 degree murder can be defined. There must be: 1) a killing of another, 2) malice, 3) no premedi-tation or
28 deliberation, planning, lying in wait, torture, etc., as would be present in a first degree murder, a crime that

1   Petitioner was specifically acquitted by a jury of his peers.

2   Now that the crime is defined, the question must be what evidence indicates that any particular second
3   degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence
4   indicates the commitment offense was "*especially* heinous" or "*exceptionally* grave", given that there typically
5   must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant
6   to have had his second degree murder conviction sustained by the appellate courts in the first place and where
7   Petitioner WAS NOT the killer?

8   There was no weapon enhancement that could reasonably demonstrate that this crime was "beyond the
9   minimal elements" of a second-degree murder conviction, and is in no way some evidence establishing that he is
10  *currently* an unreasonable threat to public safety. Petitioner was not the shooter and lacked the requisite intent to
11  charge an enhancement. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence in every
12  case, every second degree murder would be "beyond the minimal elements" and there would be no way to
13  commit a second degree murder in California that did not qualify as an "especially" heinous crime and thereby
14  justify imprisonment for life, without any chance of parole. This is not what the Legislature wrote the
15  enhancement statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds
16  the bounds of common sense in every conceivable manner.

17  Having doubts as to these elements, the People accepted a plea to agreement to second degree
18  murder and there has never been any contention that the admission should have been otherwise. The unique
19  elements present here were duly recounted: (by **PRESIDING COMMISSIONER ENG**): "I have another question
20  for you. When you look back, okay, in all honesty, today when you look back, do you, would you say that you
21  had a serious drinking problem or a drug problem? **INMATE VASQUEZ**: I know I had a problem. How serious it
22  was, (sic) I know I had a problem with drinking and using drugs. **PRESIDING COMMISSIONER ENG**: Why do
23  you say you had a problem? How do you define that problem? **INMATE VASQUEZ**: Because I would like,
24  because I had a cycle when, you know, on the weekends I would drink and to me, a normal person doesn't, I
25  could have used that money for something better instead of wasting it on drugs or alcohol. An everyday person
26  doesn't do that. And to me, comparing myself to an everyday person, I knew I had a problem. **PRESIDING**
27  **COMMISSIONER ENG**: Were you drinking a lot, like on a daily basis or weekly where - -(sic) **INMATE**
28  **VASQUEZ**: I don't know, for a while there I was drinking on a daily basis. And then I cut back and it was like a

1    weekly basis. **PRESIDING COMMISSIONER ENG**: Okay would you drink to excess where you would always get

2    drunk or - - **INMATE VASQUEZ**: There was a couple times that I woke up the next morning and I didn't

3    remember nothing. (sic) **PRESIDING COMMISSIONER ENG**: And do you feel that you knew what an alcohol

4    and drug problem looked like? **INMATE VASQUEZ**: At the time I didn't. **PRESIDING COMMISSIONER ENG**: <u>But</u>

5    <u>how did you see your mother and father?</u> **INMATE VASQUEZ**: ...it was sad. When I first discovered they were

6    using drugs, I was going through my dad's closet looking for Christmas presents. And when I went through the

7    closet a bag of stuff falls out. And I go inside the bag. And that's when I found out their drug paraphernalia. And

8    that's when I knew they had a problem. **PRESIDING COMMISSIONER ENG**: Did you notice anything different

9    about their behavior around when you and your sisters were home? **INMATE VASQUEZ**: <u>In the beginning</u>, *my*

10   *mom would always pass out. **She would OD**.* And he would always have to take my mom to the restroom and

11   bring her back. And then after a while when my dad, when he used to get, when he wasn't using drugs, he had a

12   real nasty attitude. **PRESIDING COMMISSIONER ENG**: So your mother, were they both doing drugs more than

13   drinking? Did they drink to get drunk often, too or no? (sic)  **INMATE VASQUEZ**: I remember them just like

14   drinking like, I don't remember them drinking all the time like for parties, you know. Drugs, I could say was a daily

15   basis. **PRESIDING COMMISSIONER ENG**: Right. " (Exhibit "A", pages 63-64, emphasis added.)

16         <u>Rosenkrantz VI</u> 444 F.Supp.2d 1036 noted such a nexus insofar as age, maturity, situational factors and

17   rage are concerned by stating:

18         "The reliability of the facts of his crime as a predictor for his dangerousness is further diminished
          by petitioner's age at the time of the offense. Petitioner turned 18 [**prior to the crime**], and
19        committed his offense one month later. While *petitioner* was not legally a minor, he was very
          close to being one. [FN17]   As the [U.S.] Supreme Court recently recognized, the
20        evidentiary/predictive value of the conduct of such a young person is diminished. The
          susceptibility of juveniles to immature and irresponsible behavior means '"**their irresponsible**
21        **conduct is not as morally reprehensible as that of an adult**."' <u>Thompson v. Oklahoma</u> (1988)
          487 u.s. 815, 835 (plurality opinion). Their own vulnerability and comparative lack of control over
22        their immediate surroundings mean *juveniles have a greater claim than adults to be forgiven*
          *for failing to escape negative influences in their WHOLE ENVIRONMENT*. (Emphasis
23        added.)

24         This rendition illustrates further, the importance (given the short tenure of the suggestion that "some

25   evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all

26   courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole

27   suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or

28   not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one

1   should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT,

2   UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the

3   community.

4   Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being

5   arbitrary but is almost always counter-instructive. In the parole determination process, the panel is tasked with

6   assuring the Executive branch by determining if the prisoner is a CURRENT threat to the public safety. This

7   determination is, in total, the only decision that the BPH is sanctioned to make by the Penal Code and

8   Regulations codified for that purpose. All interpretations of mitigating and aggravating factors, and the weight

9   given to the special circumstances of the offense, merely go to instruct this final conclusion. "A determination of

10  unsuitability I simply shorthand for a finding that a prisoner CURRENTLY would pose an unreasonable risk of

11  danger if released at this time." Smith, supra, at p. 370, (citing C.C.R. § 2402(d), emphasis added.)

12

13  WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this

14  Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the

15  alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete

16  suitability consideration without bias or political, personal, or tenurial considerations, and in accordance with the

17  statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect

18  Petitioner's civil rights.

19  ///

20  ///

21  ///

22

23

24

25

26

27

28

U.S. District Court
Northern District Clerk
450 Golden Gate Ave.
San Francisco, CA 94102
***CONFIDENTIAL LEGAL MAIL***

Adam A. Vasquez
CDC # H-1078/F-224-Low
P.O. Box 689
Soledad, CA 93960
***CONFIDENTIAL LEGAL MAIL***

*Confidential
Legal Mail*